E. P. Keiffer
State Bar No. 11181700
HANCE SCARBOROUGH WRIGHT
GINSBERG & BRUSILOW, LLP
The Elm Place Building
1401 Elm Street, Suite 4750
Dallas, TX 75202
Phone: (214) 651-6500
Fax:    (214) 744-2615
E Mail: pkeiffer@hswgb.com

ATTORNEY FOR DON B CARMICHAEL

Michael Flume
State Bar No. 07188480
FLUME LAW FIRM, LLP
1020 N. E. Loop 410, Suite 200
San Antonio, Texas 78209
Phone:  (210) 828-5641
Fax:    (210) 821-6069
E mail: mflume@flumelaw.net

ATTORNEY FOR OSCAR S. WYATT, JR.

James H. Hansen
State Bar No. 08929730
PAGE, MURPHREE, BYERLY & HANSEN P.L.L.C.
Two Riverway, Suite 1700
Houston, Texas 77056
Phone:  (713) 877-8200
Fax:    (713) 877-8202
E-mail: jhansen@pmbhlaw.com

ATTORNEY FOR S&G ASSOCIATES AND DEBENTURE HOLDERS' AGENT

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **TERAFORCE TECHNOLOGY** | § | **CASE NO. 05-38756-BJH-11** |
| **CORPORATION**, *et al.* | § | **(Jointly Administered)** |
| | § | |
| **Debtors.** | § | |

## THE COMPETING PROPONENTS'
## JOINT CONSOLIDATED PLAN OF REORGANIZATION

Don B Carmichael, O. S. Wyatt, Jr. and S & G Associates on its own behalf and as agent under 12% Convertible Subordinated Notes (hereinafter collectively the "Competing Proponents')

file this their Joint Consolidated Plan of Reorganization (hereinafter the "Plan") for the Debtors' Teraforce Technology Corporation and DNA Computing Solutions, Inc.

# ARTICLE I

## DEFINITIONS

Capitalized terms used in this Plan, unless otherwise defined herein, shall have the meanings or rules of construction assigned to each under the Bankruptcy Code. In construing the defined term or terms used in the Plan, (i) the singular shall include the plural and the plural shall include the singular, (ii) the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive, and (iii) reference to any gender shall include any other gender as appropriate. Unless the context otherwise requires, the following terms used herein shall have the following meanings:

**1.1** **Administrative Expense Claim** shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code, except as to: a) any Administrative Expense which is incurred in the ordinary course of the operation of a Debtor's business, which is not required to be "allowed"; and b) as to the Allowed Administrative Expense Claim of GEF, which is otherwise described in the Plan.

**1.2** **Administrative Tax Claim** shall mean an Administrative Claim held by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period which is incurred on or after the Petition Date, up through the Confirmation Date.

**1.3** **Allowed Claim** shall mean any Claim in the amount and in the priority classification set forth in any proof of such Claim that has been timely filed in this case, or in the absence of such proof, as set forth in a Debtor's Schedule of Liabilities, as amended, filed in the Case, unless such Claim has been listed in such Schedule as disputed, contingent, or unliquidated, in which case such Claim shall be allowed only if a proof of such Claim has been timely filed; (ii) such Claim has been objected to or is objected to after entry of the Confirmation Order, in which case such Claim shall be allowed only in such amount and such classification as is authorized by a Final Order of the Bankruptcy Court; or (iii) such Claim has been paid in full, withdrawn or otherwise deemed satisfied in full. An Allowed Claim shall not include un-matured interest accruing after the Petition Date unless otherwise stated in the Plan.

**1.4** **Alameda** shall mean Alameda Corporation, a Texas corporation whose sole shareholder and president is Truman Arnold, but who shares are subject to a claim of beneficial ownership by O. S. Wyatt, Jr. Alameda will be funding the Plan Closing Loan and tendering the Plan Closing Loan Proceeds ten (10) days prior to the Plan Closing Date.

**1.5** **Alameda Funding Commitment** shall mean Alameda's written commitment to fund the Competing Plan with the Plan Closing Loan. The particulars of the Alameda Funding Commitment are set forth in Plan Exhibit 1.5.

**1.6** **Allowed General Unsecured Claim** shall mean an Allowed Claim which is not entitled to priority under Section 507(a) of the Bankruptcy Code, or as to which the claimant does not have a validly perfected enforceable lien or security interest as defined in Sections 101(37), (50) and (51) of the Bankruptcy Code, or an Allowed Claim arising from the rejection of an unexpired lease or executory contract.

**1.7** **Allowed Interests** shall mean the equity interests of all of the holders of any Equity Security of a Debtor prior to the Confirmation Date.

**1.8** **Allowed Secured Claim** shall mean an Allowed Claim which is secured by an interest in property of a Debtor's Estate, to the extent of the value of such property.

**1.9** **Allowed Unsecured Priority Claim** shall mean an Allowed Claim of a creditor which is unsecured and which is entitled to priority under Sections 507(a)(3) - (a)(8) of the Bankruptcy Code.

**1.10** **APA** shall mean that certain Asset Purchase Agreement dated August 1, 2005 by and between the Debtors and GEF and approved by order of the Bankruptcy Court on September __ 2005.

**1.11** **Avoidance Actions** shall mean any and all rights, claims or actions which either or both of the Debtors may assert on behalf of the Estates under chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 544, 545, 546, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code, except to the extent that any such rights, claims, or actions are released or waived in this Plan.

**1.12** **Ballot** shall mean the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject this Plan.

**1.13** **Bankruptcy Cases** shall mean the bankruptcy cases initiated by TeraForce Technology Corporation and DNA Computing Solutions, Inc. in the Bankruptcy Court on the Petition Date, respectively numbered as Case Nos. 05-38756-BJH and 05-38757-BJH, and jointly administered under Case No. 05-38756-BJH.

**1.14** **Bankruptcy Code** shall mean 11 U.S.C. §§ 101, et. seq., in effect as of the Petition Date and as may have been or may be amended or supplemented since, to the extent that any such amendment or supplement is automatically applicable to the Bankruptcy Cases by operation of law and not by operation of any election or choice.

**1.15** **Bankruptcy Court** shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

**1.16** **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure, together with the local bankruptcy rules for the Bankruptcy Court.

**1.17** **Bar Date** shall mean October 21, 2005, the date set by the Bankruptcy Court as the deadline for filing proofs of claim.

**1.18** **Bean Group** shall mean the group of individuals consisting of Richard E. Bean, as agent for himself, Robert E. Garrison, II, Steven A. Webster, James R. Hawkins, Peter W. Badger, John H. Styles, and Donald R. Campbell. The allocation of any rights or obligations of the Bean Group under this Plan as between the individual members of the Bean Group shall be governed for all purposes by that certain Agreement by, between, and among the members of the Bean Group.

**1.19** **Bean Group Secured Claim** shall mean $2,789,993.19 as of the Petition Date, plus non default interest on $2,750,0000 at Wall Street Journal Prime plus .50% and attorneys fees as may be determined by the Bankruptcy Court to be appropriate after the application of 11 U.S.C. §§ 503 and 506.

**1.20** **Business Day** shall mean any day which is not a Saturday, a Sunday, or a legal holiday within the meaning of Bankruptcy Rule 9006(a).

**1.21** **Carmichael** shall mean Don B Carmichael.

**1.22** **Carmichael Claim** shall mean any Claim held or assertable by Carmichael against one or more of the Debtors, their Estates, or their property as to his note in the original principal amount of $500,000.

**1.23** **Carmichael Plan Commitment** shall mean Carmichael's written commitment to fund his pro rata portion of the New Equity Pool (Capital) both its initial and subsequent requirements. The particulars of the Carmichael Funding Commitment are set forth in Plan Exhibit 1.26.

**1.24** **Claim** shall mean a claim against any one or both of the Debtors, the Estates, and/or property of the Debtors or the Estates, as such term is defined in section 101(5) of the Bankruptcy Code, arising prior to the Effective Date.

**1.25** **Claimant** shall mean the holder of any Claim entitled to distributions with respect to such Claim.

**1.26     Claims Objection Bar Date** shall mean the date by which the Consolidated Debtor may file any objection to a Claim, which date shall be no later than twenty (20) days after the Effective Date, except with respect to Administrative Claims as otherwise provided for herein.

**1.27     Class** shall mean one of the categories of Claims or Equity Interests established under Article II of this Plan.

**1.28     Committee** shall mean the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases pursuant to section 1102 of the Bankruptcy Code.

**1.29     Confirmation Date** shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**1.30     Confirmation Hearing** shall mean the hearing(s) before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing(s) may be continued, rescheduled or delayed.

