**E. P. Keiffer**
**State Bar No. 11181700**
**HANCE SCARBOROUGH WRIGHT**
**GINSBERG & BRUSILOW, LLP**
**The Elm Place Building**
**1401 Elm Street, Suite 4750**
**Dallas, TX  75202**
**Phone: (214) 651-6500**
**Fax:     (214) 744-2615**
**E Mail:  pkeiffer@hswgb.com**

**ATTORNEY FOR DON B CARMICHAEL**

**Michael Flume**
**State Bar No. 07188480**
**FLUME LAW FIRM, LLP**
**1020 N. E. Loop 410, Suite 200**
**San Antonio, Texas  78209**
**Phone:  (210) 828-5641**
**Fax:     (210) 821-6069**
**E mail:  mflume@flumelaw.net**

**ATTORNEY FOR OSCAR S. WYATT, JR.**

**James H. Hansen**
**State Bar No. 08929730**
**PAGE, MURPHREE, BYERLY & HANSEN P.L.L.C.**
**Two Riverway, Suite 1700**
**Houston, Texas  77056**
**Phone:  (713) 877-8200**
**Fax:     (713) 877-8202**
**E-mail:  jhansen@pmbhlaw.com**

**ATTORNEY FOR S&G ASSOCIATES AND DEBENTURE HOLDERS' AGENT**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **TERAFORCE TECHNOLOGY** | § | **CASE NO. 05-38756-BJH-11** |
| **CORPORATION,** *et al.* | § | **(Jointly Administered)** |
| | § | |
| **Debtors.** | § | |

## THE COMPETING PROPONENTS' AMENDED
## JOINT CONSOLIDATED PLAN OF REORGANIZATION

Don B Carmichael, O. S. Wyatt, Jr. and S & G Associates on its own behalf and as agent under 12% Convertible Subordinated Notes (hereinafter collectively the "Competing Proponents')

file this their Amended Joint Consolidated Plan of Reorganization (hereinafter the "Plan") for the Debtors' Teraforce Technology Corporation and DNA Computing Solutions, Inc.

# ARTICLE I

## DEFINITIONS

Capitalized terms used in this Plan, unless otherwise defined herein, shall have the meanings or rules of construction assigned to each under the Bankruptcy Code. In construing the defined term or terms used in the Plan, (i) the singular shall include the plural and the plural shall include the singular, (ii) the conjunctive shall include the disjunctive and the disjunctive shall include the conjunctive, and (iii) reference to any gender shall include any other gender as appropriate. Unless the context otherwise requires, the following terms used herein shall have the following meanings:

**1.1** **Administrative Expense Claim** shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code, except as to: a) any Administrative Expense which is incurred in the ordinary course of the operation of a Debtor's business, which is not required to be "allowed"; and b) as to the Allowed Administrative Expense Claim of GEF, which is otherwise described in the Plan.

**1.2** **Administrative Tax Claim** shall mean an Administrative Claim held by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period which is incurred on or after the Petition Date, up through the Confirmation Date.

**1.3** **Allowed** shall mean any Claim in the amount and in the priority classification set forth in any proof of such Claim that has been timely filed in this case, or in the absence of such proof, as set forth in a Debtor's Schedule of Liabilities, as amended, filed in the Case, unless such Claim has been listed in such Schedule as disputed, contingent, or unliquidated, in which case such Claim shall be allowed only if a proof of such Claim has been timely filed; (ii) such Claim has been objected to or is objected to after entry of the Confirmation Order, in which case such Claim shall be allowed only in such amount and such classification as is authorized by a Final Order of the Bankruptcy Court; or (iii) such Claim has been paid in full, withdrawn or otherwise deemed satisfied in full. An Allowed Claim shall not include un-matured interest accruing after the Petition Date unless otherwise stated in the Plan.

**1.4** **Alameda** shall mean Alameda Corporation, a Texas corporation whose sole shareholder and president is Truman Arnold, but who shares are subject to a claim of beneficial ownership by O. S. Wyatt, Jr. Alameda will be the initial holder of the Plan Closing Loan in exchange for securing and tendering the Plan Letter of Credit by means of resolving a claim held by Alameda against Wyatt for prior advances, prior to the approval of the Competing Proponents Disclosure Statement.

**1.5** **Alameda Funding Commitment** shall mean Alameda's written commitment to cause the Competing Plan to be funded with Plan Letter of Credit, which will result in the issuance of the Plan Closing Loan Documents. The particulars of the Alameda Funding Commitment are set forth in Plan Exhibit 1.5.

**1.6** **Allowed General Unsecured Claim** shall mean an Allowed Claim which is not entitled to priority under Section 507(a) of the Bankruptcy Code, or as to which the claimant does not have a validly perfected enforceable lien or security interest as defined in Sections 101(37), (50) and (51) of the Bankruptcy Code, or an Allowed Claim arising from the rejection of an unexpired lease or executory contract.

**1.7** **Allowed Interests** shall mean the equity interests of all of the holders of any Equity Security of a Debtor prior to the Confirmation Date.

**1.8** **Allowed Secured Claim** shall mean an Allowed Claim which is secured by an interest in property of a Debtor's Estate, to the extent of the value of such property.

**1.9** **Allowed Unsecured Priority Claim** shall mean an Allowed Claim of a creditor which is unsecured and which is entitled to priority under Sections 507(a)(3) - (a)(8) of the Bankruptcy Code.

**1.10** **APA** shall mean that certain Asset Purchase Agreement dated August 1, 2005 by and between the Debtors and GEF and approved by order of the Bankruptcy Court on September 7, 2005.

**1.11** **Avoidance Actions** shall mean any and all rights, claims or actions which either or both of the Debtors may assert on behalf of the Estates under chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 544, 545, 546, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code, except to the extent that any such rights, claims, or actions are released or waived in this Plan.

**1.12** **Ballot** shall mean the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each holder of a Claim entitled to vote to accept or reject this Plan.

**1.13** **Bankruptcy Cases** shall mean the bankruptcy cases initiated by TeraForce Technology Corporation and DNA Computing Solutions, Inc. in the Bankruptcy Court on the Petition Date, respectively numbered as Case Nos. 05-38756-BJH and 05-38757-BJH, and jointly administered under Case No. 05-38756-BJH.

**1.14** **Bankruptcy Code** shall mean 11 U.S.C. §§ 101, et. seq., in effect as of the Petition Date and as may have been or may be amended or supplemented since, to the extent that any such amendment or supplement is automatically applicable to the Bankruptcy Cases by operation of law and not by operation of any election or choice.

**1.15** **Bankruptcy Court** shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

**1.16** **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure, together with the local bankruptcy rules for the Bankruptcy Court.

**1.17** **Bar Date** shall mean October 21, 2005, the date set by the Bankruptcy Court as the deadline for filing proofs of claim.

**1.18** **Bean Group** shall mean the group of individuals consisting of Richard E. Bean, as agent for himself, Robert E. Garrison, II, Steven A. Webster, James R. Hawkins, Peter W. Badger, John H. Styles, and Donald R. Campbell. The allocation of any rights or obligations of the Bean Group under this Plan as between the individual members of the Bean Group shall be governed for all purposes by that certain Agreement by, between, and among the members of the Bean Group.

**1.19** **Bean Group Secured Claim** shall mean $2,789,993.19 as of the Petition Date, plus interest on $2,750,0000 at Wall Street Journal Prime plus .50% and attorneys fees and default interest, as may be determined by the Bankruptcy Court to be appropriate after the application of 11 U.S.C. §§ 503 and 506.

**1.20** **Business Day** shall mean any day which is not a Saturday, a Sunday, or a legal holiday within the meaning of Bankruptcy Rule 9006(a).

**1.21** **Carmichael** shall mean Don B Carmichael.

**1.22** **Carmichael Claim** shall mean any Claim held or assertable by Carmichael against one or more of the Debtors, their Estates, or their property as to his note in the amount of $510,236.

**1.23** **Carmichael Plan Commitment** shall mean Carmichael's written commitment to fund his pro rata portion of the New Equity Pool (Capital) both its initial and subsequent requirements. The particulars of the Carmichael Funding Commitment are set forth in Plan Exhibit 1.23.

**1.24** **Claim** shall mean a claim against any one or both of the Debtors, the Estates, and/or property of the Debtors or the Estates, as such term is defined in section 101(5) of the Bankruptcy Code, arising prior to the Effective Date.

**1.25** **Claims Reserve** shall mean a separate interest-bearing escrow account at a national, federally-insured banking institution established and funded by the Consolidated Debtor in an amount sufficient to pay a 12.5% dividend to each Disputed Claim if each such claim became an Allowed Claim. The funds in the Claim Reserve shall be property held either: (i) in trust for the benefit of holders of Disputed Claims until such claims become Allowed Claims and receive a

distribution; or (ii) fifty percent (50%) of the sum attributable to each Claim is held in trust for the benefit of all Allowed Unsecured Claims if a Disputed Claim is disallowed.

**1.26** **Claimant** shall mean the holder of any Claim entitled to distributions with respect to such Claim.

**1.27** **Claims Objection Bar Date** shall mean the date by which the Consolidated Debtor may file any objection to a Claim, which date shall be no later than twenty (20) days after the Effective Date, except with respect to Administrative Claims as otherwise provided for herein.

**1.28** **Class** shall mean one of the categories of Claims or Equity Interests established under Article II of this Plan.

**1.29** **Committee** shall mean the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases pursuant to §1102 of the Bankruptcy Code.

**1.30** **Confirmation Date** shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**1.31** **Confirmation Hearing** shall mean the hearing(s) before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing(s) may be continued, rescheduled or delayed.

**1.32** **Confirmation Order** shall mean the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended.

**1.33** **Consolidated Debtor** shall mean TeraForce Technology Corporation after the Effective Date.

**1.34** **Consolidated Estate** shall mean the single substantively consolidated estate resulting from the substantive consolidation of the Estates and of the Debtors as provided for in this Plan.

**1.35** **Contractually Subordinated Debt** shall mean the 12% Convertible Subordinated Notes due June 30, 2005 issued by TeraForce Technology Corporation to certain individual holders.

**1.36** **Cure Claim** shall refer to the payment or other performance required to cure any existing default under an Executory Contract.

**1.37** **Debtors** shall mean, collectively: (i) TeraForce Technology Corporation; and (ii) DNA Computing Solutions, Inc.

**1.38**   **Disallowed Claim** shall mean a Claim or portion thereof that (i) has been disallowed by a Final Order; or (ii) is identified in the Schedules in an amount of zero dollars or as contingent, unliquidated, or disputed and as to which a proof of Claim was not filed by the Bar Date.

**1.39**   **Disputed Claim** shall mean any Claim or any portion thereof which has not become Allowed and which is not yet a Disallowed Claim. In the event that any part of a Claim is a Disputed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan unless the party responsible for the payment thereof, the objecting party, and the holder thereof agree otherwise or the Competing Plan specifically provides otherwise; provided, however, that nothing in this definition of Disputed Claim is intended to or does impair the rights of any holder of a Disputed Claim to pursue its rights under section 502(c) of the Bankruptcy Code. Without limiting any of the foregoing, but subject to the provisions of this Plan, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, subordinate, or estimate such Claim shall be deemed to constitute a Disputed Claim unless and until the entry of a Final Order providing otherwise.  Any claim which is objected to by the Claims Objection Bar Date shall be a Disputed Claim.  Any proof of claim which is an equity security which has to be re-characterized as a proof of interest, is not a Disputed Claim for the purposes of Plan Section 1.25, 3.09 or Section 6.

**1.40**   **DNA** shall mean DNA Computing Solutions, Inc.

**1.41**   **Effective Date** shall mean the first Business Day eleven (11) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least eleven (11) days after the Confirmation Date.

**1.42**   **Equity Interest** shall mean any ownership interest or share in TeraForce (including, without limitation, all options, conversion rights, warrants or other rights to obtain such an interest or share in TeraForce) whether or not transferable, preferred, common, voting, or denominated stock or a similar security, as well as any similar ownership interest or share in DNA.

**1.43**   **Estates** shall mean, collectively, the estates created for the Debtors pursuant to § 541 of the Bankruptcy Code.

**1.44**   **Event of Default** shall mean the failure or neglect of the Consolidated Debtor to perform, keep, or observe any term, covenant, or condition of the Plan, but only if the Event of Default is not cured prior to the expiration of the applicable cure period.

**1.45**   **Executory Contract** shall mean, collectively, executory contracts and unexpired leases of the Debtors as of the Petition Date as such terms are used within §365 of the Bankruptcy Code, and specifically excludes any of the GEF Sale Documents.

**1.46    Existing Liquid Assets Base** shall mean that portion of the proceeds of the GEF Sale which are not set aside in separate accounts for specific purpose for the GFE Sale and have not been consumed by the Debtors pre confirmation and as well as any other cash on hand on the Plan Closing Date.