**1.31     Confirmation Order** shall mean the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended.

**1.32     Consolidated Debtor** shall mean TeraForce Technology Corporation after the Effective Date.

**1.33     Consolidated Estate** shall mean the single substantively consolidated estate resulting from the substantive consolidation of the Estates and of the Debtors as provided for in this Plan.

**1.34     Contractually Subordinated Debt** shall mean the 12% Convertible Subordinated Notes due June 30, 2005 issued by TeraForce Technology Corporation to certain individual holders.

**1.35     Cure Claim** shall refer to the payment or other performance required to cure any existing default under an Executory Contract.

**1.36     Debtors** shall mean, collectively: (i) TeraForce Technology Corporation; and (ii) DNA Computing Solutions, Inc.

**1.37     Disallowed Claim** shall mean a Claim or portion thereof that (i) has been disallowed by a Final Order; or (ii) is identified in the Schedules in an amount of zero dollars or as contingent, unliquidated, or disputed and as to which a proof of Claim was not filed by the Bar Date.

**1.38     Disputed Claim** shall mean any Claim or any portion thereof which has not become Allowed and which is not yet a Disallowed Claim. In the event that any part of a Claim is a Disputed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan unless the party responsible for the payment thereof, the objecting party,

and the holder thereof agree otherwise or the Competing Plan specifically provides otherwise; provided, however, that nothing in this definition of Disputed Claim is intended to or does impair the rights of any holder of a Disputed Claim to pursue its rights under section 502(c) of the Bankruptcy Code. Without limiting any of the foregoing, but subject to the provisions of this Plan, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, subordinate, or estimate such Claim shall be deemed to constitute a Disputed Claim unless and until the entry of a Final Order providing otherwise. Any claim which is objected to by the Claims Objection Bar Date shall be a Disputed Claim.

  **1.39**  <u>**DNA**</u> shall mean DNA Computing Solutions, Inc.

  **1.40**  <u>**Effective Date**</u> shall mean the first Business Day eleven (11) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least eleven (11) days after the Confirmation Date.

  **1.41**  <u>**Equity Security**</u> shall mean any ownership interest or share in TeraForce (including, without limitation, all options, conversion rights, warrants or other rights to obtain such an interest or share in TeraForce) whether or not transferable, preferred, common, voting, or denominated stock or a similar security, as well as any similar ownership interest or share in DNA.

  **1.42**  <u>**Estates**</u> shall mean, collectively, the estates created for the Debtors pursuant to section 541 of the Bankruptcy Code.

  **1.43**  <u>**Event of Default**</u> shall mean the failure or neglect of the Consolidated Debtor to perform, keep, or observe any term, covenant, or condition of the Plan, but only if the Event of Default is not cured prior to the expiration of the applicable cure period.

  **1.44**  <u>**Executory Contract**</u> shall mean, collectively, executory contracts and unexpired leases of the Debtors as of the Petition Date as such terms are used within section 365 of the Bankruptcy Code, and specifically excludes any of the GEF Sale Documents.

  **1.45**  <u>**Existing Liquid Assets Base**</u> shall mean that portion of the proceeds of the GEF Sale which are not set aside in separate accounts for specific purpose for the GFE Sale and have not been consumed by the Debtors pre confirmation and as well as any other cash on hand on the Plan Closing Date.

  **1.46**  <u>**Final Decree**</u> shall mean the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

  **1.47**  <u>**Final Order**</u> shall mean a judgment or order by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which has not been reversed, stayed, modified, or amended and as to which (i) the time to appeal or petition

for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (ii) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

      **1.48**    <u>**GEF**</u> shall mean GE Fanuc Imbedded Systems, Inc.

      **1.49**    <u>**GEF Sale**</u> shall mean the sales, transfers, and assignments to GEF effectuated under the GEF Sale Order.

      **1.50**    <u>**GEF Sale Documents**</u> shall mean: (i) the APA; (ii) all agreements and contracts incorporated into the APA, including the Indemnity Escrow Agreement; (iii) the Transitional Services Agreement by and between the Debtors and GEF dated September 7, 2005; and (iv) the Sublease by and between Teraforce and GEF dated November 18, 2005.

      **1.51**    <u>**GEF Sale Order**</u> shall mean that certain Agreed Order Pursuant to Sections 105(a), and 363 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Debtors' Sale to GE Fanuc Embedded Systems, Inc. of Substantially All Assets of DNA Computing Solutions, Inc., Free and Clear of Liens, Claims, Interests, and Encumbrances and (ii) Approving an Asset Purchase Agreement, as entered by the Bankruptcy Court.

      **1.52**    <u>**Governmental Unit**</u> shall mean a governmental unit as such term is defined in section 101(27) of the Bankruptcy Code.

      **1.53**    <u>**Insider**</u> shall mean Persons described in section 101(31) of the Bankruptcy Code.

      **1.54**    <u>**Indemnity Escrow Account**</u> shall mean the indemnity escrow account created under the Indemnity Escrow Agreement.

      **1.55**    <u>**Indemnity Escrow Agreement**</u> shall mean that certain Indemnity Escrow Agreement executed by and between GEF, the Debtors, and Wilmington Trust Bank, as the escrow agent.

      **1.56**    <u>**Intercompany Claim**</u> shall mean any Claim held by one of the Debtors against the other Debtor, or by one of the Estates against the other Estate.

      **1.57**    <u>**Inter-Creditor Agreement**</u> shall mean that certain Intercreditor Agreement by and between Don B Carmichael and certain members of the Bean Group.

      **1.58**    <u>**KERP Claim**</u> shall mean a claim arising under the KERP Order in favor of the Key Employees as defined in the KERP Order.

**1.59** **KERP Order** shall mean the Bankruptcy Court's Agreed Final Order Granting Emergency Motion for Approval of Key Employee Retention Plan.

**1.60** **New Equity** shall mean the sum of the sole class of Equity Security in the Consolidated Debtor which are made available in all of the New Equity Pools hereinafter defined. The total number of authorized shares of New Equity shall equal 1,000,000 shares with a par value of .01/share. The total number of shares to be issued will be determined by the operation of the formulas and the amount of Allowed General Unsecured Claims which elects Option A under the Plan.

**1.61** **New Equity Pool (Capital)** shall mean no more than forty percent (40%) of the New Equity to be issued pursuant to the Plan, to holders of qualified Allowed General Unsecured Claims in exchange for the per share price derived by the application of the New Equity Pool (Capital) Formula.

**1.62** **New Equity Pool (Capital) Formula** shall mean the formula which will determine the amount which qualified electing holders of Allowed General Unsecured Claims must tender per share to acquire New Equity from the New Equity Pool (Capital). This formula has two phases. The initial phase requires that the total amount of value which can be exchanged for a share of New Equity Pool (Capital) can not exceed 90.476% of the value of the cumulative final value of the New Equity Pool (GUC). If the New Equity Pool (Sub Debt) is activated and funded per the requirements of the Plan, then this pool can not have a cumulative value which exceeds 76.191% of the final value of the New Equity Pool (GUC). With these stated restrictions on value contributions, the initial amount of value per share shall equal either 76.191% or 90.476% of the total value of the New Equity Pool (GUC) divided by the number of shares necessary for this pool to not equal more than 40% of the New Equity issued under the Plan. By way of example, if the per share price utilizing the baseline valuation for shares in the New Equity Pool (GUC) is $.125 per share and only the Carmichael Claim and the Wyatt Claim trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity Pool (GUC) of $554,620. The value of the New Equity Pool (Capital) can not exceed $554,620 times 76.191% or $422,568 assuming New Equity Pool (Sub Debt) is fully subscribed or $554,620 times 90.476% or $501,799 assuming New Equity Pool (Sub Debt) does not subscribe. Once the value of the New Equity Pool (GUC) is finalized, then the amount of value required will be adjusted and the electing holders billed for the difference.

**1.63** **New Equity Pool (Sub Debt)** shall mean no more than seven and one half percent (7.5%) of the New Equity to be issued pursuant to the Plan, to holders of qualified Allowed Subordinated Debt Claims in exchange for the per share price derived by the application of the New Equity Pool (Sub Debt) Formula.