**1.47    Final Decree** shall mean the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

**1.48    Final Order** shall mean a judgment or order by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which has not been reversed, stayed, modified, or amended and as to which (i) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (ii) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

**1.49    GEF** shall mean GE Fanuc Embedded Systems, Inc.

**1.50    GEF Sale** shall mean the sales, transfers, and assignments to GEF effectuated under the GEF Sale Order.

**1.51    GEF Sale Documents** shall mean: (i) the APA; (ii) all agreements and contracts incorporated into the APA, including the Indemnity Escrow Agreement; (iii) the Transitional Services Agreement by and between the Debtors and GEF dated September 7, 2005; and (iv) the Sublease by and between Teraforce and GEF dated November 18, 2005.

**1.52    GEF Sale Order** shall mean that certain Agreed Order Pursuant to Sections 105(a), and 363 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Debtors' Sale to GE Fanuc Embedded Systems, Inc. of Substantially All Assets of DNA Computing Solutions, Inc., Free and Clear of Liens, Claims, Interests, and Encumbrances and (ii) Approving an Asset Purchase Agreement, as entered by the Bankruptcy Court.

**1.53    Governmental Unit** shall mean a governmental unit as such term is defined in section 101(27) of the Bankruptcy Code.

**1.54    Insider** shall mean Persons described in section 101(31) of the Bankruptcy Code.

**1.55    Indemnity Escrow Account** shall mean the indemnity escrow account created under the Indemnity Escrow Agreement.

**1.56    Indemnity Escrow Agreement** shall mean that certain Indemnity Escrow Agreement executed by and between GEF, the Debtors, and Wilmington Trust Bank, as the escrow agent.

**1.57** **Intercompany Claim** shall mean any Claim held by one of the Debtors against the other Debtor, or by one of the Estates against the other Estate.

**1.58** **Inter-Creditor Agreement** shall mean that certain Intercreditor Agreement by and between Don B Carmichael and certain members of the Bean Group.

**1.59** **KERP Claim** shall mean a claim arising under the KERP Order in favor of the Key Employees as defined in the KERP Order.

**1.60** **KERP Order** shall mean the Bankruptcy Court's Agreed Final Order Granting Emergency Motion for Approval of Key Employee Retention Plan.

**1.61** **New Equity** shall mean the sum of the sole class of Equity Security in the Consolidated Debtor which are made available in all of the New Equity Pools hereinafter defined. The total number of authorized shares of New Equity shall equal 5,000,000 shares with a par value of .01/share. The total number of shares to be issued will be determined by the operation of the formulas and the amount of Allowed General Unsecured Claims which elects Options A and C under the Plan.

**1.62** **New Equity Pool (Capital)** shall mean no more than forty percent (40%) of the New Equity to be issued pursuant to the Plan, to holders of qualified Allowed General Unsecured Claims in exchange for the per share price derived by the application of the New Equity Pool (Capital) Formula.

**1.63** **New Equity Pool (Capital) Formula** shall mean the formula which will determine the amount which qualified electing holders of Allowed General Unsecured Claims must tender per share to acquire New Equity from the New Equity Pool (Capital). This formula has two phases. The initial phase requires that the total amount of value which can be exchanged for a share of New Equity Pool (Capital) can not exceed 90.476% of the value of the cumulative final value of the New Equity Pool (GUC). If the New Equity Pool (Sub Debt) is activated and funded per the requirements of the Plan, then this pool can not have a cumulative value which exceeds 76.191% of the final value of the New Equity Pool (GUC). With these stated restrictions on value contributions, the initial amount of value per share shall equal either 76.191% or 90.476% of the total value of the New Equity Pool (GUC) divided by the number of shares necessary for this pool to not equal more than 40% of the New Equity issued under the Plan. By way of example, if the per share price utilizing the baseline valuation for shares in the New Equity Pool (GUC) is $.125 per share and only the Carmichael Claim and the Wyatt Claim trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity Pool (GUC) of $559,621. The value of the New Equity Pool (Capital) can not exceed $559,621 times 76.191% or $426,381 assuming New Equity Pool (Sub Debt) is fully subscribed or $559,621 times 90.476% or $506,323 assuming New Equity Pool (Sub Debt) does not subscribe. Once the value of the New Equity Pool (GUC) is finalized, then the amount of value required will be adjusted and the electing holders billed for the difference.

**1.64** **New Equity Pool (Sub Debt)** shall mean no more than seven and one half percent (7.5%) of the New Equity to be issued pursuant to the Plan, to holders of qualified Allowed Contractually Subordinated Debt Claims in exchange for the per share price derived by the application of the New Equity Pool (Sub Debt) Formula.

**1.65** **New Equity Pool (Sub Debt) Formula** shall mean the formula which will determine the amount which qualified electing holders of Contractually Subordinated Debt or if applicable qualified electing holders of Allowed General Unsecured Claims who elect Option C and perform per its requirements, must tender per share to acquire New Equity from the New Equity Pool (Sub Debt). This formula has two phases. The initial phase requires that the total amount of value which can be exchanged for a share of New Equity Pool (Sub Debt) can not exceed 14.286% of the value of the cumulative final value of the New Equity Pool (GUC). With this stated restriction on value contributions, the initial amount of value per share shall equal 14.286% of the total value of the New Equity Pool (GUC) divided by the number of shares necessary for this pool to not equal more than 7.5% of the New Equity issued under the Plan. By way of example, if the per share price utilizing the baseline valuation for shares in the New Equity Pool (GUC) is $.125 per share and only the Carmichael Claim and the Wyatt Claim trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity Pool (GUC) of $559,621. The value of the New Equity Pool (Sub Debt) can not exceed $559,621 times 14.286% or $79,947 assuming New Equity Pool (Sub Debt) is fully subscribed. Once the value of the New Equity Pool (GUC) is finalized, then the amount of value required will be adjusted and the electing holders billed for the difference.

**1.66** **New Equity Pool (GUC)** shall equal at least fifty two and one half percent (52.5%) of the New Equity to be issued . The shares in this pool will be divided up amongst those holders of Allowed General Unsecured Claims who elect to take Option A as set forth in Section 3.08 of the Plan, based upon the amount by which each electing claim is as a percentage to the total amount of electing claims. A share of New Equity will have as their baseline value $.125 per dollar of claim traded for stock based upon the assumption that only the Carmichael Claim and the Wyatt Claim will trade their Allowed General Unsecured Claim for Stock, resulting in a baseline valuation of the New Equity issued for Allowed General Unsecured Claims of $554,620. If additional Allowed General Unsecured Claims tender their debt for New Equity, the same baseline value of $.125 per dollar will apply, but the size of this pool shall increase. The final value per dollar of claim traded for stock will not be known until all Disputed Claims which are General Unsecured Claims are resolved. If any Disputed Claim is resolved in a manner which causes a reduction in the amount up to the elimination of the Disputed Claim, then the per share value of each share of New Equity issued as a part of the New Equity Pool (GUC) shall equal the same percentage per dollar of claim which the holders of Allowed General Unsecured Claims who elect to take Option B receive under the Plan (i.e. if the dividend to Allowed General Unsecured Claims who took Option B increased from 12.5% to 15%, then each share issued from this pool shall have a value equal to $.15 per dollar of claim traded for stock. Many other end results exist).

**1.67    New Equity Pool (Proceeds)** shall mean the sum of the funds raised by the New Equity Pool (Capital) per the New Equity Pool (Capital) formula and the New Equity Pool (Sub Debt) Formula and will ultimately include any adjusted increase per those terms and Plan treatment requirements.

**1.68    Plan** shall mean this Competing Proponents Joint Consolidated Plan of Reorganization, either in its present form or as it may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

**1.69    Plan Closing Date** shall occur as soon as reasonably possible after the Effective Date, but in no event more than 20 days after the Effective Date.

**1.70    Plan Closing Loan** shall mean a loan of $3,000,000.00 from Alameda to the Consolidated Debtor for the purpose of helping to meet Plan Closing Date obligations, as well as post confirmation operations of the Consolidated Debtor. The Post Closing Loan shall be a secured loan, on all collateral which is capable of being collateral for a commercial loan. The Post Closing Loan shall be for a term of seven (7) years, shall be interest only for twenty four (24) months, and then be paid on a five (5) year term with a ten (10) year amortization. The interest rate shall be prime plus 1% floating with adjustments semi-annually.

**1.71    Plan Closing Loan Documents** shall mean the promissory note and security agreement which will evidence the Plan Closing Loan. The Plan Closing Loan Documents, as executed, are attached as Plan Exhibit 1.71. The Plan Closing Loan Documents can not become effective until the Effective Date. In conjunction with the Plan Letter of Credit, the Plan Closing Loan Documents must be presented to a representative of Alameda, including its counsel, Michael Flume, on or after the Effective Date, prior to submission of the Plan Letter of Credit to Texas State Bank.

**1.72    Plan Letter of Credit** shall mean Texas State Bank Irrevocable Letter of Credit Number 2528, a true and correct copy of which is attached as Plan Exhibit 1.72. The Plan Letter of Credit is the means by which Alameda funds the Alameda Funding Commitment.

**1.73    Plan Distribution Date** shall mean forty five (45) days after the Plan Closing Date, unless the Plan specifically provides for a different date.

**1.74    Person** shall mean and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

**1.75    Petition Date** shall mean August 3, 2005.

**1.76    Priority Claim** shall mean a Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code, excluding any Claim that is an Administrative Claim.

**1.77    Record Date** shall mean, for purposes of voting, the date on which the Bankruptcy Court enters an order approving the Disclosure Statement.

**1.78    Rejection Claim** shall mean a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

**1.79    Reliance Claim** shall mean any claim held by the Debtors or the Estates against United Pacific Insurance Company and/or Reliance Insurance Company, as to the Debtors' interest in a policy of insurances related to directors and officers liability, including in the insolvency proceedings pending with respect to Reliance Insurance Company in the Commonwealth Court of the State of Pennsylvania under Case No. 269 M.D. 2001, and including, specifically, Proof of Claim No. 2025614 and Reliance Claim No. 99245456 therein.

**1.80    Schedules** shall mean the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

**1.81    Secured Claim** shall mean a Claim that is alleged to be secured, in whole or in part, (i) by a lien against an asset of the Debtors or the Estates to the extent such lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance or subordination under the Bankruptcy Code or other applicable non-bankruptcy law, but only to the extent that such Claim is secured within the meaning of § 506(a) of the Bankruptcy Code; or (ii) as a result of rights of setoff under § 553 of the Bankruptcy Code.

**1.82    Subordinated Claim** shall mean a Claim that is subordinated pursuant to § 510 of the Bankruptcy Code, or by Order of the Bankruptcy Court, or otherwise and specifically includes the Contractually Subordinated Debt.

**1.83    TeraForce** shall mean TeraForce Technology Corporation and shall refer to the Consolidated Debtor where the context so requires.

**1.84    Unsecured Claim** shall mean any Claim that is not secured by a valid, enforceable, and unavoidable lien against any asset of the Debtors or the Estates, but excluding any Administrative Claim, Priority Claim, a Priority Tax Claim, KERP Claim, Secured Claim, or an Equity Interest, and including a Subordinated Claim if not secured by a valid and enforceable lien against any asset of the Debtors or the Estates.

**1.85    Unsecured Creditor** shall mean the holder of a Unsecured Claim.

**1.86    Wyatt Plan Commitment** shall mean Wyatt's written commitment to fund his pro rata portion of the New Equity Pool (Capital) both its initial and subsequent requirements.  The particulars of the Wyatt Funding Commitment are set forth in Plan Exhibit 1.86.

## ARTICLE II

## CLASSIFICATION OF ALLOWED CLAIMS AND ALLOWED INTERESTS

All Allowed Claims and Allowed Interests, other than Allowed Claims specified in Sections 507(a)(1), 507(a)(2) and 507(a)(8), which Allowed Claims are not classified in accordance with Section 1123(a)(1) of the Bankruptcy Code, or claims for Administrative Expense, are placed in the classes described in this Article II of the Plan.

**2.01    Class 1:  The Bean Group Secured Claim.**   Class 1 shall consist of the holders of The Bean Group Claim which claim is secured by virtually all of the assets of the Debtors.

**2.02    Class 2: Allowed Unsecured Convenience Claims of $5,000 or less.**  Class 2 shall consist of the Allowed Unsecured Convenience Claims of $5,000 or less or any holder of an Allowed General Unsecured Claim which elects to receive $5,000 or less by designation on their ballot that the holder is specifically reducing their claim to $5,000.

**2.02    Class 3:  Allowed General Unsecured Claims.**  Class 3 shall consist of the Allowed General Unsecured Claims against both of the Debtors.

**2.03    Class 4: Allowed Contractually Subordinated Debenture Claims.**  Class 4 shall consist of the Allowed Contractually Subordinated Debenture Claims against Teraforce.

**2.04    Class 5:  Allowed Equity Interests.**  Class 5 shall consist of the Allowed Equity Interests in either of the Debtors.