**1.64** **New Equity Pool (Sub Debt) Formula** shall mean the formula which will determine the amount which qualified electing holders of Subordinated Debt or if applicable qualified electing holders of Allowed General Unsecured Claims who elect Option C and perform per its requirements, must tender per share to acquire New Equity from the New Equity Pool (Sub Debt). This formula

has two phases. The initial phase requires that the total amount of value which can be exchanged for a share of New Equity Pool (Sub Debt) can not exceed 14.286% of the value of the cumulative final value of the New Equity Pool (GUC). With this stated restriction on value contributions, the initial amount of value per share shall equal 14.286% of the total value of the New Equity Pool (GUC) divided by the number of shares necessary for this pool to not equal more than 7.5% of the New Equity issued under the Plan. By way of example, if the per share price utilizing the baseline valuation for shares in the New Equity Pool (GUC) is $.125 per share and only the Carmichael Claim and the Wyatt Claim trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity Pool (GUC) of $554,620. The value of the New Equity Pool (Sub Debt) can not exceed $554,620 times 14.286% or $79,231 assuming New Equity Pool (Sub Debt) is fully subscribed. Once the value of the New Equity Pool (GUC) is finalized, then the amount of value required will be adjusted and the electing holders billed for the difference.

      **1.65**   **New Equity Pool (GUC)** shall equal at least fifty two and one half percent (52.5%) of the New Equity to be issued . The shares in this pool will be divided up amongst those holders of Allowed General Unsecured Claims who elect to take Option A as set forth in Section 3.0_ of the Plan, based upon the amount by which each electing claim is as a percentage to the total amount of electing claims. A share of New Equity will have as their baseline value $.125 per dollar of claim traded for stock based upon the assumption that only the Carmichael Claim and the Wyatt Claim will trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity issued for Allowed General Unsecured Claims of $554,620. If additional Allowed General Unsecured Claims tender their debt for New Equity, the same baseline value of $.125 per dollar will apply, but the size of this pool shall increase. The final value per dollar of claim traded for stock will not be known until all Disputed Claims which are General Unsecured Claims are resolved. If any Disputed Claim is resolved in a manner which causes a reduction in the amount up to the elimination of the Disputed Claim, then the per share value of each share of New Equity issued as a part of the New Equity Pool (GUC) shall equal the same percentage per dollar of claim which the holders of Allowed General Unsecured Claims who elect to take Option B receive under the Plan (i.e. if the dividend to Allowed General Unsecured Claims who took Option B increased from 12.5% to 15%, then each share issued from this pool shall have a value equal to $.15 per dollar of claim traded for stock. Many other end results exist).

      **1.66**   **New Equity Pool (Proceeds)** shall mean the sum of the funds raised by the New Equity Pool (Capital) per the New Equity Pool (Capital) formula and the New Equity Pool (Sub Debt) Formula and will ultimately include any adjusted increase per those terms and Plan treatment requirements.

      **1.67**   **Plan** shall mean this Competing Proponents Joint Consolidated Plan of Reorganization, either in its present form or as it may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

      **1.68**   **Plan Closing Date** shall occur as soon as reasonably possible after the Effective Date, but in no event more than 20 days after the Effective Date.

**1.69     Plan Closing Loan** shall mean a loan of $3,000,000.00 from Alameda to the Consolidated Debtor for the purpose of helping to meet Plan Closing Date obligations, as well as post confirmation operations of the Consolidated Debtor.  The Post Closing Loan shall be a secured loan, on all collateral which is capable of being collateral for a commercial loan.  The Post Closing Loan shall be for a term of ___ years, shall be interest only for ____ months, and then be paid on a five (5) year term with a ten (10) year amortization.  The interest rate shall be prime plus 1% floating with adjustments semi-annually.  Other financial terms as well as a promissory note and applicable secure documentation as to securing the note shall be executed and steps taken to perfect same, on or shortly after the Plan Closing Date.

**1.70     Plan Distribution Date** shall mean forty five (45) days after the Plan Closing Date, unless the Plan specifically provides for a different date or process.  The Plan Distribution Date as to those classes who will have their distributions made by the Creditors Distribution Trust may be extended if the Creditors Distribution Trust files a notice of extension with the Bankruptcy Court requesting an extension for up to an additional 21 days.

**1.71     Person** shall mean and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

**1.72     Petition Date** shall mean August 3, 2005.

**1.73     Priority Claim** shall mean a Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code, excluding any Claim that is an Administrative Claim.

**1.74     Record Date** shall mean, for purposes of voting, the date on which the Bankruptcy Court enters an order approving the Disclosure Statement.

**1.75     Rejection Claim** shall mean a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

**1.76     Reliance Claim** shall mean any claim held by the Debtors or the Estates against United Pacific Insurance Company and/or Reliance Insurance Company, as to the Debtors' interest in a policy of insurances related to directors and officers liability, including in the insolvency proceedings pending with respect to Reliance Insurance Company in the Commonwealth Court of the State of Pennsylvania under Case No. 269 M.D. 2001, and including, specifically, Proof of Claim No. 2025614 and Reliance Claim No. 99245456 therein.

**1.77     Schedules** shall mean the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy

Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

       1.78    **Secured Claim** shall mean a Claim that is alleged to be secured, in whole or in part, (i) by a lien against an asset of the Debtors or the Estates to the extent such lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance or subordination under the Bankruptcy Code or other applicable non-bankruptcy law, but only to the extent that such Claim is secured within the meaning of section 506(a) of the Bankruptcy Code; or (ii) as a result of rights of setoff under section 553 of the Bankruptcy Code.

       1.79    **Subordinated Claim** shall mean a Claim that is subordinated pursuant to sections 510 of the Bankruptcy Code, or by Order of the Bankruptcy Court, or otherwise and specifically includes the Contractually Subordinated Debt..

       1.80    **TeraForce** shall mean TeraForce Technology Corporation and shall may refer to the Consolidated Debtor where the context so requires.

       1.81    **Unsecured Claim** shall mean any Claim that is not secured by a valid, enforceable, and unavoidable lien against any asset of the Debtors or the Estates, but excluding any Administrative Claim, Priority Claim, a Priority Tax Claim, KERP Claim, Secured Claim, or an Equity Interest, and including a Subordinated Claim if not secured by a valid and enforceable lien against any asset of the Debtors or the Estates.

       1.82    **Unsecured Creditor** shall mean the holder of a Unsecured Claim.

       1.83    **Wyatt Plan Commitment** shall mean Wyatt's written commitment to fund his pro rata portion of the New Equity Pool (Capital) both its initial and subsequent requirements. The particulars of the Wyatt Funding Commitment are set forth in Plan Exhibit 1.87.

**ARTICLE II**

**CLASSIFICATION OF ALLOWED CLAIMS AND ALLOWED INTERESTS**

       All Allowed Claims and Allowed Interests, other than Allowed Claims specified in Sections 507(a)(1), 507(a)(2) and 507(a)(8), which Allowed Claims are not classified in accordance with Section 1123(a)(1) of the Bankruptcy Code, or claims for Administrative Expense, are placed in the classes described in this Article II of the Plan.

       2.01    **Class 1: The Bean Group Secured Claim.** Class 1 shall consist of the holders of The Bean Group Claim which claim is secured by virtually all of the assets of the Debtors.

       2.02    **Class 2: Allowed General Unsecured Claims.** Class 2 shall consist of the Allowed General Unsecured Claims against both of the Debtors.

**2.03    Class 3: Allowed Subordinated Debenture Claims.**  Class 3 shall consist of the Allowed Subordinated Debenture Claims against Teraforce.

**2.04    Class 4:  Allowed Equity Interests.**  Class 4 shall consist of the Allowed Equity Interests in either of the Debtors.

# ARTICLE III

## PROVISIONS FOR TREATMENT OF UNCLASSIFIED AND CLASSIFIED CLAIMS

### A. *Unclassified Claims*

**3.01    Title 28 U.S.C. Section 1930 Fees.**  All fees required pursuant to 28 U.S.C. Section 1930 shall, if not previously paid in full, be paid in cash as and when those fees are normally due, by the Consolidated Debtors on the Plan Distribution Date

**3.02    Allowed Administrative Expense Claims of Professionals.**  Each holder of an Allowed Administrative Expense Claim of Professionals, if not previously paid in full pursuant to a Final Order of the Bankruptcy Court, shall receive Cash equal to the unpaid amount of such Allowed Administrative Expense Claim from the Consolidated Debtor. *All Administrative Expense Claims of Professionals for work performed through the Effective Date shall be filed with the Court within 45 days of the Effective Date or be barred.*

**3.03    Allowed Administrative Expense Claims Incurred in a Debtor's Ordinary Course of Business.**  Each holder of an Allowed Administrative Expense Claim Incurred in the Debtors' Ordinary Course of Business shall be paid in accordance with the customary terms and conditions of said vendor in its dealings with such Debtor, without any further Court order.