## ARTICLE III

## PROVISIONS FOR TREATMENT OF UNCLASSIFIED AND CLASSIFIED CLAIMS

### A.  *Unclassified Claims*

**3.01    Title 28 U.S.C. Section 1930 Fees.**  All fees required pursuant to 28 U.S.C. § 1930 shall, if not previously paid in full, be paid in cash as and when those fees are normally due, by the Consolidated Debtors on the Plan Distribution Date

**3.02    Allowed Administrative Expense Claims of Professionals.**  Each holder of an Allowed Administrative Expense Claim of Professionals, if not previously paid in full pursuant to a Final Order of the Bankruptcy Court, shall receive Cash equal to the unpaid amount of such

Allowed Administrative Expense Claim from the Consolidated Debtor within five (5) business days after the entry of a final order allowing same. ***All Administrative Expense Claims of Professionals for work performed through the Effective Date shall be filed with the Court within 45 days of the Effective Date or be barred.***

**3.03    Allowed Administrative Expense Claims Incurred in the Debtors' Ordinary Course of Business.**  Each holder of an Allowed Administrative Expense Claim Incurred in the Debtors' Ordinary Course of Business shall be paid in accordance with the customary terms and conditions of said vendor in its dealings with such Debtor, without any further Court order.

**3.04    Allowed Unsecured Priority Claims of Taxing Authorities.**  Each holder of an Allowed Unsecured Priority Claim of Taxing Authorities shall be paid in full on the Plan Distribution Date.

**3.05    Allowed Administrative Claim of GEF.**  Any Allowed Administrative Claim held by GEF arising under the GEF Sale Documents shall be satisfied from the Indemnity Escrow Account under the provisions of the GEF Sale Documents and any applicable order of the Bankruptcy Court, subject to the Consolidated Debtor's rights and abilities to contest the same as otherwise appropriate. Any Administrative Claim held by GEF not subject to payment from the Indemnity Escrow Account under the GEF Sale Documents or applicable order of the Bankruptcy Court, or in excess thereof, shall be treated as an obligation of the Consolidated Debtor to be paid from its then available assets, subject to its becoming an Allowed Administrative Claim as otherwise applicable under section 503(b) of the Bankruptcy Code.

**3.06    Allowed KERP Claims.**  KERP Claims remaining unpaid as of the Effective Date shall be deemed Allowed in the amount of $57,799, to be paid to the Persons entitled thereto as provided for in the KERP Order shall be paid on the Plan Distribution Date or in the event of dispute or litigation concerning the allowance or payment of any KERP Claim, three (3) business days after a Final Order allowing such KERP Claim.

## B.    *Classified Claims*

**3.07    Class 1:  The Bean Group Secured Claim.**  The Bean Group Secured Claim shall be paid, $2,789,993.19 as of the Petition Date, plus interest, attorneys fees and expenses as may be determined by the Bankruptcy Court to be appropriate after the application of 11 U.S.C. §§ 503 and 506 in full satisfaction of such claim, on the Plan Distribution Date  or the date upon which the Bankruptcy Court determines the amount of fees and expenses which should be paid for the Bean Groups' counsel in this matter if the Bean Group and the Competing Proponents can not agree upon such amount.

**3.08    Class 2: Allowed Unsecured Convenience Claims of $5,000 or less.**  The Allowed Unsecured Convenience Claims of $5,000.00 or those General Unsecured Claims which elect to receive $5,000.00 or less by ballot designation on their ballot specifically reducing to their claim to

$5,000.00 shall be paid fifteen percent (15%) of their Allowed General Unsecured Claim or if an electing General Unsecured Claim at $5,000, fifteen percent (15%) of their Allowed General Unsecured Claim as reduced, in cash, from the Consolidated Debtor on the Plan Distribution Date. This class is impaired.

**3.09     Class 3: Allowed General Unsecured Claims.**  Holders of Allowed General Unsecured Claims, in full satisfaction of their claim, may elect one of three principal treatments: Option A, Option B or Option C with regard to their Allowed General Unsecured Claim by designating which option they wish Any failure to designate which option is chosen will result in such creditor being deemed to have chosen Option B.  *Please note that Options A and B contain a waiver of any rights which an Allowed General Unsecured Claim holder may have as to any holder of a Contractually Subordinated Debt Claim.  The only means by which the holder of an Allowed General Unsecured Claim may enforce such rights is through Option C and then only if there are holders of claims in that class who qualify and who participate, as the only treatment holders of Class 3 Contractually Subordinated Debt Claims will receive is the opportunity to acquire the 7.5% interest in the Consolidated Debtor as described therein.  See Option C for more details.*

*Option A:*

A holder of an Allowed General Unsecured Claim who is the original holder of such claim and such claim is older than eighteen months on the Petition Date, or arose out of or in aid of the Debtors ordinary operations, may elect Option A on their ballot, and in such case, shall receive so many shares of New Equity of the Consolidated Debtor from the New Equity Pool (GUC) as such holder's Allowed Claim represents as a proportion of all Allowed Claims electing Option A [i.e. if claimant X holding a claim for $ 500 elects Option A, and there are $20,000 in total elections, then claimant X will own 2.5% of the New Equity Pool (GUC)].  Additionally, each qualified holder of an Allowed General Unsecured Claim who elects Option A shall be entitled to acquire shares from the New Equity Pool (Capital) at the per share price per the New Equity Pool (Capital) Formula (the initial per share price will likely be modified once the final dividend rate for Allowed General Unsecured Creditors is determined).

Any holder of an Allowed General Unsecured Claim who elects Option A and who designates that they want to acquire shares from the New Equity Pool (Capital) must, ten (10) business days before the Plan Distribution Date, tender to the Consolidated Debtor their proportionate amount of all of the funds necessary to acquire all of the New Equity Pool (Capital) of the Consolidated Debtor.  Failure to tender such amount by any one electing holder of an Allowed Unsecured Claim shall entitle any holder(s) who did tender the required initial amount, to tender the remaining amount which could be tendered, within (5) business days of the publishing of compliance by those exercising Option A and electing to acquire shares from the New Equity Pool (Capital) or such shares of New Equity will not be issued and the resulting end percentages shall adjust such that only the New Equity Pool (GUC) shall own a higher percentage of the Consolidated Debtor than

originally provided. Such an event will not, however, modify the per share price of New Equity issued out of the New Equity Pool (GUC).

There are two funding requirements: a) the initial funding requirement set forth above in the prior paragraph; b) the subsequent funding requirement wherein any additional funds must be tendered once the dividend to the holders of Allowed General Unsecured Claims taking Option B is finally determined. There will be 21 days to supply the extra funding from and after the date which the Consolidated Debtor notifies those actually acquiring shares from the New Equity Pool (Capital) of the final dividend percentage and the resulting amount due per share. No electing party is, however, required to purchase any shares from the New Equity Pool (Capital).

Any holder of an Allowed General Unsecured Claim who elects Option A revokes any rights to seek to require any holder of Contractually Subordinated Debt to transfer to them any rights which any Contractually Subordinated Debt holder acquires under the Plan.

The Carmichael Claim and the Wyatt Claim, are qualified holders and are deemed to have elected Option A as to their Allowed Claims. The Carmichael Claim and the Wyatt Claim are also deemed to have elected to purchase shares from the New Equity Pool (Capital) per the New Equity Pool (Capital) formula. (See Plan Exhibits 1.23 and 1.86 for the Carmichael Plan Commitment and the Wyatt Plan Commitment).

Nothing in this Plan shall have any effect upon any rights or defenses which the holder of the Carmichael Claim may have as against the Bean Group, pursuant to the Intercreditor Agreement, nor any rights or defenses which the Bean Group may have as against the Carmichael Claim, pursuant to the Intercreditor Agreement. Any such rights, claims or action may be prosecuted by either party in any court of competent jurisdiction, regardless of what treatment is accorded to the Bean Group per the terms of the Plan.

***Option B:***

A holder of an Allowed General Unsecured Claim who elects Option B shall receive 12.5% of their Allowed General Unsecured Claim in cash from the Consolidated Debtor on the Plan Distribution Date. Any holder of an Allowed General Unsecured Claim who fails to elect any Option or if they elect Option A but do not qualify, shall be deemed to have elected Option B. Any holder of an Allowed General Unsecured Claim who elects or is deemed to have elected Option B revokes any rights to seek to require any holder of Contractually Subordinated Debt to transfer to such holder any rights which any Contractually Subordinated Debt holder acquires under the Plan. Any funds set aside for distribution as to any General Unsecured Claim which is governed by Option B or Option C, because such claim is a Disputed Claim are treated as set forth herein. If, with respect to such reserved fund, the Consolidated Debtor prevails on its objection or otherwise comes to a settlement as to the allowance of a Disputed Claim, the Consolidated Debtor shall, upon the Disputed Claim being disallowed in whole or in part pursuant to a Final Order or pursuant to a stipulation of resolution, have such reserved funds which do not go to the claimant, be disbursed as

follows: a) 50% to be disbursed to all Allowed General Unsecured Creditors governed by Option B and Option C; and 50% to the Consolidated Debtor.

***Option C:***

A holder of an Allowed General Unsecured Claim who elects Option C shall receive 12.5% of their Allowed General Unsecured Claim in cash from the Consolidated Debtor on the Plan Distribution Date. Any funds set aside for distribution as to any General Unsecured Claim which is governed by Option B or Option C, because such claim was a Disputed Claim. if the Consolidated Debtor prevails on its objection or otherwise comes to a settlement as to the allowance of such Disputed Claim, shall upon the Disputed Claim being disallowed in whole or in part pursuant to a Final Order or pursuant to a stipulation of resolution, have such set aside funds disbursed as follows: a) 50% to be disbursed to all Allowed General Unsecured Creditors governed by Option B and Option C; and 50% to the Consolidated Debtor. Any holder of an Allowed General Unsecured Claim who elects Option C must, ten (10) business days before the Plan Distribution Date, tender to the Consolidated Debtor their proportionate amount of all of the funds necessary to acquire all of the New Equity Pool (Sub Debt) which is granted to Class 3. Failure to tender such amount by any one electing holder of an Allowed Unsecured Claim shall require that any holders who did tender the required initial amount, to tender the remaining amount required to be tendered per the election of the holders of Contractually Subordinated Debt, within (5) business days of the publishing of compliance by those exercising Option C or such election shall be deemed to have not occurred as to any such remaining Option C participants, resulting in all parties electing Option C to be deemed to have elected Option B.

**3.10    Class 4: Allowed Contractually Subordinated Debt Claims.** Holders of Allowed Contractually Subordinated Debt Claims may, by designating that they wish to participate in the New Equity Pool (Sub Debt) on their ballot, elect to acquire a proportionate share of the New Equity Pool (Sub Debt) and contribute funds to the Consolidated Debtor within ten (10) days after the Plan Distribution Date to acquire a portion of the New Equity Pool (Sub Debt) pursuant to the price per share derived by application of the New Equity Pool (Sub Debt) Formula. This is the only treatment which is being afforded to holders of Allowed Contractually Subordinated Debt Claims. If such holder does not designate that they wish to participate in the New Equity Pool (Sub Debt), then they shall receive nothing on account of their Allowed Claim in this case. All electing holders of Allowed Contractually Subordinated Debt Claim are subject to having their cumulative right to acquire New Equity overridden by those holders of Allowed General Unsecured Claims who elect Option C as set forth in Section 3.08 above and who tender the required amount of funds as dictated by the New Equity Pool (Sub Debt) Formula. If no holder of an Allowed Contractually Subordinated Debt Claim elects to acquire a proportionate share of the New Equity Pool (Sub Debt), then the total amount of shares available shall become part of the New Equity Pool (Capital) and shall be distributed to those holders who can and did elect to participate in the New Equity Pool (Capital) on a pro rata basis, based upon the number of shares each holder has acquired or agreed to acquire.

**3.11    Class 5: Allowed Equity Interests.**  Holders of Allowed Equity Interests shall receive no distribution or any property under the Plan on account of said Equity Interests.  All pre-petition Equity Interests shall be cancelled.  This class is deemed to have rejected the Plan.

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF PLAN

**4.01    Impairment Controversies.**  If a controversy arises as to whether any Class of Claims or Class of Equity Interests is impaired under this Plan, such Class shall be treated as specified in this Plan unless the Bankruptcy Court shall determine such controversy differently upon motion of the party challenging the characterization of a particular Class of Claims or Class of Equity Interests under this Plan.

**4.02    Classes and Claims Entitled to Vote.**  Classes 2 - 4 are impaired and the holders of Claims in those classes are therefore entitled to vote to accept or reject this Plan.   Class 5 is receiving nothing under the Plan and is deemed to reject the Plan.  Class 1 is unimpaired and is deemed to accept the Plan.