**3.04    Allowed Unsecured Priority Claims of Taxing Authorities.**  Each holder of an Allowed Unsecured Priority Claim of Taxing Authorities shall be paid in full on the Plan Distribution Date.

**3.05    Allowed Administrative Claim of GEF.**  Any Allowed Administrative Claim held by GEF arising under the GEF Sale Documents shall be satisfied from the Indemnity Escrow Account under the provisions of the GEF Sale Documents and any applicable order of the Bankruptcy Court, subject to the Consolidated Debtor's rights and abilities to contest the same as otherwise appropriate. Any Administrative Claim held by GEF not subject to payment from the Indemnity Escrow Account under the GEF Sale Documents or applicable order of the Bankruptcy Court, or in excess thereof, shall be treated as provided for in Section___ of this Plan subject to its becoming an Allowed Administrative Claim as otherwise applicable under section 503(b) of the Bankruptcy Code.

**3.06    Allowed KERP Claims.**  KERP Claims remaining unpaid as of the Effective Date shall be deemed Allowed in the amount of $57,799, to be paid to the Persons entitled thereto as provided for in the KERP Order shall be paid on the Plan Distribution Date or in the event of dispute or litigation concerning the allowance or payment of any KERP Claim, three (3) business days after a Final Order allowing such KERP Claim.

## B. *Classified Claims*

**3.07    Class 1:  The Bean Group Secured Claim.**  The Bean Group Secured Claim shall be paid, $2,789,993.19 as of the Petition Date, plus non default interest on $2,750,0000 at Wall Street Journal Prime plus .50% plus attorneys fees and expenses as may be determined by the Bankruptcy Court to be appropriate after the application of 11 U.S.C. §§ 503 and 506 in full satisfaction of such claim, on the Plan Distribution Date  or the date upon which the Bankruptcy Court determines the amount of fees and expenses which should be paid for the Bean Groups' counsel in this matter if the Bean Group and the Competing Proponents can not agree as to what should be such amount.

**3.08    Class 2: Allowed General Unsecured Claims.**  Holders of Allowed General Unsecured Claims, in full satisfaction of their claim, may elect one of three principal treatments: Option A, Option B or Option C with regard to their Allowed General Unsecured Claim by designating which option they wish Any failure to designate which option is chosen will result in such creditor having chosen Option A.

*Option A:*

A holder of an Allowed General Unsecured Claim who is the original holder of such claim and who elects Option A on their ballot, shall receive so many shares of New Equity of the Consolidated Debtor from the New Equity Pool (GUC) as such holder's Allowed Claim represents as a proportion of all Allowed Claims electing Option A [i.e. if claimant X holding a claim for $ 500 elects Option A, and there are $20,000 in total elections, then claimant X will own 2.5% of the New Equity Pool (GUC)].  Additionally, each qualified holder of an Allowed General Unsecured Claim who elects Option A shall be entitled to acquire shares from the New Equity Pool (Capital) at the per share price per the New Equity Pool (Capital) Formula (the initial per share price will likely be modified once the final dividend rate for Allowed General Unsecured Creditors is determined).

Any holder of an Allowed General Unsecured Claim who elects Option A and who designates that they want to acquire shares from the New Equity Pool (Capital) must, ten (10) business days before the Plan Distribution Date, tender to the Consolidated Debtor their proportionate amount of all of the funds necessary to acquire all of the New Equity Pool (Capital) to the Consolidated Debtor.  Failure to tender such amount by any one electing holder of an Allowed Unsecured Claim shall entitle any holder(s) who did tender the required initial amount, to tender the remaining amount which could be tendered, with in (5) business days of the publishing of compliance by those exercising Option A and electing to acquire shares from the New Equity Pool

(Capital) or such shares of New Equity will not be issued and the resulting end percentages shall adjust such that only the New Equity Pool (GUC) shall own a higher percentage of the Consolidated Debtor than originally provided. Such an event will not, however, modify the per share price of New Equity issued out of the New Equity Pool (GUC). There are two funding requirements: a) the initial funding requirement set forth above in this paragraph; b) the subsequent funding requirement wherein any additional funds must be tendered once the dividend to the holders of Allowed General Unsecured Claims taking Option B is finally determined. There will be 21 days to supply the extra funding from and after the date which the Consolidated Debtor notifies those actually acquiring shares from the New Equity Pool (Capital) of the final dividend percentage and the resulting amount due per share. No electing party is, however, required to purchase any shares from the New Equity Pool (Capital).

Any holder of an Allowed General Unsecured Claim who elects Option A revokes any rights to seek to require any holder of Contractually Subordinated Debt to transfer to such holder any rights which any Contractually Subordinated Debt holder acquires under the Plan.

The Carmichael Claim and the Wyatt Claim, are qualified holders and are deemed to have elected Option A as to their Allowed Claims. The Carmichael Claim and the Wyatt Claim are also deemed to have elected to purchase shares from the New Equity Pool (Capital) per the New Equity Pool (Capital) formula. (See Plan Exhibits 1.27 and 1.87 for the Carmichael Plan Commitment and the Wyatt Plan Commitment).

Nothing in this Plan shall have any affect upon any rights or defenses which the holder of the Carmichael Claim may have as against the Bean Group, pursuant to the Intercreditor Agreement, nor any rights or defenses which the Bean Group may have as against the Carmichael Claim, pursuant to the Intercreditor Agreement. Any such rights, claims or action may be prosecuted by either party in any court of competent jurisdiction, regardless of what treatment is accorded to the Bean Group per the terms of the Plan.

## Option B:

A holder of an Allowed General Unsecured Claim who elects Option B shall receive 12.5% of their Allowed General Unsecured Claim in cash from the Consolidated Debtor on the Plan Distribution Date. Any holder of an Allowed General Unsecured Claim who fails to elect any Option or if they elect Option A but do not qualify, shall be deemed to have elected Option B. Any holder of an Allowed General Unsecured Claim who elects or is deemed to have elected Option B revokes any rights to seek to require any holder of Contractually Subordinated Debt to transfer to such holder any rights which any Contractually Subordinated Debt holder acquires under the Plan. Any funds set aside for distribution as to any General Unsecured Claim which is governed by Option B or Option C, because such claim was a Disputed Claim. if the Consolidated Debtor prevails on its objection or otherwise comes to a settlement as to the allowance of such Disputed Claim, shall upon the Disputed Claim being disallowed in whole or in part pursuant to a Final Order or pursuant to a stipulation of resolution, have such set aside funds disbursed as follows: a) 30% to be disbursed to

all Allowed General Unsecured Creditors governed by Option B and Option C; and 70% to the Consolidated Debtor.

***Option C:***

A holder of an Allowed General Unsecured Claim who elects Option C shall receive 12.5% of their Allowed General Unsecured Claim in cash from the Consolidated Debtor on the Plan Distribution Date. Any funds set aside for distribution as to any General Unsecured Claim which is governed by Option B or Option C, because such claim was a Disputed Claim. if the Consolidated Debtor prevails on its objection or otherwise comes to a settlement as to the allowance of such Disputed Claim, shall upon the Disputed Claim being disallowed in whole or in part pursuant to a Final Order or pursuant to a stipulation of resolution, have such set aside funds disbursed as follows: a) 30% to be disbursed to all Allowed General Unsecured Creditors governed by Option B and Option C; and 70% to the Consolidated Debtor. Any holder of an Allowed General Unsecured Claim who elects Option C must, ten (10) business days before the Plan Distribution Date, tender to the Consolidated Debtor their proportionate amount of all of the funds necessary to acquire all of the New Equity Pool (Sub Debt) which is granted to Class 3. Failure to tender such amount by any one electing holder of an Allowed Unsecured Claim shall require that any holders who did tender the required initial amount, to tender the remaining amount required to be tendered per the election of the holders of Subordinated Debt, with in (5) business days of the publishing of compliance by those exercising Option C or such election shall be deemed to have not occurred as to any such remaining Option C participants, resulting in all parties electing Option C to be deemed to have elected Option B.