**4.03    Cramdown.**  To the extent required, the Competing Proponents, pursuant to section 1129(b) of the Bankruptcy Code, request that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not been met.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.01    Substantive Consolidation.**  On the Effective Date and without the need of further action on the part of the Debtors, DNA shall be merged into TeraForce and TeraForce shall be the surviving Consolidated Debtor, with the Estates being automatically substantively consolidated such that there will remain, on the Effective Date, only the Consolidated Debtor's Estate comprised of the assets and liabilities of each of the separate Estates, subject to the discharge as provided for in the Plan, and such that: (i) all Intercompany Claims shall be canceled and disallowed and no distributions shall be made on account thereof; (ii) all guarantees of either of the Debtors of the payment, performance or collection of obligations of the other Debtor shall be eliminated and canceled; (iii) any obligation of the Debtors and all guarantees thereof executed by the other Debtor shall be treated as a single obligation and such guaranties shall be deemed a single Claim against the Consolidated Estate; (iv) all joint obligations of the Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be treated and allowed only as a single Claim against the Consolidated Estate; and (v) each Claim against one of the Debtors or the Estates shall be deemed (a) filed or asserted against the Consolidated Estate, and (b) a single obligation of the Consolidated Estate.

Notwithstanding the automatic merger and substantive consolidation provided for herein, and without constituting a condition precedent to said merger and substantive consolidation, the Consolidated Debtor shall be entitled to file any appropriate document with any Governmental Unit to record or reflect said merger and substantive consolidation at the Consolidated Debtor deems advisable or appropriate, and all Governmental Units shall be instructed to accept such filing.

**5.02    Execution of Plan Closing Loan Documents.**  On or after the Confirmation Hearing Date, and at least one day prior to the Plan Closing Date, the Consolidated Debtor shall deliver the already executed Plan Closing Loan Documents to Alameda.  The Debtors current officers shall, by the terms of the Confirmation Order, be the representatives of the Consolidated Debtor in order to execute the Plan Letter of Credit's sworn certificate and present same to Texas State Bank.

**5.03    Plan Letter of Credit Conditions.**  The Plan Letter of Credit contains the following language as to what must accompany the letter of credit:

1. The original of this letter of credit and any amendments thereto.

2. A certified copy of the order confirming the Competing Proponents' Joint Consolidated Plan of Reorganization (the "Plan"), as it may be amended or modified (the "Confirmation Order"), in case No. 05-38756-BJH; In Re: Teraforce Technology Corporation (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

3. A sworn certificate, dated at least eleven (11) calendar days after the entry of the Confirmation Order, signed by a representative of the Beneficiary who is designated in the Confirmation Order as authorized to execute the sworn certificate, which states:

"I am the representative of the Beneficiary who is designated in the Confirmation Order as authorized to execute the sworn certificate.  According to the electronic docket in the Bankruptcy Case, as maintained by the Bankruptcy Court, eleven (11) calendar days or more have lapsed since the Confirmation Order was entered on the electronic docket and a stay of the Confirmation Order has not been granted, if a notice of appeal, motion for new trial or any other motion has been filed."

"All conditions set forth in the Confirmation Order for the funding of this irrevocable letter of credit have been met."

The only conditions which will be set forth in the Confirmation Order is that the Consolidated Debtor, by a representative designated by that order, execute the Plan Closing Loan Documents and deliver same to a representative of Alameda Corporation.

**5.04    Plan Closing Date: Funding of Plan Obligations.**  All Plan obligations which are required to be paid on the Plan Closing Date shall be funded from the following sources: (a) the Plan Letter of Credit; (b) the New Equity Pool (Capital); (c) if existent, the New Equity Pool (Subdebt) and (d) any other assets which are converted to cash by the Plan Closing Date or by virtue of the Effective Date occurring, becoming available.

**5.05.    Post Plan Closing Date Operational Funding.**  Any continuing obligations of the Consolidated Debtor will be paid from: (a) net remaining proceeds from the Plan Closing Date; (b) any additional funding required from the New Equity Pool (Capital) and/or the New Equity Pool (Subdebt) per their respective formula; and (c) collections from any claims or assets retained by the Consolidated Debtor, including but not limited to, the Vista Claim, the Reliance Claim, any other assets, and the amounts if any available from the escrows set aside for the GEF Sale.

**5.06    Capitalization of the Consolidated Debtor.**  The Post Confirmation Consolidated Debtor shall have one class of common stock.  The proceeds from the New Equity Pool (Capital) and the New Equity Pool (Subdebt) if any, as to the latter pool, shall constitute the hard "capital" of the Debtor and shall in concert with the New Equity Pool (GUC) as that value is finally determined constitute the total capitalization of the Consolidated Debtor.

**5.07    Release of Bulk-Sale and Transfer Taxes.**  Pursuant to section 1146(c) of the Bankruptcy Code, the transfer of assets to GEF under the GEF Sale Documents shall not subject the Debtors, the Estates, GEF, the Consolidated Estate, the Consolidated Debtor, or any of their employees, officers and agents to any taxation under any federal, state, local, municipal or other law imposing or purporting to impose a stamp, transfer, recording or any other similar tax on any of said transfers, and all so-called bulk sales laws shall be waived accordingly in all applicable jurisdictions.

All taxing authorities who have or may be able to assert such tax claims or any similar claims released herein and based on said transfers are enjoined and prohibited from attempting to collect any such taxes or similar claims from any of the foregoing parties.

The Debtors, their Estates, the Consolidated Estate, and the Consolidated Debtor are released from any obligations imposed pursuant to paragraph 40 of the GEF Sale Order, and funds in the Tax Account (as defined in said paragraph) may be used by the Consolidated Debtor to fund its obligations under the Plan upon the Effective Date.

**5.08    Incorporation of Rule 9019.**  To the extent necessary to effectuate and implement the releases contained in this Plan, the Plan shall be deemed to constitute a motion under Bankruptcy Rule 9019 seeking the Bankruptcy Court's approval of all of the compromises and releases contained herein.

**5.09    Incorporation of Section 363 of the Bankruptcy Code.**  The transfer of assets from the Debtors, their Estates, and their Estates to the Consolidated Debtor shall be free and clear of all liens, claims, interests, and encumbrances under §363(f) of the Bankruptcy Code, and the Consolidated Debtor shall be deemed to be good faith transferees for value entitled to the full protections of §§ 363(m) and 363(n) of the Bankruptcy Code. To the extent necessary to effectuate and implement the transfers contained in this Plan, the Plan shall be deemed to constitute a motion filed by the Debtors under § 363 of the Bankruptcy Code seeking the Court's approval of said transfers.

## ARTICLE VI

## PROVISIONS FOR THE RESOLUTION AND TREATMENT OF DISPUTED AND CONTINGENT CLAIMS

**6.01    Standing to Object to Claims or to Challenge Assertion that a Creditor is a Qualified Holder under § 382 (l)(5) IRC.**  If the Consolidated Debtor is obligated to pay a Claim under this Plan, the Consolidated Debtor shall be the sole party with standing to object to the allowance of said Claim.  If any creditor asserts that it is qualified to receive stock in lieu of debt such that the requirements of §382 (l)(5) of the Internal Revenue Code are met by designating that such creditor desires to be so treated under the Plan, then the Consolidated Debtor shall be entitled to promptly object to such creditor's designation and by same require such creditor to provide proof that it meets the requirement that such creditor's claim is qualified.   Failure to satisfy the Consolidated Debtor's requirements will result in such creditor's election being voided and Option B being deemed to be that party's elected choice.   Any such party disagreeing with such determination may seek relief from the Bankruptcy Court by motion practice procedures.

**6.02    Objection Deadline.**  All objections to Claims shall be filed by the Objection Bar Date; however, the Claims Objection Bar Date shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim. Unless arising from an Avoidance Action, any proof of Claim filed after the Bar Date shall be of no force and effect and need not be objected to by the Consolidated Debtor.  Any Disputed Claim may be litigated to Final Order. The Consolidated Debtor may compromise and settle any Disputed Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any settlement of a Disputed Claim after the Effective Date; provide, however, that nothing contained herein shall apply to the Allowance of a Professional Claim for which approval from the Bankruptcy Court is required.

**6.03    No Waiver of Right to Object.**  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Consolidated Debtor's right to object to any Claim.

**6.04    Rights Under Section 505.**  All Claims for taxes by Governmental Units shall remain subject to section 505 of the Bankruptcy Code. The Consolidated Debtor shall retain the right to a

determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code. The Consolidated Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any Objection to any claim for taxes by a Governmental Unit.

6.05    **Offsets.**  The Consolidated Debtor shall be vested with and retain all rights of offset or recoupment and all counterclaims against any holder of a Claim.

6.06    **Amendments to Claims Filed After the Confirmation Date.**  Except as otherwise provided in the Plan, a Claim may not be amended after the Confirmation Date without the prior authorization of the Bankruptcy Court. Except as otherwise provided in the Plan, any amended Claim filed with the Bankruptcy Court after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Consolidated Debtor.

6.07    **Reserve Account for Disputed Claims.**  To ensure payment of Disputed Claims, on or prior to the Plan Distribution Date, the Consolidated Debtor shall (i) establish a separate interest-bearing escrow account with a national, federally-insured banking institution (the Claims Reserve) and (ii) deposit into the Claims Reserve funds sufficient to pay a dividend of 12.5% to each holder of a Disputed Claim if all of the Disputed Claims become Allowed Claims.  No funds shall be distributed to any holder of a Disputed Claim from the Claims Reserve unless and until (i) there is a Final Order allowing the claim or (ii) as appropriate, the Consolidated Debtor has withdrawn its objection or has filed notice that it has settled, compromised or otherwise resolved such objection.

6.08    **Distribution of Excess Funds.**  As each Disputed Claim is resolved and becomes an Allowed Claim, any distributions to which such Allowed Claim is entitled shall be appropriately disbursed to such holder by the Consolidated Debtor from the Claim Reserve within 15 days of (i) an order allowing the claim becoming a Final Order or (ii) the filing of any withdrawal of objection or of a filed settlement, compromise or other disposition of such claim.  Any funds set aside in the Claims Reserve for the payment of a Disputed Claim that are not necessary to pay the claim once it has become and Allowed Claim (i.e., any excess amounts remaining in the event that a Claim is reduced in amount before allowance of such claim) shall be disbursed by the Consolidated Debtor to other holders of Allowed Unsecured Claims in accordance with applicable terms of the Plan.

## ARTICLE VII

## EXECUTORY CONTRACTS

7.01    **Rejection.**  Effective on and as of the Effective Date, all of the Debtors' Executory Contracts that have not previously been assumed or assumed and assigned or rejected by the Debtors shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.

7.02    **GEF Executory Obligations.**  Notwithstanding anything contained in this Plan to the contrary, none of the Debtors' or the Estates' rights and obligations arising from any of the GEF

Sale Documents are affected or altered by this Plan, and all such rights and obligations shall be vested in the Consolidated Debtor on the Effective Date.

**7.03    Claims for Rejection Damages.** Claims for damages allegedly arising from the rejection pursuant to this Plan or the Confirmation Order of any Executory Contract, whether rejected prior to the Effective Date or deemed rejected as a result of this Plan, must be filed with the Bankruptcy Court and served on the Consolidated Debtor, through its lead counsel, E. P. Keiffer, at the address shown on the first page of this document not later than thirty (30) days after the Effective Date. All Claims for such damages not timely filed and properly served as prescribed herein shall be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution under the Plan.

**7.04    Responsibility for Rejection Damages.**  Any Claim arising from the rejection of an Executory Contract shall, if Allowed, and only to the extent Allowed, be treated as a Claim in Class 2 Option B under the terms provided for in this Plan.

**7.05    Objections to Claim Based On Rejection Damages.** Only the Consolidated Debtor shall be entitled to file objections to Claims based on the rejection of an Executory Contract in this Plan under the law, rules, and provisions governing standing otherwise applicable to objections to claims under the Bankruptcy Code; provided, however, that any such objection shall be filed no later than one hundred and twenty days after the later: of (a) the date that such Claim is filed; or (b) the Effective Date.

**7.06    No Prejudice to Vista and Rafael.**  Notwithstanding anything contained herein to the contrary, the Plan does not affect or alter the rights and obligations of: (i) Rafael Armament Development Authority Ltd. and/or the Government of Israel – Ministry of Defense under that certain Agreed Order Approving Debtors' Settlement with and Sale to Rafael Armament Development and Rejecting Certain Contracts; or (ii) Vista Controls, Inc. and/or Curtiss-Wright Corporation under that certain Agreed Order Rejecting Vista Controls, Inc. Agreements. All rights and obligations of the Debtors or of the Estates under the aforementioned orders shall be vested in and be the obligations of the Consolidated Debtor on the Effective Date.