     **3.09**    **Class 3: Allowed Subordinated Debt Claims.** Holders of Allowed Subordinated Debt Claims may, by designating that they wish to participate in the New Equity Pool (Sub Debt) on their ballot, elect to acquire a proportionate share of the New Equity Pool (Sub Debt) and contribute funds to the Consolidated Debtor within ten (10) days after the Plan Distribution Date to acquire a portion of the New Equity Pool (Sub Debt) pursuant to the price per share derived by application of the New Equity Pool (Sub Debt) Formula. This is the only treatment which is being afforded to holders of Allowed Subordinated Debt Claims. If such holder does not designate that they wish to participate in the New Equity Pool (Sub Debt), then they shall receive nothing on account of their Allowed Claim in this case. All electing holders of Allowed Subordinated Debt Claim are subject to having their cumulative right to acquire New Equity overridden by those holders of Allowed General Unsecured Claims who elect Option C as set forth in Section 3.08 above and who tender the required amount of funds as dictated by the New Equity Pool (Sub Debt) Formula. If no holder of an Allowed Subordinated Debt Claim elects to acquire a proportionate share of the New Equity Pool (Sub Debt), then the total amount of shares available shall become part of the New Equity Pool (Capital) and shall be distributed to those holders who can and did elect to participate in the New Equity Pool (Capital) on a pro rata basis, based upon the number of shares each holder has acquired or agreed to acquire.

**3.10    Class 4: Allowed Equity Interests.**   Holders of Allowed Equity Interests shall receive no distribution or any property under the Plan on account of said Equity Interests.   All pre-petition Equity Interests shall be cancelled.   This class is deemed to have rejected the Plan.

ARTICLE IV

<u>ACCEPTANCE OR REJECTION OF PLAN</u>

**4.01    Impairment Controversies.**   If a controversy arises as to whether any Class of Claims or Class of Equity Interests is impaired under this Plan, such Class shall be treated as specified in this Plan unless the Bankruptcy Court shall determine such controversy differently upon motion of the party challenging the characterization of a particular Class of Claims or Class of Equity Interests under this Plan.

**4.02    Classes and Claims Entitled to Vote.** Classes 1 - 3 are impaired and the holders of Claims in those classes are therefore entitled to vote to accept or reject this Plan.   Class 4 is receiving nothing under the Plan and is deemed to reject the Plan.

**4.03    Cramdown.**   To the extent required, the Competing Proponents, pursuant to section 1129(b) of the Bankruptcy Code, request that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not been met.

ARTICLE V

<u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>

**5.01    Substantive Consolidation.**   On the Effective Date and without the need of further action on the part of the Debtors, DNA shall be merged into TeraForce and TeraForce shall be the surviving Consolidated Debtor, with the Estates being automatically substantively consolidated such that there will remain, on the Effective Date, only the Consolidated Debtor's Estate comprised of the assets and liabilities of each of the separate Estates, subject to the discharge as provided for in the Plan, and such that: (i) all Intercompany Claims shall be canceled and disallowed and no distributions shall be made on account thereof; (ii) all guarantees of either of the Debtors of the payment, performance or collection of obligations of any of the other Debtors shall be eliminated and canceled; (iii) any obligation of the Debtors and all guarantees thereof executed by the other Debtors shall be treated as a single obligation and such guaranties shall be deemed a single Claim against the Consolidated Estate; (iv) all joint obligations of the Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be treated and allowed only as a single Claim against the Consolidated Estate; and (v) each Claim against one of the Debtors or the Estates shall be deemed (a) filed or asserted against the Consolidated Estate, and (b) a single obligation of the Consolidated Estate.

Notwithstanding the automatic merger and substantive consolidation provided for herein, and without constituting a condition precedent to said merger and substantive consolidation, the Consolidated Debtor shall be entitled to file any appropriate document with any Governmental Unit to record or reflect said merger and substantive consolidation at the Consolidated Debtor deems advisable or appropriate, and all Governmental Units shall be instructed to accept such filing.

**5.02     Plan Closing Date: Funding of Plan Obligations.**  All Plan obligations which are required to be paid on the Plan Closing Date shall be funded from the following sources: (a) the Plan Closing Loan proceeds; (b) the New Equity Pool (Capital); (c) if existent, the New Equity Pool (Subdebt) and (d) any other assets which are converted to cash by the Plan Closing Date or by virtue of the Effective Date occurring, becoming available.

**5.03.     Post Plan Closing Operational Funding.**  Any continuing obligations of the Consolidated Debtor will be paid from: (a) net remaining proceeds from the Plan Closing; (b) any additional funding required from the New Equity Pool (Capital) and/or the New Equity Pool (Subdebt) per their respective formula; and (c) collections from any claims or assets retained by the Consolidated Debtor, including but not limited to, the Vista Claim, the Reliance Claim, any other assets, and the amounts if any available from the escrows set aside for the GEF Sale.

**5.04     Capitalization of the Consolidated Debtor.**  The Post Confirmation Consolidated Debtor shall have one class of common stock.  The proceeds from the New Equity Pool (Capital) and the New Equity Pool (Subdebt) if any, as to the latter pool, shall constitute the hard "capital" of the Debtor and shall in concert with the New Equity Pool (GUC) as that value is finally determined constitute the total capitalization of the Consolidated Debtor.

**5.05     Release of Bulk-Sale and Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, the transfer of assets to GEF under the GEF Sale Documents shall not subject the Debtors, the Estates, GEF, the Creditor Trust, the Consolidated Estate, or the Consolidated Debtor to any taxation under any federal, state, local, municipal or other law imposing or purporting to impose a stamp, transfer, recording or any other similar tax on any of said transfers, and all so-called bulk sales laws shall be waived accordingly in all applicable jurisdictions.

All taxing authorities who have or may be able to assert such tax claims or any similar claims released herein and based on said transfers are enjoined and prohibited from attempting to collect any such taxes or similar claims from any of the foregoing parties.

The Debtors, their Estates, the Consolidated Estate, and the Consolidated Debtor are released from any obligations imposed pursuant to paragraph 40 of the GEF Sale Order, and funds in the Tax Account (as defined in said paragraph) may be used by the Consolidated Debtor to fund its obligations under the Plan upon the Effective Date.

**5.06     Incorporation of Rule 9019.**  To the extent necessary to effectuate and implement the releases contained in this Plan, the Plan shall be deemed to constitute a motion under Bankruptcy

Rule 9019 seeking the Bankruptcy Court's approval of all of the compromises and releases contained herein.

**5.07  Incorporation of Section 363 of the Bankruptcy Code.**  The transfer of assets from the Debtors, their Estates, and their Estates to the Consolidated Debtor shall be free and clear of all liens, claims, interests, and encumbrances under section 363(f) of the Bankruptcy Code, and the Consolidated Debtor shall be deemed to be good faith transferees for value entitled to the full protections of section 363(m) and section 363(n) of the Bankruptcy Code. To the extent necessary to effectuate and implement the transfers contained in this Plan, the Plan shall be deemed to constitute a motion filed by the Debtors under section 363 of the Bankruptcy Code seeking the Court's approval of said transfers.

**ARTICLE VI**

**PROVISIONS FOR THE RESOLUTION AND TREATMENT
OF DISPUTED AND CONTINGENT CLAIMS**

**6.01  Standing to Object to Claims.**  If the Consolidated Debtor is obligated to pay a Claim under this Plan, the Consolidated Debtor shall be the sole party with standing to object to the allowance of said Claim.

**6.02  Objection Deadline.**  All objections to Claims shall be filed by the Objection Bar Date; however, the Objection Date shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim. Unless arising from an Avoidance Action, any proof of Claim filed after the Bar Date shall be of no force and effect and need not be objected to by the Consolidated Debtor.  Any Disputed Claim may be litigated to Final Order. The Consolidated Debtor may compromise and settle any Disputed Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any settlement of a Disputed Claim after the Effective Date; provide, however, that nothing contained herein shall apply to the Allowance of a Professional Claim for which approval from the Bankruptcy Court is required.

**6.03  No Waiver of Right to Object.**  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Consolidated Debtor's right to object to any Claim.

**6.04  Rights Under Section 505.**  All Claims for taxes by Governmental Units shall remain subject to section 505 of the Bankruptcy Code. The Consolidated Debtor and/or the Creditor Trust shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code. The Consolidated Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any Objection to any claim for taxes by a Governmental Unit.

**6.05** **Offsets.** The Consolidated Debtor shall be vested with and retain all rights of offset or recoupment and all counterclaims against any holder of a Claim.

**6.06** **Amendments to Claims Filed After the Confirmation Date.** Except as otherwise provided in the Plan, a Claim may not be amended after the Confirmation Date without the prior authorization of the Bankruptcy Court. Except as otherwise provided in the Plan, any amended Claim filed with the Bankruptcy Court after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Consolidated Debtor.