## ARTICLE VIII

## MAINTENANCE OF CAUSES OF ACTION AND RIGHTS

**8.01    Retention of Causes of Action.**  All causes of action, rights, claims and demands against any third parties, creditors, investors, individuals, insiders or other entities which each Debtor or each Debtor in Possession owns or has an interest in or can assert in any fashion, in any forum, since their formation, or which could be asserted by any creditor or trustee under the Bankruptcy Code, whether pre-petition or post-petition, including, but not limited to, actions under §§ 542 through 553 inclusive of the Bankruptcy Code (sometimes referred to as "Avoidance Actions") and § 510 of the Bankruptcy Code to recover assets for an applicable Debtor's estate and to subordinate

claims (collectively an applicable "Debtor's Actions"), as well as all proceeds of and recoveries on Debtor's Actions, are retained post confirmation by each applicable Debtor, save for the transfer and reservation set forth in Plan as to certain causes of action, which shall inure to the Consolidated Debtor.

## ARTICLE IX

## THE CONSOLIDATED DEBTOR

**9.01    Issuance of Stock.**  On the Plan Closing Date, the Consolidated Debtor shall issue as many shares of common stock as are required to meet and fulfill the requirements of the various New Equity Pools described in the Plan.  All New Equity issued shall be issued on account of an Allowed Claim or expense and are issued under §1145(a) or (b) and are not subject to securities laws and regulations relative to their transferability and their issuance.

**9.02    Privatization of the Consolidated Debtor.**  The Consolidated Debtor shall no longer be a publicly held company and the Consolidated Debtor shall take appropriate steps to de-list itself with the Securities and Exchange Commission, including by filing Form 15 or such other document as it may deem appropriate to effectuate the same as soon as reasonably possible after the Effective Date.

**9.03    Amendment of Articles of Incorporation and By-Laws.**  As may be required or deemed advisable by the Consolidated Debtor, the Articles of Incorporation and By-Laws of the Consolidated Debtor shall be amended as soon as reasonably practicable after the Effective Date to the extent necessary to effectuate the provisions of the Plan and Section 1123(a)(6) of the Bankruptcy Code.

**9.04    Employment.** The Consolidated Debtor will make an offer to one or more of the existing officers of the  Debtors to continue as the officer(s) of the Consolidated Debtor on a to be negotiated salary basis.  The salary to be paid to an officer(s) will be disclosed prior to the Confirmation Hearing Date by a separate filing with the Bankruptcy Court.  The officer(s) will be responsible for the general operation of the Consolidated Debtor. Their existing expertise and knowledge of the patent issues and how to make the best of their value going forward  is the justification for their retention.

**9.05    Restrictions on Future Stock Issuance or Transfers.**  On the Effective Date or as soon as reasonably practical thereafter, the Articles of Incorporation of the Consolidated Debtor will be filed or amended so as to provide that, until the second anniversary of the Effective Date: (i) any attempted sale, transfer, assignment, conveyance, grant, pledge, gift or other disposition of any share or shares of the Consolidated Debtor's capital stock (within the meaning of Section 382 of the Internal Revenue Code of 1986 (the Code)), or any option or right to purchase such stock, as defined in the Treasury Regulations under Section 382 of the Code, to any person or entity (or group of

persons or entities acting in concert) who directly or indirectly owns or would be treated as owning, or whose shares are or would be attributed to any person or entity who directly or indirectly owns or would be treated as owning, in either case prior to the purported transfer and after giving effect to the applicable attribution rules of the Code and applicable Treasury Regulations, more than 4.75% of the value of any of the Consolidated Debtor's outstanding capital stock (within the meaning of Section 382 of the Code) shall be void ab initio insofar as it purports to transfer ownership or rights in respect of such stock to the purported transferee; and (ii) any attempted sale, transfer, assignment, conveyance, grant, pledge, gift or other disposition of any share or shares of the Consolidated Debtor's capital stock (within the meaning of Section 382 of the Code), or any option or right to purchase such stock, as defined in the Treasury Regulations under Section 382 of the Code, to any person or entity (or group of persons or entities acting in concert) not described in clause (i) who directly or indirectly would own, or whose shares would be attributed to any person or entity who directly or indirectly would own or be treated as owning, in either case as a result of the transfer and after giving effect to the applicable attribution rules of the Code and the Treasury Regulations, more than 4.75% of the value of any of the Consolidated Debtor's outstanding capital stock (within the meaning of Section 382 of the Code), shall, as to the number of shares representing such excess over 4.75% be void ab initio insofar as it purports to transfer ownership to the purported transferee; provided, however, that neither clause (i) nor (ii) shall prevent a valid transfer if the transferor obtains the written approval of the Board of Directors of the Consolidated Debtor and provides the Consolidated Debtor with an opinion of counsel satisfactory to the Consolidated Debtor that the transfer shall not result in the application of any tax law limitation on the use of the Consolidated Debtor's losses or other tax attributes. No employee or agent of the Consolidated Debtor shall be permitted to record any attempted or purported transfer made in violation of the subject article and no intended transferee or optionee of shares of common stock of the Consolidated Debtor in any such attempted or purported transfer shall be recognized as a shareholder of the Consolidated Debtor of any purpose whatever.

In the event consideration is paid or delivered by an intended transferee in a transaction which is void pursuant to the foregoing, such intended transferee shall be entitled solely to restitution from the purported transferor of the consideration paid or delivered. In such event, the Consolidated Debtor may, as third party beneficiary of the restriction imposed, initiate action to effect such restitution and to enforce nullification of the attempted transfer. The Consolidated Debtor shall be entitled to damages, including reasonable attorneys' fees with costs, from the purported transferor or intended transferee or both, on account of any purported transfer. The By-Laws of the Consolidated Debtor shall make appropriate provisions to effectuate the requirements of this article. All certificates evidencing ownership of shares of capital stock of the Consolidated Debtor, including those to be issued pursuant to the Plan, shall bear a conspicuous legend as follows:

THE SHARES OF STOCK REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS PURSUANT TO ARTICLE ... OF THE ARTICLES OF INCORPORATION OF THE CORPORATION REPRINTED IN ITS ENTIRETY ON THE BACK OF THIS CERTIFICATE.

# ARTICLE X

# RELEASES

On the Effective Date, and without the need for further action, the Plan and Confirmation Order shall constitute a release and discharge by: the Debtors; the Estates; the Consolidated Estate; and the Consolidated Debtor; of any and all actions, causes of action (including Chapter 5 avoidance actions), claims, suits, debts, damages, judgments, liabilities, and demands whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state, or federal court, state or federal administrative agency or commission, regardless of location and whether now known or unknown, liquidated or unliquidated, that the Debtors or Consolidated Debtor now have or may have had, or thereafter claim to have, on behalf of themselves, or any other person or entity, against each individual who at any time served as an officer or director of one or more of the Debtors, including, but not necessarily limited to: (a) Robert E. Garrison, II; (b) David Yedwob; (c) Anton Liechtenstein; (d) Herman M. Frietsch; (e) Robert P. Capps; and (f) R. Eugene Helms ((a) through (f), inclusive, the Directors and Officers) *provided, that as to directors and officers, such directors and officers by filing a notice with the Bankruptcy Clerk's Office, waives any and all claims they may have against the Debtors for services, wages, director's fees, and expense reimbursement arising prior to the Petition Date, and any and all such claims shall be disallowed in full and expunged from the Schedules and the Claims Register; provided, however, that nothing contained herein shall constitute a waiver, release, or discharge of any obligation or liability of the Consolidated Debtor to the Directors and Officers arising under: (i) this Plan; (ii) the KERP Order; or (iii) any Administrative Claim not otherwise paid under the KERP Order. Failure to file an appropriate and timely notice will result in the Release offered not becoming operative, nor are the claims made by the parties referenced waived either. The Consolidated Debtor may then pursue whatever rights it believes the Debtors may possess as to such individuals in their respective capacities and may contest any claim filed by any such person.*

# ARTICLE XI

# EFFECTS OF PLAN CONFIRMATION

**11.01  Discharge of the Consolidated Debtor.** The terms, covenants and consideration under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtors, the Consolidated Debtor or the Assets, including, without limitation, all Unsecured Claims or Secured Claims. Except as otherwise expressly provided herein, upon the Effective Date, the Debtors and its successors in interest, the Consolidated Debtor shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, demands and liabilities that arose before the Effective Date, and all debts of any kind specified in section 502(g), 502(h), or 502(l) of the Bankruptcy Code, whether or not: (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted this Plan; or (d) the

Claim has been Allowed, Disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code other than those obligations specifically set forth pursuant to this Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Consolidated Debtor and its successors-in-interest and assigns, other than those obligations specifically set forth pursuant to this Plan.

**11.02    Injunction.** The entry of the Confirmation Order shall permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability against either of the Debtors, their Estates, or who have held, currently hold or may hold an Equity Interest in the Debtors, from taking any of the following actions on account of such Claim or Equity Interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against either of or both the Debtors, the Estates or the Consolidated Debtor with respect to any property to be distributed under the Plan including funds or reserves held or maintained by any of them pursuant to this Plan; (ii) enforcing, levying, attaching, collecting, or otherwise recovering in any manner or by any shall mean, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Estates, or the Consolidated Debtor with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan; (iii) creating, perfecting or enforcing in any manner directly or indirectly, any lien, charge or encumbrance of any kind against the Debtors, the Estates, or the Consolidated Debtor with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan; and (iv) proceeding in any manner in any place whatsoever against the Debtors or, the Estates, with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to this Plan in any way that does not conform to, or comply, or is inconsistent with, the provisions of this Plan; provided, however, that such injunction shall not preclude any party in interest from seeking to enforce or interpret the terms of the Plan through an action commenced in the Bankruptcy Court.

**11.03    No Liability for Solicitation or Participation.**  Pursuant to section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of securities offered or sold under this Plan.

**ARTICLE XII**

**MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN**

**12.01    Modification of this Plan.** The Plan Proponents may alter, amend or modify this Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by applicable law at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial

consummation of this Plan, any party in interest in the Bankruptcy Cases may, so long as the treatment of holders of Claims or Equity Interests under this Plan are not materially adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in this Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of this Plan; provided, however, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## ARTICLE XIII

## RETENTION OF JURISDICTION

**13.01 Jurisdiction of Bankruptcy Court.** Following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases and all matters arising in, or related to, the Bankruptcy Cases to the fullest extent permitted by law, including jurisdiction to:

(a)     To hear and determine motions, applications, adversary proceedings, and contested matters pending or commenced after the Effective Date, including but not limited to, Avoidance Actions and issues concerning any disputed portion of The Bean Group Secured Claim or any issue as to whether a creditor is not qualified to receive stock under the Plan;

(b)     To hear and determine objections (whether filed before or after the Effective Date) to, or requests for estimation of, any Claim or Equity Interest, and to enter any order requiring the filing of proof of any Claim or Equity Interest before a particular date;

(c)     To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided in the Plan;

(d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)     To construe and to take any action to enforce this Plan, and the Confirmation Order;

(f)     To issue such orders as may be necessary for the implementation, execution and consummation of this Plan and to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan and the Confirmation Order;

(g)     To hear and determine any applications to modify this Plan, to cure any defect or omission or to reconcile any inconsistency in this Plan, the Disclosure Statement or

in any order of the Bankruptcy Court including, without limitation, the Confirmation Order;

(h)     To hear and determine all applications for Professional Claims;

(i)     To hear and determine all issues arising under the KERP Order or related to the allowance, payment, or dispute regarding the KERP Claims.

(j)     To hear and determine other issues presented or arising under this Plan, including disputes among holders of Claims and arising under agreements, documents or instruments executed in connection with this Plan;

(k)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(m)    To enter the Final Decree; and

(n)     To hear and determine any action concerning the recovery and liquidation of Assets, wherever located, including without limitation litigation to liquidate and recover Assets that consist of Claims, rights and causes of action against third parties and actions seeking declaratory relief with respect to issues relating to or affecting Assets; and to hear and determine any action concerning the determination of taxes, tax refunds, tax attributes, and tax benefits and similar or related matters with respect to the Debtors, the Estates, or the Consolidated Debtor including, without limitation, matters concerning federal, state, local and other taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

**13.02    Failure of Bankruptcy Court to Exercise Jurisdiction.**  If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction, over any matter arising under, arising in or related to the Bankruptcy Cases, including with respect to the matters set forth above in Plan and any Plan documentation, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.01    Committee.** The Committee shall cease operating and dissolve on the Effective Date; provided, however, that notwithstanding said dissolution, the Committee shall remain in existence

and have standing for the sole purpose of filing, litigating, and obtaining, to the extent otherwise appropriate, payment from the Consolidated Debtor of the Committee's and its Professional's fees and expenses as allowed by the Bankruptcy Court.

**14.02  Plan Controls.**  To the extent there is an inconsistency or ambiguity between any term or provision contained in the Disclosure Statement and the Plan, the terms and provisions of the Plan shall control.

**14.03  Governing Law.**  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal or state laws are applicable, the laws of the State of Texas shall govern the construction, implementation and enforcement of this Plan and all rights and obligations arising under this Plan, without giving effect to the principles of conflicts of law.