**6.07** **Reserve Account for Disputed Claims.** As to any Disputed Claim which is not a Claim to be administered by the Consolidated Debtor, on and prior to the Plan Distribution Date, the Consolidated Debtor shall establish a separate interest bearing account as to the holders of Disputed Claim(s) wherein any distributions due to the holder of such Disputed Claim under Plan, will be deposited. No funds shall be distributed to any holder of a Disputed Claim, absent a Final Order allowing the claim or as appropriate, the applicable Debtor has withdrawn its objection or has filed notice that it has settled, compromised or otherwise resolved such objection

**6.08** **Distribution of Excess Funds.** As each Disputed Claim is resolved any distributions which such Allowed Claim is entitled to shall be appropriately disbursed to such holder with in 15 days of any applicable order becoming a Final Order completely resolving the issue or the filing of any withdrawal of objection or of a filed settlement, compromise or other disposition of such claim. Any funds remaining on account of the requirement to set aside funds until the resolution of the Disputed Claim shall be disbursed by the Consolidated Debtor to other members of the class in which the previously Disputed Claim was classified in accordance with applicable terms of the Plan.

## ARTICLE VII

## EXECUTORY CONTRACTS

**7.01** **Rejection.** Effective on and as of the Effective Date, all of the Debtors' Executory Contracts that have not previously been assumed or assumed and assigned or rejected by the Debtors shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.

**7.02** **GEF Executory Obligations.** Notwithstanding anything contained in this Plan to the contrary, none of the Debtors' or the Estates' rights and obligations arising from any of the GEF Sale Documents are affected or altered by this Plan, and all such rights and obligations shall be vested in the Consolidated Debtor on the Effective Date.

**7.03** **Claims for Rejection Damages.** Claims for damages allegedly arising from the rejection pursuant to this Plan or the Confirmation Order of any Executory Contract, whether rejected prior to the Effective Date or deemed rejected as a result of this Plan, must be filed with the Bankruptcy Court and served on the Creditor Trust not later than thirty (30) days after the Effective Date. All Claims for such damages not timely filed and properly served as prescribed herein shall

be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution under the Plan.

**7.04    Responsibility for Rejection Damages.**  Any Claim arising from the rejection of an Executory Contract shall, if Allowed, and only to the extent Allowed, be treated as a Claim in Class 2 Option B under the terms provided for in this Plan.

**7.05    Objections to Claim Based On Rejection Damages.**  Parties-in-interest shall be entitled to file objections to Claims based on the rejection of an Executory Contract in this Plan under the law, rules, and provisions governing standing otherwise applicable to objections to claims under the Bankruptcy Code; provided, however, that any such objection shall be filed no later than one hundred and twenty days after the later: of (a) the date that such Claim is filed; or (b) the Effective Date.

**7.06    No Prejudice to Vista and Rafael.**  Notwithstanding anything contained herein to the contrary, the Plan does not affect or alter the rights and obligations of: (i) Rafael Armament Development Authority Ltd. and/or the Government of Israel – Ministry of Defense under that certain Agreed Order Approving Debtors' Settlement with and Sale to Rafael Armament Development and Rejecting Certain Contracts; or (ii) Vista Controls, Inc. and/or Curtiss-Wright Corporation under that certain Agreed Order Rejecting Vista Controls, Inc. Agreements. All rights and obligations of the Debtors or of the Estates under the aforementioned orders shall be vested in and be the obligations of the Consolidated Debtor on the Effective Date.

## ARTICLE VIII

## MAINTENANCE OF CAUSES OF ACTION AND RIGHTS

**8.01    Retention of Causes of Action.**  All causes of action, rights, claims and demands against any third parties, creditors, investors, individuals, insiders or other entities which each Debtor or each Debtor in Possession owns or has an interest in or can assert in any fashion, in any forum, since their formation, or which could be asserted by any creditor or trustee under the Bankruptcy Code, whether pre-petition or post-petition, including, but not limited to, actions under §§ 542 through 553 inclusive of the Bankruptcy Code (sometimes referred to as "Avoidance Actions") and § 510 of the Bankruptcy Code to recover assets for an applicable Debtor's estate and to subordinate claims (collectively an applicable "Debtor's Actions"), as well as all proceeds of and recoveries on Debtor's Actions, are retained post confirmation by each applicable Debtor, save for the transfer and reservation set forth in Plan as to certain causes of action, which shall inure to the Consolidated Debtor.

# ARTICLE IX

## THE CONSOLIDATED DEBTOR

**9.01    Issuance of Stock.**  On the Plan Closing Date, the Consolidated Debtor shall issue as many shares of common stock as are required to meet and fulfill the requirements of the various New Equity Pools described in the Plan.  All New Equity issued shall be issued on account of an Allowed Claim or expense and are issued under §1145(a) or (b) and are not subject to securities laws and regulations relative to their transferability and their issuance.

**9.02    Privatization of the Consolidated Debtor.**  The Consolidated Debtor shall no longer be a publicly held company and the Consolidated Debtor shall take appropriate steps do de-list itself with the Securities and Exchange Commission, including by filing Form 15 or such other document as it may deem appropriate to effectuate the same.

**9.03    Amendment of Articles of Incorporation and By-Laws.**  As may be required or deemed advisable by the Consolidated Debtor, the Articles of Incorporation and By-Laws of the Consolidated Debtor shall be amended as soon as reasonably practicable after the Effective Date to the extent necessary to effectuate the provisions of the Plan and Section 1123(a)(6) of the Bankruptcy Code.

**9.04    Employment.**  As soon as practicable on or after the Effective Date, the Consolidated Debtor may offer employment to Herman M. Frietsch and Robert P. Capps on terms agreeable to the Consolidated Debtor and those individuals.

**9.05    Restrictions on Future Stock Issuance for Transfers.**  On the Effective Date or as soon as reasonably practical thereafter, the Articles of Incorporation of the Consolidated Debtor will be filed or amended so as to provide that, until the second anniversary of the Effective Date: (i) any attempted sale, transfer, assignment, conveyance, grant, pledge, gift or other disposition of any share or shares of the Consolidated Debtor's capital stock (within the meaning of Section 382 of the Internal Revenue Code of 1986 (the Code)), or any option or right to purchase such stock, as defined in the Treasury Regulations under Section 382 of the Code, to any person or entity (or group of persons or entities acting in concert) who directly or indirectly owns or would be treated as owning, or whose shares are or would be attributed to any person or entity who directly or indirectly owns or would be treated as owning, in either case prior to the purported transfer and after giving effect to the applicable attribution rules of the Code and applicable Treasury Regulations, more than 4.75% of the value of any of the Consolidated Debtor's outstanding capital stock (within the meaning of Section 382 of the Code) shall be void ab initio insofar as it purports to transfer ownership or rights in respect of such stock to the purported transferee; and (ii) any attempted sale, transfer, assignment, conveyance, grant, pledge, gift or other disposition of any share or shares of the Consolidated Debtor's capital stock (within the meaning of Section 382 of the Code), or any option or right to purchase such stock, as defined in the Treasury Regulations under Section 382 of the Code, to any

person or entity (or group of persons or entities acting in concert) not described in clause (i) who directly or indirectly would own, or whose shares would be attributed to any person or entity who directly or indirectly would own or be treated as owning, in either case as a result of the transfer and after giving effect to the applicable attribution rules of the Code and the Treasury Regulations, more than 4.75% of the value of any of the Consolidated Debtor's outstanding capital stock (within the meaning of Section 382 of the Code), shall, as to the number of shares representing such excess over 4.75% be void ab initio insofar as it purports to transfer ownership to the purported transferee; provided, however, that neither clause (i) nor (ii) shall prevent a valid transfer if the transferor obtains the written approval of the Board of Directors of the Consolidated Debtor and provides the Consolidated Debtor with an opinion of counsel satisfactory to the Consolidated Debtor that the transfer shall not result in the application of any tax law limitation on the use of the Consolidated Debtor's losses or other tax attributes. No employee or agent of the Consolidated Debtor shall be permitted to record any attempted or purported transfer made in violation of the subject article and no intended transferee or optionee of shares of common stock of the Consolidated Debtor in any such attempted or purported transfer shall be recognized as a shareholder of the Consolidated Debtor of any purpose whatever.

In the event consideration is paid or delivered by an intended transferee in a transaction which is void pursuant to the foregoing, such intended transferee shall be entitled solely to restitution from the purported transferor of the consideration paid or delivered. In such event, the Consolidated Debtor may, as third party beneficiary of the restriction imposed, initiate action to effect such restitution and to enforce nullification of the attempted transfer. The Consolidated Debtor shall be entitled to damages, including reasonable attorneys' fees with costs, from the purported transferor or intended transferee or both, on account of any purported transfer. The By-Laws of the Consolidated Debtor shall make appropriate provisions to effectuate the requirements of this article. All certificates evidencing ownership of shares of capital stock of the Consolidated Debtor, including those to be issued pursuant to the Plan, shall bear a conspicuous legend as follows:

THE SHARES OF STOCK REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS PURSUANT TO ARTICLE ... OF THE ARTICLES OF INCORPORATION OF THE CORPORATION REPRINTED IN ITS ENTIRETY ON THE BACK OF THIS CERTIFICATE.