**14.04  Severability.**  Should the Bankruptcy Court determine, on or prior to the Confirmation Date, that any provision of this Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Equity Interest, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and modify such provision to make it valid and enforceable to the maximum extent practicable consistent with the original purpose of such provision. Notwithstanding any such determination, interpretation, or alteration, the remainder of the terms and provisions of this Plan shall remain in full force and effect.

**14.05  Notices and Distributions.**  On and after the Effective date, all notices, requests and distributions to a holder of a Claim or Equity Interest shall be sent to the last known address of: (i) the holder or its attorney of record as reflected in the holder's proof of Claim or Administrative Expense Claim filed by or on behalf of such holder; or (ii) if there is no such evidence of a last known address, to the last known address of the holder according to the books and records of the Debtors. Any holder of a Claim or Equity Interest may designate another address for the purposes of this Section by providing the Consolidated Debtor written notice of such address, which notice will be effective upon receipt by the Consolidated Debtor.

**14.06  Unclaimed Property.**  If any property distributed by the Consolidated Debtor remains unclaimed for a period of six (6) months after it has been delivered (or delivery has been attempted) or has otherwise been made available, such unclaimed property shall be forfeited by the Person entitled to receive the property and the unclaimed property and the right to receive it shall revert to and vest in the Consolidated Debtor free and clear of any rights, claims or interests.

**14.07  Withholding and Reporting.**  In connection with this Plan and all instruments issued in connection therewith and distributions thereon, the Consolidated Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding and reporting requirements. Notwithstanding anything herein to the contrary, in calculating and making the payments due to Allowed Claims hereunder, the Consolidated Debtors shall be authorized to deduct from such payments any necessary withholding amount.

**14.08   Other Documents and Actions.** The Debtors and the Consolidated Debtors may execute such documents and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in this Plan.

## ARTICLE XV

## CONFIRMATION REQUEST

The Proponents hereby request confirmation of this Plan pursuant to Section 1129(a) of the Bankruptcy Code or, in the event that this Plan is not accepted by each of those Classes of Claims and Equity Interests entitled to vote, Section 1129(b) of the Bankruptcy Code.

*(The Remainder of this Page Left Blank Intentionally)*

DATED: February 3, 2006

**THE COMPETING PROPONENTS**

     */s/ Don B Carmichael*
**Don B Carmichael**

     */s/ Oscar S. Wyatt, Jr.*
**Oscar S. Wyatt, Jr.**

**S & G Associates**

By:   */s/ Edward C. Gaiennie*
Its:      Manager

**OF COUNSEL:**

E. P. Keiffer
State Bar No. 11181700
Hance Scarborough Wright
Ginsberg & Brusilow, LLP
The Elm Place Building
1401 Elm Street, Suite 4750
Dallas, TX 75202
Phone: (214) 651-6500
Fax: (214) 744-2615
E Mail: pkeiffer@hswgb.com

ATTORNEY FOR DON B CARMICHAEL

Michael Flume
State Bar No. 07188480
Flume Law Firm, LLP
1020 N. E. Loop 410, Suite 200
San Antonio, Texas 78209
Phone: (210) 828-5641
Fax: (210) 821-6069
E mail: mflume@flumelaw.net

ATTORNEY FOR OSCAR S. WYATT, JR.
James H. Hansen
State Bar No. 08929730
Page, Murphree, Byerly & Hansen P.L.L.C.
Two Riverway, Suite 1700
Houston, Texas 77056
Phone: (713) 877-8200
Fax: (713) 877-8202
E-mail: jhansen@pmbhlaw.com

ATTORNEY FOR S&G ASSOCIATES AND DEBENTURE HOLDERS' AGENT

Competing Proponents
Amended Joint Consolidated
Chapter 11 Plan of Reorganization

<u>Exhibit "1.5"</u>


Alameda Funding Commitment

## ALAMEDA FUNDING COMMITMENT

Alameda Corporation ("Alameda"), hereby commits to secure the necessary funds to provide the Plan Closing Loan[1] in the amount of $3,000,0000 to the Consolidated Debtor on the Plan Closing Date, by means of an irrevocable letter of credit from Texas State Bank in McAllen, Texas, provided that the following contingencies are met or are waived by Alameda: a) the Competing Proponents file, in accordance with orders of the Bankruptcy Court, its plan and disclosure statement; b) the Competing Proponents disclosure statement is approved by the Bankruptcy Court; c) the Competing Proponents plan, as it may be amended or modified, is confirmed; and d) the Competing Proponents plan's Effective Date is not stayed in any manner.

It shall be sufficient proof of the conditions b)-d)above that: i) an electronic notification from the Bankruptcy Court per its ECF system, that condition has occurred; and ii) as to the final condition, an electronic copy of the docket in Case No. 05-38756-BJH-11 (Jointly Administered) from the Bankruptcy Court's ECF system showing that eleven days or more have lapsed since the entry of the Confirmation Order and that the Plan Closing Loan Documents have been executed by the Consolidated Debtor.

Dated:  February 3, 2006.

Alameda Corporation
(a Texas Corporation)


By:____*/s/ M. T. Arnold*_____
          M. T. Arnold, President

---

[1]All capitalized terms not otherwise defined herein are defined in the Competing Proponents Joint Consolidated Plan of Reorganization for Teraforce Technology Corporation, et al., Case No. 05-38756-BJH-11 (Jointly Administered)

Competing Proponents
Amended Joint Consolidated
Chapter 11 Plan of Reorganization

<u>Exhibit "1.23"</u>


Carmichael Funding Commitment

## CARMICHAEL PLAN COMMITMENT

Don B Carmichael, as the holder of an unsecured claim in the amount of $510,236 does hereby commit to fund to his counsel and if the Competing Plan is confirmed, the sums necessary to acquire my pro-rata share of the New Equity Pool (Capital) per the requirements of the New Equity Pool (Capital) Formula, as well as other applicable provisions of the Competing Proponents Plan. I am ready, willing and able to fund the maximum percentage I can acquire as an unsecured creditor in this case, which is 11.5% of the New Equity Pool (Capital). I am also ready, willing and able to fund any supplemental increase in the effective pre share price for such stock as may be dictated by the resolution of claims objections and the resulting adjustment to the final price per share required

**Don B Carmichael**

Competing Proponents
Amended Joint Consolidated
Chapter 11 Plan of Reorganization

<u>Exhibit "1.71"</u>


Promissory Note
and Security Agreement

**PROMISSORY NOTE**

Effective Date:  The 11th day after entry of the Confirmation Order of the Competing Proponents' Joint Consolidated Plan of Reorganization in Case No. 05-38756-BJH, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, which date is _____.

FOR VALUE RECEIVED, the undersigned, TERAFORCE TECHNOLOGY CORPORATION, a Texas corporation, as maker (hereinafter called "Maker"), promises to pay to the order of ALAMEDA CORPORATION, a Texas corporation, as payee (hereinafter called "Payee", which term shall also refer to any subsequent owner or holder of this Note), the principal sum of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00), together with interest thereon accruing on any and all principal amounts from time to time remaining unpaid, at the per annum rate hereinafter stated (the "Stated Rate"), said principal and interest being payable in lawful money of the United States of America at 8 Greenway Plaza, Suite 930, Houston, Harris County, Texas 77046.

This Note shall bear interest, except on past due sums, at a per annum rate equal to the lesser of either the Prime Rate (as hereinafter defined) plus ONE PERCENT (1.00%), floating, or the Maximum Lawful Rate (as hereinafter defined) permitted by applicable law.  Interest shall be calculated on the basis of a three hundred sixty (360) day year for the actual number of days elapsed (including the first day, but excluding the last day), unless such rate would result in a usurious rate, in which case, interest shall be calculated on the basis of three hundred sixty-five (365) or three hundred sixty-six (366) days, as appropriate.  "Prime Rate" as used herein shall mean the rate of interest publicly announced as the prime lending rate on corporate loans at large U.S. money center commercial banks, as published on the first business day of each calendar quarter in the Money Rates Section of the Wall Street Journal.  Without notice to the Maker or any other person, the Prime Rate shall automatically fluctuate upward or downward.  It is expressly agreed and understood that the Prime Rate is an index chosen by Payee as a general reference rate of interest, taking into account such factors as Payee may deem appropriate, it being understood that many of Payee's commercial or other loans are priced in relation to the Prime Rate, that the use of the Prime Rate is not to be construed as a warranty or representation that such rate is more favorable than another rate or index, that rates on other loans or credit facilities may be based on indices other than on the Prime Rate, or that rates on loans to others may be made below the Prime Rate.

Interest only on this Note shall be due and payable monthly as its accrues, with the first such installment of interest being due and payable one (1) month after the date hereof and continuing regularly and monthly thereafter on the same day of each succeeding month until the expiration of twenty-four (24) months after the date hereof.  Thereafter, principal and accrued interest are due and payable in equal monthly installments based on a ten (10) year amortization, beginning twenty-five (25) months after the date hereof and continuing regularly and monthly thereafter on the same day of each succeeding month until the expiration of five (5) years from the date hereof, when the entire amount of principal and interest remaining unpaid, shall be due and payable.  Interest will be calculated on the unpaid principal to the date of each payment made.  Payments will be credited first to accrued unpaid interest and then to reduction of principal.  Payee may adjust the monthly installments in its sole discretion to maintain the established amortization.

The Stated Rate shall not originally be, nor ever be increased to, a rate greater than the

maximum non-usurious contract rate of interest (determined from time to time if the applicable maximum rate is a floating rate) that Payee may charge Maker under applicable law and in regard to which Maker would be prevented successfully from raising the claim or defense of usury. Nothing is this Note or any related contract, charge or receipt, is intended to permit Payee or any other person to contract for, charge or receive any interest or other amount in excess of the maximum rate or amount allowed by applicable law, including, as applicable, the laws of the United States of America and any preemptions thereunder. For purposes of determining compliance with applicable laws, the following shall apply to the maximum extent permitted by law: (a) any contract, charge or receipt, whether occurring now or in the future, shall be strictly limited by this provision; (b) the "Maximum Lawful Rate" shall mean the maximum lawful ceiling, rate or amount that lender could have contracted to charge or receive under Texas law or applicable federal law, whichever permits the highest maximum ceiling, rate or amount; (c) to the extent Texas law establishes the Maximum Lawful Rate, the parties elect the "weekly" rate under Chapter 303 of the Texas Finance Code or the most favored lender rate, whichever is greater; (d) the Payee may calculate rates or amounts by amortizing, prorating, allocating, and spreading amounts contracted for, charged or received over the full term or longer if permitted by applicable law; (e) no contract, charge or receipt shall obligate maker or any obligor to pay any amount in excess of the Maximum Lawful Rate; and (f) any contract, charge or receipt that, in the event of acceleration or under any other contingency whatsoever, purports to require the payment or collection of any amount in excess of the Maximum Lawful Rate, shall be automatically constrained and reformed so as not to obligate maker or any obligor to pay any amount in excess of the Maximum Lawful Rate. If the Payee or any other person ever contracts for, charges or receives a rate or amount in excess of the Maximum Lawful Rate respecting this loan document or any related contract, charge or receipt, the excess (whether denominated principal, time-price differential, interest, charge, fee or otherwise) shall be automatically constrained and subject to reallocation, cancellation, credit, application, or refund so as to eliminate any amount in excess of the Maximum Lawful Rate.

In addition to and without limitation of any defenses to which Payee may be entitled under applicable law, Maker and any obligor agree to provide Payee with written notice and a reasonable opportunity of at least sixty (60) days to correct any excessive contract, charge or receipt, and any corrective action by Payee shall relieve Payee of any liability regarding same. Any such notice to Payee must be by certified mail, return receipt requested, and must provide Payee with specific details regarding the nature and extent of any alleged excessive contract, charge or receipt.

In the event Maker elects to prepay this Note, Maker shall provide written notice thereof to Payee at least thirty (30) days prior to the date to be fixed therein for prepayment, and such prepayment shall include the payment of all accrued interest on the amount prepaid (and any interest payable at a higher per annum rate for late payments, if any, and any other sums that may be payable under any other loan document executed by Maker in connection with this Note) to the date so fixed.

Maker may prepay this Note in whole or in part at any time without being required to pay any penalty or premium for such privilege. All payments hereunder, whether designated as payments of principal or interest, shall be applied first to unpaid and accrued interest, then to the discharge of any expenses or damages for which the holder of this Note may be entitled to receive reimbursement under the terms of this Note or any other instrument now or hereafter executed in connection with or as security for this Note, and last to unpaid principal. In the application of any prepayment of principal as provided for in the preceding sentence, if any principal hereof is to be paid in

installments, in the absence of any written agreement between Maker and Payee, each such prepayment shall be applied to installments of principal in the inverse order of maturity. All past due sums, including principal and interest of this Note, whether due as the result of acceleration of maturity or otherwise, shall bear interest at the Maximum Lawful Rate, or if applicable law shall not provide for a Maximum Lawful Rate, at a rate per annum equal to the eighteen percent (18.0%) from the date the payment thereof shall have become due until the same have been fully discharged by payment. In addition, Payee may charge and collect a late fee of five percent (5.0%) of any scheduled installment that is more than ten (10) days past due.