## ARTICLE X

## RELEASES

On the Effective Date, and without the need for further action, the Plan and Confirmation Order shall constitute a release and discharge by: the Debtors; the Estates; the Consolidated Estate; and the Consolidated Debtor; of any and all actions, causes of action (including Chapter 5 avoidance actions), claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state, or federal court, state or federal administrative agency or commission, regardless of location and whether now known

or unknown, liquidated or unliquidated, that the Releasing Parties now have or may have had, or thereafter claim to have, on behalf of themselves, or any other person or entity, against each individual who at any time served as an officer or director of one or more of the Debtors, including, but not necessarily limited to: (a) Robert E. Garrison, II; (b) David Yedwob; (c) Anton Liechtenstein; (d) Herman M. Frietsch; (e) Robert P. Capps; and (f) R. Eugene Helms ((a) through (f), inclusive, the Directors and Officers) *provided, that as to directors and officers, such directors and officers by filing a notice with the Bankruptcy Clerk's Office, waives any and all claims they may have against the Debtors for services, wages, director's fees, and expense reimbursement arising prior to the Petition Date, and any and all such claims shall be disallowed in full and expunged from the Schedules and the Claims Register; provided, however, that nothing contained herein shall constitute a waiver, release, or discharge of any obligation or liability of the Consolidated Debtor to the Directors and Officers arising under: (i) this Plan; (ii) the KERP Order; or (iii) any Administrative Claim not otherwise paid under the KERP Order. Failure to file an appropriate and timely notice will result in the Release offered not becoming operative, nor are the claims made by the parties referenced waived either. The Consolidated Debtor may then pursue whatever rights it believes the Debtors may possess as to such individuals in their respective capacities and may contest any claim filed by any such person.*

## ARTICLE XI

## EFFECTS OF PLAN CONFIRMATION

**11.01  Discharge of the Consolidated Debtor.** The terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor, the Consolidated Debtor or the Assets, including, without limitation, all Unsecured Claims or Secured Claims. Except as otherwise expressly provided herein, upon the Effective Date, both the Consolidated Debtor and its successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, demands and liabilities that arose before the Effective Date, and all debts of any kind specified in section 502(g), 502(h), or 502(l) of the Bankruptcy Code, whether or not: (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted this Plan; or (d) the Claim has been Allowed, Disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Consolidated Debtor and its successors-in-interest and assigns other than those obligations specifically set forth pursuant to this Plan.

**11.02  Injunction.**  The entry of the Confirmation Order shall permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability against the Estates, or who have held, currently hold or may hold an Equity Interest in the Debtors, from taking any of the following actions on account of such Claim or Equity Interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding

of any kind against the Debtors, the Estates or the Consolidated Debtor with respect to any property to be distributed under the Plan including funds or reserves held or maintained by any of them pursuant to this Plan; (ii) enforcing, levying, attaching, collecting, or otherwise recovering in any manner or by any shall mean, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Estates, or the Consolidated Debtor with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan; (iii) creating, perfecting or enforcing in any manner directly or indirectly, any lien, charge or encumbrance of any kind against the Debtors, the Estates, or the Consolidated Debtor with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan; and (iv) proceeding in any manner in any place whatsoever against the Debtors or, the Estates, with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan in any way that does not conform to, or comply, or is inconsistent with, the provisions of this Plan; provided, however, that such injunction shall not preclude any party in interest from seeking to enforce or interpret the terms of the Plan through an action commenced in the Bankruptcy Court.

**11.03  No Liability for Solicitation or Participation.**  Pursuant to section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of securities offered or sold under this Plan.

## ARTICLE XII

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

**12.01  Modification of this Plan.** The Plan Proponents may alter, amend or modify this Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by applicable law at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of this Plan, any party in interest in the Bankruptcy Cases may, so long as the treatment of holders of Claims or Equity Interests under this Plan are not materially adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in this Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of this Plan; provided, however, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

# ARTICLE XIII

## RETENTION OF JURISDICTION

**13.01 <u>Jurisdiction of Bankruptcy Court.</u>** Following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases and all matters arising in, or related to, the Bankruptcy Cases to the fullest extent permitted by law, including jurisdiction to:

(a)     To hear and determine motions, applications, adversary proceedings, and contested matters pending or commenced after the Effective Date, including but not limited to, Avoidance Actions and issues concerning any disputed portion of The Bean Group Secured Claim;

(b)     To hear and determine objections (whether filed before or after the Effective Date) to, or requests for estimation of, any Claim or Equity Interest, and to enter any order requiring the filing of proof of any Claim or Equity Interest before a particular date;

(c)     To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided in the Plan;

(d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)     To construe and to take any action to enforce this Plan, and the Confirmation Order;

(f)     To issue such orders as may be necessary for the implementation, execution and consummation of this Plan and to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan and the Confirmation Order;

(g)     To hear and determine any applications to modify this Plan, to cure any defect or omission or to reconcile any inconsistency in this Plan, the Disclosure Statement or in any order of the Bankruptcy Court including, without limitation, the Confirmation Order;

(h)     To hear and determine all applications for Professional Claims;

(i)     To hear and determine all issues arising under the KERP Order or related to the allowance, payment, or dispute regarding the KERP Claims.

(j)     To hear and determine other issues presented or arising under this Plan, including disputes among holders of Claims and arising under agreements, documents or instruments executed in connection with this Plan;

(k)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(m)     To enter the Final Decree; and

(n)     To hear and determine any action concerning the recovery and liquidation of Assets, wherever located, including without limitation litigation to liquidate and recover Assets that consist of Claims, rights and causes of action against third parties and actions seeking declaratory relief with respect to issues relating to or affecting Assets; and to hear and determine any action concerning the determination of taxes, tax refunds, tax attributes, and tax benefits and similar or related matters with respect to the Debtors, the Estates, or the Consolidated Debtor including, without limitation, matters concerning federal, state, local and other taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

**13.02    Failure of Bankruptcy Court to Exercise Jurisdiction.**  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction, over any matter arising under, arising in or related to the Bankruptcy Cases, including with respect to the matters set forth above in Plan and the Creditor Trust Documentation, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

# ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.01    Committee.** The Committee shall cease operating and dissolve on the Effective Date; provided, however, that notwithstanding said dissolution, the Committee shall remain in existence and have standing for the sole purpose of filing, litigating, and obtaining, to the extent otherwise appropriate, payment from the appropriate party of the Committee's and its Professional's fees and expenses as allowed by the Bankruptcy Court.

**14.02    Plan Controls.**  To the extent there is an inconsistency or ambiguity between any term or provision contained in the Disclosure Statement and the Plan, the terms and provisions of the Plan shall control.

**14.03** __Governing Law.__ Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal or state laws are applicable, the laws of the State of Texas shall govern the construction, implementation and enforcement of this Plan and all rights and obligations arising under this Plan, without giving effect to the principles of conflicts of law.

**14.04** __Severability.__ Should the Bankruptcy Court determine, on or prior to the Confirmation Date, that any provision of this Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Equity Interest, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and modify such provision to make it valid and enforceable to the maximum extent practicable consistent with the original purpose of such provision. Notwithstanding any such determination, interpretation, or alteration, the remainder of the terms and provisions of this Plan shall remain in full force and effect.

**14.05** __Notices and Distributions.__ On and after the Effective date, all notices, requests and distributions to a holder of a Claim or Equity Interest shall be sent to the last known address of: (i) the holder or its attorney of record as reflected in the holder's proof of Claim or Administrative Expense Claim filed by or on behalf of such holder; or (ii) if there is no such evidence of a last known address, to the last known address of the holder according to the books and records of the Debtors. Any holder of a Claim or Equity Interest may designate another address for the purposes of this Section by providing the Consolidated Debtor or the Creditor Trust, as otherwise appropriate, written notice of such address, which notice will be effective upon receipt by the Consolidated Debtor or the Creditor Trust, as otherwise appropriate.

**14.06** __Unclaimed Property.__ If any property distributed by the Consolidated Debtor remains unclaimed for a period of six (6) months after it has been delivered (or delivery has been attempted) or has otherwise been made available, such unclaimed property shall be forfeited by the Person entitled to receive the property and the unclaimed property and the right to receive it shall revert to and vest in the Consolidated Debtor free and clear of any rights, claims or interests.