Upon an event of default (as defined in the Commercial Security Agreement securing this Note and described below), at the option of Payee and subject to notice and rights to cure provided to Maker under the terms of the Commercial Security Agreement, this Note and any and all other indebtedness of Maker to Payee shall become and be due and payable forthwith without demand, notice of default or of intent to accelerate the maturity hereof, notice of acceleration, notice of nonpayment, presentment, protest or notice of dishonor, all of which are hereby expressly waived by Maker and each other liable party. Notwithstanding anything to the contrary in the Commercial Security Agreement securing this Note, the Maker shall be in default under this Note in the event that Maker or any guarantor defaults under any loan, extension of credit, security agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Maker's property or Maker's ability to repay this Note or perform Maker's obligations under this Note or any related document.

Maker and each other liable party shall be directly and primarily, jointly and severally, liable to any legal holder of this Note for the payment of all sums called for hereunder. Maker and each other liable party hereby expressly and severally waive grace, any and all demands of any kind or nature whatsoever, any and all notices of any kind or nature whatsoever (including but not limited to notice of default, notice of non-payment, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of acceleration of the maturity hereof, or notice of protest), dishonor, presentment of any kind or nature whatsoever, protest, and diligence in collecting or bringing any suit on or under this Note or any other instrument now or hereafter executed in connection with or as security for this Note, whether before or after the maturity of this Note. Maker and each other liable party agree:

> (1)     that Payee or other legal holder of this Note may, at any time, and from time to time, on request of or by agreement with Maker or any other liable party, with or without notice to or the consent of Maker or any other liable party, extend the date of maturity of, renew, extend for any period or rearrange all or any part hereof;

> (2)     that it will not be necessary for Payee or any holder hereof, in order to enforce payment of this Note, to first institute or exhaust its remedies against Maker or any other liable party or to enforce its rights against any security for this Note; and

> (3)     to any substitution, exchange or release of any security now or hereafter given for this Note or the release of any party, in whole or in part, primarily or secondarily liable hereon, with or without notice to or the consent of Maker or any other liable party.

If in the event of default hereunder or under any other instrument now or hereafter executed in connection with or as security for this Note, this Note is placed in the hands of any attorney for

collection (whether or not suit is filed), or if this Note is collected by suit or legal proceedings or through probate, bankruptcy, receivership, reorganization, arrangement or other legal proceedings, Maker and each other liable party agree to pay the reasonable attorneys fees of Payee and the expenses of collection in connection therewith, but in no event to exceed the maximum amount permitted by applicable law.  It is stipulated and agreed that reasonable attorney's fees shall be TEN AND 00/100 PERCENT (10.00%) of all sums due hereunder unless any party pleads otherwise.

In addition to any other right, security interest, or remedy which Payee may have or which may be available to Payee or which may exist, arising out of or created under this Note, any other instrument now or hereafter executed in connection with or as security for this Note, statutory law, common law, equitable principles, or otherwise, Maker and each other liable party agree that:

(1)     Maker and each other liable party hereby pledge to Payee as security for the payment of any sums due hereunder and any and all other indebtedness or obligations of Maker or any other liable party, respectively, to Payee, and grant Payee a lien on and security interest in, all funds and property of Maker and each other liable party on deposit with Payee or in control or possession of Payee, it being expressly understood that the pledge and lien hereby granted and created shall be in addition to Payee's right of set off, as well as any other rights and remedies which Payee may have; and

(2)     in the event of default hereunder or under any other instrument now or hereafter executed in connection with or as security for this Note, Payee is hereby authorized at any time and from time to time, to set off (less any rebate required by law) any and all money and deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Payee to or for the credit or the account of Maker or any other liable party and Payee may retain and apply said money, deposits or proceeds of such collections to the payment of or against any and all sums due hereunder and any and all other indebtedness or obligations of Maker or any other liable party to Payee, irrespective of whether or not Payee shall have made any demand under this Note or the instrument creating such indebtedness or obligation, and although such indebtedness or obligations may be unmatured, provided however, Payee agrees promptly to notify the party whose account has been set off after any such set off and application has been made by Payee, but, provided further, that the failure to give such notice shall not affect the validity of such set off and application thereof, it being expressly understood that the rights of Payee under this subparagraph are in addition to any other rights and remedies, including, without limitation, other rights of set off, which Payee may have.  If Maker's or any other liable party's deposits or right to receive money from Payee is also owned by someone who has not agreed to pay this Note, Payee's right of set off will apply to Maker's or such other liable party's interest in the deposit or obligation and to any other amounts Maker or such other liable party could withdraw on Maker's or such other liable party's sole request, signature or endorsement.  Payee's right of set off does not apply to an account or other obligation where Maker's or any other liable party's rights are only as a fiduciary, nor shall any such right of set off apply to any Individual Retirement Account, other tax deferred retirement account or any other property which is exempt by law.  Payee will not be liable for the dishonor of any check when the dishonor occurs because Payee set off any indebtedness pursuant to this subparagraph against any of Maker's or any other liable party's account, and Maker and such other liable parties agree to hold Payee harmless from any claims arising as a result of Payee's exercise of Payee's right of setoff.

Any check, draft, money order or other instrument given in payment of any portion of this Note may be accepted by the holder hereof and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instrument are unconditionally received by the holder and applied to this indebtedness in the manner provided elsewhere herein.

This Note is the promissory note referred to herein, has been issued pursuant to, is entitled to the benefits of, and/or is secured by the following (all of which, together with this Note and all other documents executed and delivered in connection with the loans evidenced by this Note, are referred to as the "Loan Documents"):

(1)   a first lien security interest created by that certain Commercial Security Agreement (the "Commercial Security Agreement") of even date herewith, executed by Maker to Payee, that conveys the following described personal property to wit:

All inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

All of Debtor's interest in the Reliance Insurance claim pending in the Commonwealth Court of the state of Pennsylvania under Case No. 269MD2001, including, but not limited to, Debtor's interest in the March 2005 Notice of Determination.

All of Debtor's interest in all claims and causes of action against one or both of Vista Controls, Inc. and Curtis Wright Corporation and all affiliates and subsidiaries.

(2)   all other security agreements, pledge agreements, collateral assignments, deeds of trust, mortgages, and other lien instruments of any nature, including those executed simultaneously herewith, and those heretofore or hereafter executed, by Maker and/or other(s) in favor of Payee as security for this Note and any other sums that Maker may owe to Payee.

Reference is hereby made to the above documents for a more particular description of the property covered thereby and for all relevant purposes.

By the acceleration clauses herein, the Payee expressly does <u>not</u> intend thereby to collect any excessive unearned interest or finance charges in the event of acceleration of the amounts due hereunder.

Each Maker states that the purposes of the loan evidenced by this Note are primarily for business and commercial purposes, and <u>not</u> for personal, family, household, or agricultural purposes.

Each Maker is jointly and severally responsible for the entire amount of this Note. The terms Maker and Payee and other nouns and pronouns include the plural if more than one and include the masculine or feminine where appropriate.

<u>**NOTICE TO MAKER:**</u>

> ***THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.***

> ***THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.***

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE PAYEE IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. A NEW APPLICATION FOR REFINANCING MAY BE CONSIDERED AT MATURITY.**

**THIS NOTE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS. IN CONNECTION THEREWITH, THE PARTIES ELECT THE WEEKLY RATE CEILING UNDER CHAPTER 303 OF THE TEXAS FINANCE CODE. THE PARTIES AGREE THAT THIS LOAN IS FOR BUSINESS PURPOSES, SHALL BE GOVERNED BY SUBTITLE A OF TITLE 4 OF THE TEXAS FINANCE CODE, AND SHALL NOT BE GOVERNED BY CHAPTER 346 OF THE TEXAS FINANCE CODE.**

**IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THE DISTRICT COURTS OF HARRIS COUNTY, TEXAS AND FEDERAL DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS SHALL HAVE EXCLUSIVE JURISDICTION AND VENUE OF ALL PROCEEDINGS BASED ON OR ARISING OUT OF THIS NOTE, AND MAKER HEREBY SUBMITS TO THE JURISDICTION OF SUCH COURTS.**

EXECUTED to be effective on the date above first written.

MAKER:

TERAFORCE TECHNOLOGY CORPORATION

BY:_____

NAME:_____

TITLE:_____

# COMMERCIAL SECURITY AGREEMENT

Effective Date:  The 11th day after entry of the Confirmation Order of the Competing Proponents' Joint Consolidated Plan of Reorganization in Case No. 05-38756-BJH, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, which date is _____.

Debtor: TERAFORCE TECHNOLOGY CORPORATION

Debtor's Mailing Address:

> 1240 E. CAMPBELL ROAD
> RICHARDSON, TEXAS 75081-1935

Secured Party: ALAMEDA CORPORATION

Secured Party's Mailing Address:

> 8 GREENWAY PLAZA, SUITE 930
> HOUSTON, TEXAS 77046

**Collateral:**

All inventory, equipment, accounts, chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

All of Debtor's interest in the Reliance Insurance claim pending in the Commonwealth Court of the state of Pennsylvania under Case No. 269MD2001, including, but not limited to, Debtor's interest in the March 2005 Notice of Determination.

All of Debtor's interest in all claims and causes of action against one or both of Vista Controls, Inc. and Curtis Wright Corporation and all affiliates and subsidiaries.

**Obligation:**

Promissory Note

Date: The 11th day after confirmation of the Competing Proponents' Joint Consolidated Plan of Reorganization in Case No. 05-38756-BJH, pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, which date is _____.

Amount: THREE MILLION AND NO/100 DOLLARS ($3,000,000.00)

Maker: TERAFORCE TECHNOLOGY CORPORATION

Payee: ALAMEDA CORPORATION

Final Maturity Date: as therein provided

Terms of Payment: as therein provided

**Debtor's Representation Concerning Location of Collateral:**

Subject to the terms of this Agreement, Debtor grants to Secured Party a security interest in the collateral and all its proceeds to secure payment and performance of Debtor's obligation in this security agreement and all renewals and extensions of any of the obligation.

**Debtor's Warranties**

1. Financing Statement. Except for that in favor of Secured Party, no financing statement covering the collateral is filed in any public office.

2. Ownership. Debtor owns the collateral and has the authority to grant this security interest. Ownership is free from any setoff, claim, restriction, lien, security interest, or encumbrance except this surety interest and liens for taxes not yet due.

3. Fixtures and Accessions. None of the collateral is affixed to any real estate, is an accession to any goods, is commingled with other goods, or will become a fixture, accession, or part of a product or mass with other goods except as expressly provided in this Agreement.

4. Financial Statements. All information about Debtor's financial condition provided to Secured Party was accurate when submitted, as will be any information subsequently provided.

**Debtor's Covenants**

1. Protection of Collateral. Debtor will defend the collateral against all claims and demands adverse to Secured Party's interest in it and will keep it free from all liens except those for taxes not yet due and from all security interests except this one. The collateral will remain in Debtor's possession or control at all times, except as otherwise provided in this Agreement. Debtor will maintain the collateral in good condition and protect it against misuse, abuse, waste, and deterioration except for ordinary wear and tear resulting from its intended use.

2. Insurance. Debtor will insure the collateral in accord with Secured Party's reasonable requirements regarding choice of carrier, casualties insured against, and amount of coverage. Policies

will be written in favor of Debtor and Secured Party according to their respective interests or according to Secured Party's other requirements. All policies will provide that Secured Party will receive at least ten days' notice before cancellation and the policies or certificates evidencing them will be provided to Secured Party when issued. Debtor assumes all risk of loss and damage to the collateral to the extent of any deficiency in insurance coverage. Debtor irrevocably appoints Secured Party as attorney-in-fact to collect any return, unearned premiums, and proceeds of any insurance on the collateral and to endorse any draft or check deriving from the policies and made payable to Debtor.

      3.    Secured Party's Costs. Debtor will pay all expenses incurred by Secured Party in obtaining, preserving, perfecting, defending, and enforcing this security interest or the collateral and in collecting or enforcing the note. Expenses for which Debtor is liable include, but are not limited to, taxes, assessments, reasonable attorney's fees, and other legal expenses. These expenses will bear interest from the dates of payments at the highest rate stated in notes that are part of the obligation, and Debtor will pay Secured Party this interest at a time and place reasonably specified by Secured Party. These expenses and interest will be part of the obligation and will be recoverable as such in all respects.

      4.    Additional Documents. Debtor will sign any papers that Secured Party considers necessary to obtain, maintain, and perfect this security interest or to comply with any relevant law.

      5.    Notice of Changes. Debtor will immediately notify Secured Party of any material change in the collateral, including, but not limited to any new, renewed or cancelled government contracts pledged as collateral under the terms hereof; change in Debtor's name, address, or location; change in any matter warranted or represented in this Agreement; change that may affect this security interest; and any event of default.