**14.07** __Withholding and Reporting.__ In connection with this Plan and all instruments issued in connection therewith and distributions thereon, the Consolidated Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding and reporting requirements. Notwithstanding anything herein to the contrary, in calculating and making the payments due to Allowed Claims hereunder, the Consolidated Debtors shall be authorized to deduct from such payments any necessary withholding amount.

**14.08** __Other Documents and Actions.__ The Debtors and the Consolidated Debtors may execute such documents and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in this Plan.

# ARTICLE XV

## CONFIRMATION REQUEST

    The Proponents hereby request confirmation of this Plan pursuant to Section 1129(a) of the Bankruptcy Code or, in the event that this Plan is not accepted by each of those Classes of Claims and Equity Interests entitled to vote, Section 1129(b) of the Bankruptcy Code.

*(The Remainder of this Page Left Blank Intentionally)*

DATED: January 16, 2006

**THE COMPETING PROPONENTS**

_____

**Don B Carmichael**

_____

**Oscar S. Wyatt, Jr.**

**S & G Associates**

By: _____
Its: _____

**OF COUNSEL:**

**E. P. Keiffer**
**State Bar No. 11181700**
**HANCE SCARBOROUGH WRIGHT**
**GINSBERG & BRUSILOW, LLP**
**The Elm Place Building**
**1401 Elm Street, Suite 4750**
**Dallas, TX 75202**
**Phone: (214) 651-6500**
**Fax:     (214) 744-2615**
**E Mail: pkeiffer@hswgb.com**

**ATTORNEY FOR DON B CARMICHAEL**

**Michael Flume**
**State Bar No. 07188480**
**FLUME LAW FIRM, LLP**
**1020 N. E. Loop 410, Suite 200**
**San Antonio, Texas 78209**
**Phone:  (210) 828-5641**
**Fax:     (210) 821-6069**
**E mail: mflume@flumelaw.net**

**ATTORNEY FOR OSCAR S. WYATT, JR.**

**James H. Hansen**
**State Bar No. 08929730**
**PAGE, MURPHREE, BYERLY & HANSEN P.L.L.C.**
**Two Riverway, Suite 1700**
**Houston, Texas 77056**
**Phone:  (713) 877-8200**
**Fax:     (713) 877-8202**
**E-mail: jhansen@pmbhlaw.com**

**ATTORNEY FOR S&G ASSOCIATES AND DEBENTURE HOLDERS' AGENT**

DATED: January 16, 2006

THE COMPETING PROPONENTS

**Don B Carmichael**

_____
Oscar S. Wyatt, Jr.

**S & G Associates**

By: _____
Its: _____

OF COUNSEL:

E. P. Keiffer
State Bar No. 11181700
HANCE SCARBOROUGH WRIGHT
GINSBERG & BRUSILOW, LLP
The Elm Place Building
1401 Elm Street, Suite 4750
Dallas, TX 75202
Phone: (214) 651-6500
Fax:      (214) 744-2615
E Mail: pkeiffer@hawgb.com

ATTORNEY FOR DON B CARMICHAEL

Michael Flume
State Bar No. 07188400
FLUME LAW FIRM, LLP
1020 N. E. Loop 410, Suite 200
San Antonio, Texas 78209
Phone:  (210) 828-5641
Fax:      (210) 821-6069
E mail: mflume@flumelaw.net

ATTORNEY FOR OSCAR S. WYATT, JR.
James H. Hansen
State Bar No. 08929730
PAGE, MURPHREE, BYERLY & HANSEN P.L.L.C.
Two Riverway, Suite 1700
Houston, Texas 77056
Phone: (713) 877-8200
Fax:    (713) 877-8202
E-mail: jhansen@pmbhlaw.com

ATTORNEY FOR S&G ASSOCIATES AND DEBENTURE HOLDERS' AGENT

DATED: January 16, 2006

THE COMPETING PROPONENTS

_____

Don B Carmichael

Oscar S. Wyatt, Jr.

S & C Associates

By: _____

Its: _____

## OF COUNSEL:

E. P. Keiffer
State Bar No. 11181700
HANCE SCARBOROUGH WRIGHT
GINSBERG & BRUSILOW, LLP
The Elm Place Building
1401 Elm Street, Suite 4750
Dallas, TX 75202
Phone: (214) 651-6560
Fax:    (214) 744-2615
E Mail: pkeiffer@hswgb.com

ATTORNEY FOR DON B CARMICHAEL

Michael Flume
State Bar No. 07153580
FLUME LAW FIRM, LLP
1020 N. E. Loop 410, Suite 200
San Antonio, Texas 78209
Phone: (210) 828-5681
Fax:    (210) 821-6069
E mail: mflume@flumelaw.net

ATTORNEY FOR OSCAR S. WYATT, JR.
James H. Hansen
State Bar No. 08923730
PAGE, MURPHREE, BYERLY & HANSEN P.L.L.C.
Two Riverway, Suite 1700
Houston, Texas 77056
Phone: (713) 877-8269
Fax:    (713) 877-8202
E-mail: jhansen@pmbhlaw.com

ATTORNEY FOR S&C ASSOCIATES AND DEBENTURE HOLDERS' AGENT

The Competing Proponents'
Joint Consolidated
Plan of Reorganization

Exhibit 1.5

Alameda Funding Commitment

## PLAN EXHIBIT 1.5

## ALAMEDA FUNDING COMMITMENT

Alameda Corporation ("Alameda"), hereby commits to secure the necessary funds to provide the Plan Closing Loan[1] in the amount of $3,000,0000 to the Consolidated Debtor on the Plan Closing Date, provided that the following contingencies are met or can be and are waived by Alameda: a) the Competing Proponents file, in accordance with orders of the Bankruptcy Court, its plan and disclosure statement; b) the Competing Proponents disclosure statement is approved by the Bankruptcy Court; c) the Competing Proponents plan, as it may be amended or modified, is confirmed; and d) the Competing Proponents plan's Effective Date is not stayed in any manner.

It shall be sufficient proof of the conditions b)-d)above that: i) an electronic notification from the Bankruptcy Court per its ECF system, that condition has occurred; and ii) as to the final condition, an electronic copy of the docket in Case No. 05-38755-BJH-11 (Jointly Administered) from the Bankruptcy Court's ECF system showing that conditions for the Effective Date to have occurred, have in fact occurred.

Alameda shall wire such funds to the Consolidated Debtor, per instructions, within 2 business days of the notification that condition d) above has been met.

Dated January ___, 2006.

Alameda Corporation
(a Texas Corporation)

By _____
M. T. Arnold, President

---

[1]All capitalized terms not otherwise defined herein are defined in the Competing Proponents Joint Consolidated Plan of Reorganization for Teraforce Technology Corporation, et al., Case No. 05-38755-BJH-11 (Jointly Administered)

The Competing Proponents'
Joint Consolidated
Plan of Reorganization

Exhibit 1.26

Carmichael Plan Commitment

PLAN EXHIBIT 1.26

## CARMICHAEL PLAN COMMITMENT

    Don B Carmichael, as the holder of an unsecured claim in the amount of $510,236 does hereby commit to fund to his counsel and if the Competing Plan is confirmed, the sums necessary to acquire my pro-rata share of the New Equity Pool (Capital) per the requirements of the New Equity Pool (Capital) Formula, as well as other applicable provisions of the Competing Proponents Plan. I am ready, willing and able to fund the maximum percentage I can acquire as an unsecured creditor in this case, which is 11.5% of the New Equity Pool (Capital). I am also ready, willing and able to fund any supplemental increase in the effective pre share price for such stock as may be dictated by the resolution of claims objections and the resulting adjustment to the final price per share required

**Don B Carmichael**

The Competing Proponents'
Joint Consolidated
Plan of Reorganization

<u>Exhibit 1.87</u>

Wyatt Plan Commitment

## WYATT PLAN COMMITMENT

Oscar S. Wyatt, Jr. as the holder of an unsecured claim in the amount of $3,926,729.50 does hereby commit to fund to his counsel and if the Competing Plan is confirmed, the sums necessary to acquire my pro-rata share of the New Equity Pool (Capital) per the requirements of the New Equity Pool (Capital) Formula, as well as other applicable provisions of the Competing Proponents Plan. I am ready, willing and able to fund the maximum percentage I can acquire as an unsecured creditor in this case, which is 88.5% of the New Equity Pool (Capital). I am also ready, willing and able to fund any supplemental increase in the effective pre share price for such stock as may be dictated by the resolution of claims objections and the resulting adjustment to the final price per share required

OSCAR S. WYATT, JR.