      6.    Use and Removal of Collateral. Debtor will use the collateral primarily according to the stated classification unless Secured Party consents otherwise in writing. Debtor will not permit the collateral to be affixed to any real estate, to become an accession to any goods, to be commingled with other goods, or to become a fixture, accession, or part of a product or mass with other goods except as expressly provided in this Agreement.

      7.    Sale. Debtor will not sell, transfer, or encumber any of the collateral without the prior written consent of Secured Party, other than in the ordinary course of business.

**Rights and Remedies of Secured Party**

      1.    Generally. Secured Party may exercise the following rights and remedies either before or after default:

            a.    take control of any proceeds of the collateral;

            b.    release any collateral in Secured Party's possession to any debtor, temporarily or otherwise;

            c.    take control of any funds generated by the collateral, such as refunds from and proceeds of insurance, and reduce any part of the obligation accordingly or permit Debtor to use such funds to repair or replace damaged

or destroyed collateral covered by insurance; and

    d.     demand, collect, convert, redeem, settle, compromise, receipt for, realize on, sue for, and adjust the collateral either in Secured Party's or Debtor's name, as Secured Party desires.

    2.     Insurance. If Debtor fails to maintain insurance as required by this Agreement or otherwise by Secured Party, then Secured Party may purchase single-interest insurance coverage that will protect only Secured Party. If Secured Party purchases this insurance, its premiums will become part of the obligation.

## Events of Default

    Each of the following conditions is an event of default:

    1.     if Debtor defaults in timely payment or performance of any obligation, covenant, or liability in any written agreement between Debtor and Secured Party or in any other transaction secured by this Agreement;

    2.     if any warranty, covenant, or representation made to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made;

    3.     if a receiver is appointed for Debtor or any of the collateral;

    4.     if the collateral is assigned for the benefit of creditors or, to the extent permitted by law if bankruptcy or, insolvency proceedings commence against or by any of these parties: Debtor; any partnership of which Debtor is a general partner; and any maker, drawer, acceptor, endorser, guarantor, surety, accommodation party, or other person liable on or for any part of the obligation;

    5.     if any financing statement regarding the collateral but not related to this security interest and not favoring Secured Party is filed;

    6.     if any lien attaches to any of the collateral; and

    7.     if any of the collateral is lost, stolen, damaged, or destroyed, unless it is promptly replaced with collateral of like quality or restored to its former condition.

## Remedies of Secured Party on Default

    During the existence of any event of default, Secured Party may declare the unpaid principal and earned interest of the obligation immediately due in whole or part, enforce the obligation, and exercise any rights and remedies granted by Chapter 9 of the Texas Business and Commerce Code or by this Agreement, including the following:

    1.     require Debtor to deliver to Secured Party all books and records relating to the collateral;

    2.     require Debtor to assemble the collateral and make it available to Secured Party at a

place reasonably convenient to both parties;

3.      take possession of any of the collateral and for this purpose enter any premises where it is located if this can be done without breach of the peace;

4.      sell, lease, or otherwise dispose of any of the collateral in accord with the rights, remedies, and duties of a secured party under Chapters 2 and 9 of the Texas Business and Commerce Code after giving notice as required by those chapters; unless the collateral threatens to decline speedily in value, is perishable, or would typically be sold on a recognized market. Secured Party will give Debtor reasonable notice of any public sale of the collateral or of a time after which it may be otherwise disposed of without further notice to Debtor; in this event, notice will be deemed reasonable if it is mailed, postage prepaid, to Debtor at the address specified in this Agreement at least ten days before any public sale or ten days before the time when the collateral may be otherwise disposed of without further notice to Debtor;

5.      surrender any insurance policies covering the collateral and receive the unearned premium;

6.      apply any proceeds from disposition of the collateral after default in the manner specified in Chapter 9 of the Texas Business and Commerce Code, including payment of Secured Party's reasonable attorney's fees and court expenses; and

7.      if disposition of the collateral leaves the obligation unsatisfied, collect the deficiency from Debtor.

**General Provisions**

1.      Parties Bound. Secured Party's rights under this Agreement shall inure to the benefit of its successors and assigns. Assignment of any part of the obligation and delivery by Secured Party of any part of the collateral will fully discharge Secured Party from responsibility for that part of the collateral. If Debtor is more than one, all their representations, warranties, and agreements are joint and several. Debtor's obligations under this Agreement shall bind Debtor's personal representatives, successors, and assigns.

2.      Waiver. Neither delay in exercise nor partial exercise of any of Secured Party's remedies or rights shall waive further exercise of those remedies or rights. Secured Party's failure to exercise remedies or rights does not waive subsequent exercise of those remedies or rights. Secured Party's waiver of any default does not waive further default. Secured Party's waiver of any right in this Agreement or of any default is binding only if it is in writing. Secured Party may remedy any default without waiving it.

3.      Reimbursement. If Debtor fails to perform any of Debtor's obligations, Secured Party may perform those obligations and be reimbursed by Debtor at the place where the note is payable for any sums so paid, including attorney's fees and other legal expenses, plus interest on those sums from the dates of payment at the rate stated in the note for matured, unpaid amounts. The sum to be reimbursed shall be secured by this security agreement.

4.      Interest Rate. Interest included in the obligation shall not exceed the maximum amount of

nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited to the principal of the obligation or, if that has been paid, refunded.  On any acceleration or required or permitted prepayment of the obligation, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal amount of the obligation or, if the principal amount has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the obligation.

5.     Modifications. No provisions of this Agreement shall be modified or limited except by written agreement.

6.     Severability. The unenforceability of any provision of this Agreement will not affect the enforceability or validity of any other provision.

7.     After-Acquired Consumer Goods. This security interest shall attach to after-acquired consumer goods only to the extent permitted by law.

8.     Applicable Law. This Agreement will be construed according to Texas laws.

9.     Place of Performance. This Agreement is to be performed in the county of Secured Party's mailing address.

10.     Financing Statement. A carbon, photographic, or other reproduction of this Agreement or any financing statement covering the collateral is sufficient as a financing statement.

11.     Presumption of Truth and Validity.  If the collateral is sold after default, recitals in the bill of sale or transfer will be prima facie evidence of their truth, and all prerequisites to the sale specified by this Agreement and by Chapter 9 of the Texas Business and Commerce Code will be presumed satisfied.

12.     Singular and Plural. When the context requires, singular nouns and pronouns include the plural.

13.     Priority of Security Interest. This security interest shall neither affect nor be affected by any other security for any of the obligation.  Neither extensions of any of the obligation nor releases of any of the collateral will affect the priority or validity of this security interest with reference to any third person.

14.     Cumulative Remedies. Foreclosure of this security interest by suit does not limit Secured Party's remedies, including the right to sell the collateral under the terms of this Agreement.  All remedies of Secured Party may be exercised at the same or different times, and no remedy shall be a defense to any other.   Secured Party's rights and remedies include all those granted by law or otherwise, in addition to those specified in this Agreement.

15.     Other Indebtedness. Debtor further agrees that this Security Agreement shall secure, in addition to the indebtedness and/or obligations described herein, to secure the payment and performance of all other indebtedness and obligations of whatever kind and character (except solely any indebtedness which is prohibited from being secured hereby under any applicable law of the State of Texas or the United States of America), owing or which may hereafter become owing or to be performed by Debtor or any obligor to Secured Party, whether such indebtedness or obligations are evidenced by a note, open account, overdraft, endorsement, surety agreement, guaranty agreement, or otherwise, and whether such indebtedness or obligations are present or future, direct or indirect, primary or secondary,

6

joint or several, fixed or contingent or otherwise, whether such indebtedness or obligations were originally owed to Secured Party or to be performed for Secured Party, and whether or not such indebtedness or obligations were created or otherwise by any Secured Party, and whether or not such indebtedness or obligations were created by any then owner of any interest in or to any of the personal property being pledged as collateral herein, it being contemplated that Debtor or obligor may now or hereafter be or become indebted or obligated to Secured Party in further sum or sums; and Debtor further agrees that if any default ever occurs under any instrument, document or other writing whatsoever now or hereafter evidencing or securing any indebtedness owed by Debtor to Secured Party, then, in any such event, Secured Party may, at its option, (without demand, notice of any such default or event, notice of intent to accelerate maturity, notice of acceleration of maturity, presentment for payment or acceleration or any other act or notice whatsoever), declare immediately due and payable any and all indebtedness then secured hereby.

16.     Agency. Debtor's appointment of Secured Party as Debtor's agent is coupled with an interest and will survive any disability of Debtor.

**DEBTOR:**

TERAFORCE TECHNOLOGY CORPORATION

BY:_____

NAME:_____

TITLE:_____

Competing Proponents
Amended Joint Consolidated
Chapter 11 Plan of Reorganization

<u>Exhibit "1.72"</u>

Plan Letter of Credit

# TEXAS STATE BANK



TEXAS STATE BANK
IRREVOCABLE LETTER OF CREDIT
NUMBER 2528

Issuance Date: January 26, 2006

Expiration Date: July 26, 2006

Issuer:  Texas State Bank

Address of Issuer:

> 3900 N. 10th Street
> McAllen, Texas 78501

Beneficiary: Teraforce Technology Corporation, or its successor under the Plan (hereinafter defined)

Address of Beneficiary:

> 1240 E. Campbell Road
> Richardson, Texas 75081-1935

Bank Customer: O. S. Wyatt, Jr.

Address of Bank Customer:

> 8 Greenway Plaza, Suite 930
> Houston, Texas 77046

Credit Amount in U. S. Dollars:

> Three Million and No/100ths Dollars (US $3,000,000.00)

Legend To Be Included on Draft:

> The single draft drawn under this credit must be marked:
>
> "DRAWN UNDER TEXAS STATE BANK IRREVOCABLE LETTER OF CREDIT NUMBER 2528";

and addressed to Texas State Bank, Attention: Letter of Credit Department - Fourth Floor, 3900 N. 10th Street, McAllen, Texas 78501.

> Issuer hereby establishes its irrevocable letter of credit in Beneficiary's favor at the request of and for the account of Bank Customer, for the amount of $3,000,000.00. This letter of credit is available for payment by Beneficiary's single draft drawn at sight on

Issuer accompanied by the Required Documents (hereinafter defined), so long as this letter of credit is presented for payment on or before Issuer's close of business on July 26, 2006, at Issuer's office located at Texas State Bank, Letter of Credit Department - Fourth Floor, 3900 N. 10th Street, in McAllen, Texas. Issuer hereby engages with Beneficiary that all drafts drawn under and in compliance with the terms of this letter of credit will be duly honored upon presentation.

As used herein, "Required Documents" means:

      1. The original of this letter of credit and any amendments thereto.

      2. A certified copy of the order confirming the Competing Proponents' Joint Consolidated Plan of Reorganization (the "Plan"), as it may be amended or modified (the "Confirmation Order"), in case No. 05-38756-BJH; In Re: Teraforce Technology Corporation (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

      3. A sworn certificate, dated at least eleven (11) calendar days after the entry of the Confirmation Order, signed by a representative of the Beneficiary who is designated in the Confirmation Order as authorized to execute the sworn certificate, which states:

      "I am the representative of the Beneficiary who is designated in the Confirmation Order as authorized to execute the sworn certificate. According to the electronic docket in the Bankruptcy Case, as maintained by the Bankruptcy Court, eleven (11) calendar days or more have lapsed since the Confirmation Order was entered on the electronic docket and a stay of the Confirmation Order has not been granted, if a notice of appeal, motion for new trial or any other motion has been filed."

      "All conditions set forth in the Confirmation Order for the funding of TEXAS STATE BANK IRREVOCABLE LETTER OF CREDIT NUMBER 2528 have been met."

This letter of credit is non transferable.

This letter of credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision) International Chamber of Commerce Publication Number 500.

      Sincerely yours,

      TEXAS STATE BANK

      By

      Curtis Brockman
      Executive Vice President

Competing Proponents
Amended Joint Consolidated
Chapter 11 Plan of Reorganization

<u>Exhibit "1.86"</u>

Wyatt Funding Commitment

## WYATT PLAN COMMITMENT

Oscar S. Wyatt, Jr. as the holder of an unsecured claim in the amount of $3,926,729.50 does hereby commit to fund to his counsel and if the Competing Plan is confirmed, the sums necessary to acquire my pro-rata share of the New Equity Pool (Capital) per the requirements of the New Equity Pool (Capital) Formula, as well as other applicable provisions of the Competing Proponents Plan. I am ready, willing and able to fund the maximum percentage I can acquire as an unsecured creditor in this case, which is 88.5% of the New Equity Pool (Capital). I am also ready, willing and able to fund any supplemental increase in the effective pre share price for such stock as may be dictated by the resolution of claims objections and the resulting adjustment to the final price per share required

OSCAR S. WYATT, JR.