

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed August 18, 2006**

_Barbara J. Houser_
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TERAFORCE TECHNOLOGY | § | CASE NO. 05-38756-BJH-11 |
| CORPORATION | § | |
| | § | |
| and | § | |
| | § | |
| DNA COMPUTING SOLUTIONS, INC. | § | CASE NO. 05-83757-BJH-11 |
| | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Final Application of Locke Liddell & Sapp LLP for Allowance of

Compensation and Reimbursement of Expenses (the "Final Fee Application") for the period from

October 1, 2005 through April 21, 2006 (the "Final Fee Period") and the objections thereto by the

Bean Group and the Reorganized Debtor Teraforce Technology Corporation (collectively, the

"Objecting Parties"). A hearing was held on the Final Fee Application (the "Final Fee Application

Hearing") on May 24, 2006. The Final Fee Application Hearing was continued to June 8, 2006 and

ultimately concluded on July 26, 2006. At the conclusion of the Final Fee Application Hearing, the Court allowed the parties to file post-hearing briefs. Upon the filing of the final brief on July 31, 2006, the Court took the Final Fee Application under advisement. The Court has core jurisdiction over the Final Fee Application pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I. Procedural Background

Teraforce Technology Corporation ("Teraforce") and DNA Computing Solutions, Inc. ("DNA") (collectively, the "Debtors") filed separate petitions for Chapter 11 relief on August 3, 2005 (the "Petition Date"). The Debtors' cases were ordered jointly administered on August 5, 2005. Docket ("Dkt.") 34.[1]

On August 10, 2005, the Office of the United States Trustee appointed the Official Unsecured Creditors' Committee (the "Committee") in the Case. Dkt. 51. On August 17, 2005, the Committee filed an interim application to employ Locke Liddell & Sapp LLP ("LLS") as attorneys for the Committee *nunc pro tunc* to August 10, 2005 (the "Interim Retention Application"). Dkt. 70. In the Interim Retention Application, the Committee sought to employ LLS at 90 percent of its customary hourly rates.[2] *Id*. In the affidavit attached to the Interim Retention Application, Doug Skierski

---

[1]The Court hereby takes judicial notice of its docket in this jointly administered case (the "Case"). *Sec. & Exch. Comm'n v. First Fin. Group of Tex.*, 645 F.2d 429, 433 n.6 (5th Cir. 1981) (noting that "a court may take judicial notice of its own records"). Any reference to the "docket" in this Memorandum Opinion and Order means the docket in case number 05-38756-BJH-11.

[2]At the Final Fee Application Hearing, LLS attempted to characterize this discount as a voluntary 10 percent reduction in LLS's fees. However, the proper characterization of this discount is as an incentive offered by LLS to secure its position as the Committee's counsel—*i.e.*, it was a cost of doing business in order to land the job.

LLS did not disclose what its customary hourly rates were for all LLS professionals who were slated to work on the Case, although Doug Skierski's affidavit lists his normal hourly rate as $300 per hour. LLS also gave notice,

("Skierski") identified himself as being "primarily responsible for LLS's representation of the Committee."[3] *Id*. The Court entered an order granting the Interim Retention Application on September 22, 2005 (the "Interim Retention Order"). Dkt. 134.

On January 6, 2006, the Committee filed an application seeking final approval of LLS's employment *nunc pro tunc* to August 10, 2005 (the "Final Retention Application"). Dkt. 206. The terms of retention—*i.e.*, at 90 percent of LLS's customary hourly rates—were the same as in the Interim Retention Application. *Id*. Contrary to the statement contained in Skierski's affidavit attached to the Interim Retention Application, both Peter Franklin ("Franklin")[4] and Skierski were listed as being primarily responsible for LLS's representation of the Committee in the Final Retention Application.[5] *Id*. After a hearing on March 7, 2006, the Court entered an order granting the Final Retention Application on April 6, 2006 (the "Final Retention Order"). LLS Exh. 5, Dkt. 332.

On October 17, 2005, the Court entered an order allowing LLS to file an application for the interim allowance of fees and expenses incurred from August 10, 2005 through, and including, September 30, 2005 (the "Interim Fee Period"). Dkt. 142. LLS filed its First Interim Application of Locke Liddell & Sapp LLP for Allowance of Compensation and Reimbursement of Expenses (the "Interim Fee Application") on January 13, 2006. Dkt. 212. In the Interim Fee Application, LLS

---

in the affidavit attached to the Interim Retention Application, that LLS's customary hourly rates would be "adjusted from time to time, subject to Court approval."

[3]Skierski was a senior associate with LLS at the time the Interim Retention Application was filed. Skierski has since been named a partner with LLS. Skierski has been in practice since 1998.

[4]Franklin is the most senior partner in LLS's bankruptcy practice group, having over 38 years of experience.

[5]Skierski's affidavit attached to Final Retention Application states that Skierski will be primarily responsible for LLS's representation of the Committee; the affidavit makes no mention of Franklin's role.

sought compensation for legal fees in the amount of $27,531.45 and reimbursement of expenses in the amount of $832.40 (collectively, the "Interim Fees") for the Interim Fee Period. *Id*. After holding a hearing on the Interim Fee Application, the Court awarded LLS the full amount of the Interim Fees, subject to a 20 percent fee holdback pending approval of LLS's fees and expenses on a final basis.[6] Dkt. 273.

On April 6, 2006, the Debtors' fourth amended chapter 11 plan (the "Plan") was confirmed. Dkt. 330. Shortly thereafter, on April 28, 2006, LLS filed the Final Fee Application seeking approval of fees in the amount of $333,636.82 and expenses in the amount of $8,287.27 (collectively, the "Final Fees") for the Final Fee Period. LLS Exh. 1 at 29. The Final Fee Application also sought payment of $5,506.29 in outstanding fees from the First Interim Application and $4,410.00 for services rendered by LLS after the Final Fee Period,[7] as well as final approval of the First Interim Application, for a total request of $351,840.38.[8] *Id*.

The Objecting Parties filed their objections to the Final Fee Application on May 14, 2006 and May 22, 2006, claiming that portions of the Final Fees were both unreasonable and unnecessary, in

---

[6]The Court authorized immediate payment of $22,025.16 in fees and $832.40 in expenses to LLS. The remaining $5,506.29 in fees was held back pending final approval of LLS's fees and expenses. LLS Exh. 1 at 5.

[7]The $4,410.00 represents LLS's request for fees associated with its representation of the Committee after the Final Fee Period. Subsequently, LLS revised its request for fees and expenses incurred after the Final Fee Period to include an additional $32,636.70 in fees and $4,150.89 in expenses, mostly associated with defending the Final Fee Application. LLS Revised Exh. 11.

[8]The $351,840.38 figure represents the $333,636.82 in fees and $8,287.27 in expenses sought for the Final Fee Period, plus the $4,410.00 for fees incurred in representing the Committee after the Final Fee Period and $5,506.29 in fees held back and remaining to be paid from the First Interim Application. LLS neglected to include in the figure the $22,857.56 in fees and expenses authorized and paid under the First Interim Application. Adjusting for this mathematical mistake, the Final Fee Application sought approval of $374,697.94 in fees and expenses. Including the documented fees and expenses (contained in LLS Revised Exhibit 11) sought for representing the Committee after the Final Fee Period, the total fees and expenses requested by LLS were $411,485.53. Moreover, LLS estimated that it incurred an additional $4,052.70 of fees in preparing for and participating in the final day of the Final Fee Application Hearing, bringing the grand total of fees and expenses sought to $415,583.23.

contravention of the provisions of section 330 of the Bankruptcy Code (the "Code"). Dkt. 360, 369. As grounds for their initial objections, the Objecting Parties argued that the fees and expenses incurred by LLS were far out of line with the results obtained for unsecured creditors. In support of their argument, the Objecting Parties specifically alleged that (i) LLS's attorneys engaged in massive duplication of effort and spent excessive time on Committee matters; (ii) LLS billed for excessive amounts of legal research, particularly by one associate; (iii) LLS attorneys improperly "clumped" time entries in contravention of local bankruptcy court guidelines covering fee applications; (iv) LLS sent multiple attorneys to hearings without adequate explanation of the need for more than one attorney; (v) the Final Fee Application contained numerous vague time entries; and (vi) LLS billed unnecessary and unreasonable amounts of time for listening to and leaving voice mail messages. LLS filed its responses to the objections on May 22 and 23, 2006. Dkt. 367, 370.

Supplemental objections, wherein the Objecting Parties focused on seeking disallowance of fees incurred by LLS in defending the Final Fee Application, and a response thereto, were filed thereafter by the Objecting Parties and LLS.[9] After the conclusion of the Final Fee Application Hearing, the Objecting Parties filed their Post Hearing Brief in Support of the Objection to Fee Application of Locke Liddell & Sapp LLP (the "Post-Hearing Brief" or "PHB") on July 31, 2006. Dkt. 408. LLS filed its Response to Post Hearing Brief in Support of the Objection to Fee

---

[9]The Objecting Parties' Supplemental Objection to Fee Application of Locke Liddell & Sapp LLP Regarding Post-Application Fees was filed June 6, 2006. Dkt. 380. The Objecting Parties' Second Supplemental Objection to Fee Application of Locke Liddell & Sapp LLP Regarding Post-Application Fees was filed July 27, 2006. Dkt. 406. The Objecting Parties' Third Supplemental Objection to Fee Application of Locke Liddell & Sapp LLP Regarding Post-Application Fees was filed July 27, 2006. Dkt. 405. LLS's Response to Supplemental Objection to Fee Application of Locke Liddell & Sapp LLP Regarding Post-Application Fee was filed June 7, 2006. Dkt. 381.

Application of Locke Liddell and Sapp LLP (the "Post-Hearing Response" or "PHR") later that same day. Dkt. 409.

## II.    Factual Background and Legal Analysis[10]

Section 330 of the Code provides the legal standard for compensating professional persons employed on behalf of the bankruptcy estate under sections 327 and 1103[11] of the Code. The provisions of section 330 allow the court to award to professional persons "reasonable" compensation for necessary services performed. *See In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005). Section 330 states:

> (a)    (1)    After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
>
> (A)    *reasonable* compensation for actual, *necessary* services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
>
> (B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1) (emphasis added). Section 330 continues by giving guidance as to what

---

[10]For brevity's sake, the Court will lay out the pertinent facts in its legal analysis.

[11]While the language of both the Interim Retention Order and the Final Retention Order (collectively, the "Retention Orders") states that LLS was retained as counsel pursuant to section 327 of the Code, Dkt. 134, 332, LLS Exh. 5, the proper retention provision for committee counsel is section 1103. Section 1103, which deals with the powers and duties of committees in a Chapter 11 case, states:

> (a)    At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

11 U.S.C. § 1103(a) (2000). The Court will address the issues in this Memorandum Opinion and Order as if the Retention Orders recited that retention of LLS as Committee counsel was made under section 1103.

constitutes "reasonable" compensation:

> (3)     *In determining the amount of reasonable compensation* to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
>> (A)     the time spent on such services;
>>
>> (B)     the rates charged for such services;
>>
>> (C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>>
>> (D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>>
>> (E)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (emphasis added). The plain language of section 330(a)(3) makes clear that the factors enumerated therein are not exhaustive in determining what constitutes "reasonable" fees; in fact, "[t]he Fifth Circuit has traditionally used the lodestar method to calculate 'reasonable' attorneys' fees under [section] 330. A court computes the lodestar by multiplying the number of hours an attorney would *reasonably* spend for the same type of work by the prevailing hourly rate in the community." *Cahill*, 428 F.3d at 539-40 (emphasis added). The lodestar is then adjusted up or down based on the factors listed in section 330(a) and the twelve factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).[12] *Id.* at 540. "The lodestar may be

---

[12]The *Johnson* factors include:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;

adjusted according to a *Johnson* factor only if that factor is not already taken into account by the

lodestar." *Transamerican Natural Gas Corp. v. Zapata P'ship, Ltd. (In re Fender)*, 12 F.3d 480,

487 (5th Cir. 1994). The court has "considerable discretion" in applying the *Johnson* factors;

however, "it must explain the weight given to each factor that it considers and how each factor

affects its award." *Cahill*, 428 F.3d at 540.

    While a court does have "considerable discretion" in awarding compensation for reasonable

and necessary services, *id*., section 330(a)(4)(A) specifically states that a

> . . . court shall not allow compensation for—
>
> (i)        unnecessary duplication of services; or
>
> (ii)      services that were not—
>
>> (I)      reasonably likely to benefit the debtor's estate;
>> or
>>
>> (II)     necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A). Where the compensation sought by a fee application is in contravention

of the above strictures,

> (2)      The court may, on its own motion or on the motion of the United
> States Trustee, the United States Trustee for the District or Region, the
> trustee for the estate, or any other party in interest, award

---

(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation and ability of the attorneys;
(10) the undesirability of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19.

> compensation that is less than the amount of compensation that is requested.

11 U.S.C. § 330(a)(2).

There is no fundamental disagreement here as to the legal standard to be applied by the Court in reviewing the bulk of the Final Fee Application.[13] What is in dispute is the reasonableness and necessity of the time billed by LLS, as well as LLS's increase in its hourly rates for services billed in 2006. It is a fee applicant's burden to prove the reasonableness and necessity of fees requested in the fee application. *Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Charles N. Wooten, Ltd. (In re Evangeline Refining Co.)*, 890 F.2d 1312, 1326 (5th Cir. 1989).

At the Final Fee Application Hearing and in the Post-Hearing Brief, the Objecting Parties presented their objections in a three-part format, addressing LLS's fees for the Interim Fee Period, the Final Fee Period, and for the period following the Final Fee Period (the "Post-Final Fee Period").[14] The Objecting Parties' objections were further subdivided into what can be deemed a macro- and micro-analysis of LLS's fees in both the Interim Fee Period and the Final Fee Period. The Court will adopt this presentation format in this Memorandum Opinion and Order.

### A.     LLS's Fees in the Interim Fee Period

#### i.     The Macro-Level of Analysis

The Case began as a fairly typical Chapter 11 case. The Debtors were involved in the computing and telecommunications business, designing systems for the defense electronics industry.

---

[13]There is a disagreement regarding LLS's entitlement to fees incurred in defending the Final Fee Application; that issue will be addressed in detail *infra*.

[14]The Post-Final Fee Period includes fees accrued from April 22, 2006 forward. The amount of fees incurred during the Post-Final Fee Period continually increased at each continuation of the Final Fee Application Hearing and upon the filing of each supplemental pleading regarding the Final Fee Application.

During the Interim Fee Period, the Debtors filed motions (1) for use of the cash collateral of the Bean Group, (2) to obtain post-petition financing from the Bean Group, and (3) to sell certain assets of DNA. Dkt. 10, 13, and 20. The motions to use cash collateral and for post-petition financing were granted on a final basis by the Court on August 24, 2005. Dkt. 88, 89. The motion approving the sale of DNA's assets was granted on September 7, 2005. Dkt. 115. These three transactions constituted the bulk of the activity in the Case during the Interim Period. As noted *supra*, LLS incurred fees of $27,531.45 and expenses of $832.40 during the Interim Fee Period for the work it did on behalf of the Committee.

As pointed out by the Objecting Parties at the Final Fee Application Hearing, LLS's fees and expenses during the Interim Period constituted about one quarter of the fees and expenses incurred by Debtors' counsel, Munsch Hardt Kopf & Harr, P.C., ("Munsch Hardt") during the same time frame.[15] At a macro-level of analysis, the Objecting Parties pointed to the reasonableness of the ratio of LLS's fees and expenses in comparison to Munsch Hardt's fees and expenses. Because the Court already approved the Interim Fee Application, and because no evidence was produced questioning the reasonableness of that award, the Court agrees that, on a macro-level of analysis, the Interim Fees incurred by LLS were reasonable and necessary.

### ii.    The Micro-Level of Analysis

While approving of LLS's fees for the Interim Fee Period at a macro-level of analysis, the

---

[15]On October 21, 2005, Munsch Hardt filed the First Interim Application of Munsch Hardt Kopf & Harr, P.C. for Allowance of Payment of Fees and Reimbursement of Expenses for Services Rendered as Counsel to Debtors-in-Possession (the "Munsch Hardt Interim Fee Application") seeking fees for the Interim Period. Dkt. 147. In the Munsch Hardt Interim Fee Application, Munsch Hardt sought fees of $103,756.50 and expenses of $14,125.44. *Id*. The Court held a hearing on November 15, 2005 and approved the Munsch Hardt Interim Fee Application, allowing Munsch Hardt to be paid 100 percent of its requested expenses and 80 percent of its requested fees. Dkt. 150.

Objecting Parties strenuously object to the allowance of LLS's fees for the Interim Fee Period on a final basis based upon two procedural grounds. First, the Objecting Parties argue that LLS's request for final approval of the Interim Fees was not timely made pursuant to the provisions of the Plan. Second, the Objecting Parties argue that LLS failed to sustain its burden of proof at the Final Fee Application Hearing as to the reasonableness and necessity of the Interim Fees.

Pursuant to the provisions of the Plan, LLS was required to make any application for fees and expenses by May 6, 2006, otherwise the claim for the fees and expenses would be forever barred.[16] While the Objecting Parties concede that LLS timely filed the Final Fee Application, the Objecting Parties argue that because the Final Fee Application did not specifically include the figures for fees and expenses approved in the Interim Fee Application, those fees and expenses should be disallowed on a final basis.

The Court rejects this argument. The Final Fee Application does make a specific request for final approval of the fees contained in the Interim Fee Application. In the "Conclusion" to the Final Fee Application, LLS asks for "final approval of the Interim [Fee] Application." LLS Exh. 1 at 29. While the request for fees in the Final Fee Application is numerically incorrect because it fails to include all of the Interim Fees in the final sum, *see* n. 8, *supra*, the Court will not deny LLS final

---

[16]Section 3.1.1 of the Plan states:

> Holders of Administrative Claims . . . must by no later than the Administrative Claims Bar Date: (x) file an application with the Bankruptcy Court for allowance of the Administrative Claim . . . . Failure to file and serve such application . . . by the Administrative Claims Bar Date shall result in the Administrative Claim being forever barred and discharged.

LLS Exh. 10 at 87. "Administrative Claim" is defined as a claim "for any cost or expense of administration of the [case] under section 503(b) of the Bankruptcy Code." *Id*. at 77. Section 503(b) of the Code allows as an administrative expense "compensation and reimbursement awarded under section 330(a) of this title . . . ." 11 U.S.C. § 503(b)(2). The "Administrative Claims Bar Date" is defined as "the day that is thirty (30) days after the Confirmation Date . . . ." LLS Exh. 10 at 77-78. The Confirmation Date for the Plan was April 6, 2006. Dkt. 330.

recovery of fees in its Interim Fee Application on this technicality. "[I]t is not the purpose of the bankruptcy compensation procedures to penalize professionals for simple oversight . . . ." *In re Computer Learning Centers, Inc.*, 285 B.R. 191, 207 (Bankr. E.D. Va. 2002).[17] LLS's omission, while clearly a mistake, does not rise to a level of egregiousness warranting disallowance of the Interim Fees.[18]

The Objecting Parties further object to final approval of the fees awarded to LLS under the Interim Fee Application on the grounds that LLS did not present any evidence in support of those fees at the Final Fee Application Hearing. Of course, LLS had the burden of proving the reasonableness and necessity of its fees from the Interim Period when seeking final approval of those fees in the Final Fee Application. The Bankruptcy Rules require that detailed statements be made regarding requests for fees and expenses;[19] however, the Fifth Circuit has held that "fee applications failing to reach an 'ideal level of completeness' may suffice." *Evangeline Refining*, 890 F.2d at 1326.

---

[17]At the Final Fee Application Hearing, the Objecting Parties made a passionate argument that LLS's failure to include in the Final Fee Application the request for final approval of the fees awarded for the Interim Period, and LLS's subsequent efforts to seek approval of the Interim Fees at the Final Fee Application Hearing, failed to give proper notice to the Objecting Parties of LLS's total request for fees. The Court finds this argument unpersuasive.

First, the Objecting Parties repeatedly made reference to LLS's fees in the Interim Fee Application as a model of reasonableness in comparison to the fees sought in the Final Fee Application at the Final Fee Application Hearing. In fact, the Post-Hearing Brief recites the reasonableness of the Interim Fees. PHB at 31. To allow the Objecting Parties to now claim surprise or a lack of notice would be to turn a blind eye to the obvious—*i.e.*, the Objecting Parties reviewed the Interim Fee Application and were aware of its contents. Notice was not an issue.

[18]This is but one of many "mistakes" appearing in the Final Fee Application. The Court is concerned about the number of such "mistakes," especially for a firm that asserts that it is entitled to higher hourly rates than that of Debtors' counsel, Munsch Hardt, because it "is a larger, national law firm." PHR at 7 n.10.

[19]Bankruptcy Rule 2016 states in part:

(a)     Application for Compensation and Reimbursement.

An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

It is necessary only that the fee application "be sufficiently detailed and accurate [such] that, in conjunction with any proceeding in connection therewith *and the record in the case*, a court can make an independent evaluation as to what level of fees are actual, necessary and reasonable." *Id*. (emphasis added).

Based on the "record in the Case," which includes the Court's prior hearing on the Interim Fee Application, the Court finds that the request for final approval of the fees awarded in the Interim Fee Application is appropriate. No evidence was produced justifying reconsideration of the Interim Fees. Rather, the Objecting Parties request that the Interim Fees be disallowed on what are essentially procedural grounds.

While an interim fee award is interlocutory in nature and can be reexamined and adjusted by the awarding court, *Evangeline Refining*, 890 F.2d at 1321, the Court sees no reason to take up further review of the reasonableness and necessity of the Interim Fees in the absence of contrary evidence. The Objecting Parties repeatedly referred to and implied the reasonableness of the fees charged by LLS in the Interim Period at the Final Fee Application Hearing and in their Post-Hearing Brief. For instance, in the Post-Hearing Brief, the Objecting Parties stated that during the Interim Fee Period "the estate was administered in an economic and efficient manner. Specifically LLS's fees were reasonable in relation to those of Munsch Hardt . . . ." PHB at 31. It would be disingenuous to allow the Objecting Parties to now assert that the Interim Fees were in any way "unreasonable," in light of this admission. Accordingly, the Court finds the record before it satisfactory and the presentation by LLS in requesting final approval of the Interim Fees adequate.

Because the Court rejects the Objecting Parties' grounds for objecting to final approval of the Interim Fees in the Final Fee Application, the Court will award LLS $27,531.45 in fees and

$832.40 in expenses on a final basis for the Interim Fee Period. Because the Court is not revisiting the substance of its ruling on the Interim Fees, the Court will not undertake further analysis of the Interim Fees using the *Johnson* factors.

### B. LLS's Fees in the Final Fee Period

#### i. The Macro-Level of Analysis

##### a. Reasonableness and Necessity of Fees

Following the Interim Fee Period, the major task remaining to be completed was the formulation and confirmation of a plan of reorganization. The parties struggled to reach this goal, filing a total of eight disclosure statements and seven plans of reorganization[20] before confirming the Plan in April of 2006. The plan formulation and confirmation process can be subdivided into the following four major tasks: (i) the formulation, and attempts at confirmation, of the Joint Proponents' joint plan of reorganization (the "Joint Plan"); (ii) the formulation of the Competing Proponents' competing plan of reorganization (the "Competing Plan"); (iii) the litigation surrounding the attempted withdrawal from the Competing Plan by O. S. Wyatt (the "Wyatt Litigation");[21] and (iv) the litigation surrounding creditor Haynes and Boone, LLP's ("H&B") complaint alleging ownership of the Reliance Claim[22] (the "H&B Litigation").

---

[20]The Debtors' and Bean Group's (collectively, the "Joint Proponents") joint plans of reorganization were filed on November 22, 2005, December 16, 2005, January 6, 2006, February 24, 2006, and March 1, 2006. Dkt. 161, 173, 204, 262, 267. Don Carmichael ("Carmichael"), O. S. Wyatt ("Wyatt"), and S&G Associates (collectively, the "Competing Proponents") filed their plans of reorganization on January 16, 2006 and February 6, 2006. Dkt. 215, 240.

[21]The Wyatt Litigation included a mediation session used to resolve the dispute.

[22]The Reliance Claim was a claim asserted by the Debtors in the Reliance Insurance Company insolvency proceedings in the State of Pennsylvania and allowed in the approximate amount of $1,600,000.00. While the recovery figures are somewhat disputed, the Debtors anticipated a recovery of between $800,000.00 and $1,100,000.00 on the Reliance Claim. These proceeds formed part of the funding of the original Joint Plan.

For its work on these tasks, LLS incurred a total of $333,636.82 in fees and $8,287.27 in expenses for the Final Fee Period, for a total sum of $341,924.09.[23] LLS Exh. 1 at 29. For approximately the same time period, Debtors' counsel, Munsch Hardt, billed a total of $271,543.50 in fees and $26,598.28 in expenses, for a total of $298,141.78.[24] Bean Exh. 1 at 38-39. Counsel for joint plan proponent and secured creditor the Bean Group, Ed Rothberg ("Rothberg"), testified to billing his client approximately $118,200.00 in fees and $8,200.00 in expenses for all his work on the Case. Counsel for the Competing Proponents, Paul Keiffer ("Keiffer"), testified that he incurred fees of approximately $111,000.00[25] for all his work on the Case.[26]

The Objecting Parties object to the overall amount of fees charged by LLS in the Final Fee Period as being "substantially out of line" with Munsch Hardt's, Keiffer's, and Rothberg's fees for the same time period. PHB at 33. Accordingly, the Objecting Parties seek to reduce LLS's fees to $175,000.00 for the Final Fee Period.[27] PHB at 47. To substantiate their argument, the Objecting Parties break down their macro-level objection into a side-by-side comparison of the fees charged

---

[23]The Objecting Parties allege that the fees and expenses charged by LLS during the Final Fee Period total $346,334.09. PHB at 32. This figure incorrectly includes the $4,410.00 for work done after the Final Fee Period. When the $4,410.00 is removed from the figure used by the Objecting Parties, the total amount of fees and expenses billed by LLS in the Final Fee Period is $341,924.09.

[24]Munsch Hardt's fees of $271,543.50 and expenses of $26,598.28 were incurred between September 26, 2005 and April 27, 2006, a time period virtually identical to that of the Final Fee Period. *See* Bean Exh. 1 at 4. Like LLS, Munsch Hardt incurred some additional fees and expenses after April 27, 2006, although those numbers are not relevant to this portion of the Court's analysis.

[25]While Keiffer's total fees were approximately $111,000.00 for his work on the Case, he made a $5,000.00 contribution from his fees to settle the H&B Litigation, and he wrote off an additional $6,000.00 in fees.

[26]Keiffer made his first appearance in the Case during the Final Fee Period in December of 2005, filing an objection to the Joint Proponents' first amended disclosure statement on behalf of Carmichael, one of the Competing Proponents. Dkt. 171, 179.

[27]The $175,000 figure is less than the $200,000.00 figure requested by the Objecting Parties at the Final Fee Application Hearing. No explanation was given for this further demanded decrease.

and tasks undertaken by Munsch Hardt, LLS, Keiffer, and Rothberg.

### 1. The Joint Plan

After the closing of the sale of DNA's assets, the Joint Proponents filed the Joint Plan in late November of 2005. The Joint Plan proposed the creation of a creditors' trust which would be funded with certain of the Debtors' remaining assets and a cash infusion from the Bean Group. However, the Committee and certain other parties objected to the Joint Plan, which led to multiple revisions of the Joint Plan before the Plan was ultimately confirmed in April of 2006.

Munsch Hardt billed $125,159.00 in fees for its work on the Joint Plan.[28] Bean Exh. 1 at 21. In comparison, the Objecting Parties point out that LLS billed $108,396.90 for its work on the Joint Plan. LLS Exh. 1 at 19. The crux of the Objecting Parties' objection to the fees charged by LLS for its work on the Joint Plan is that LLS billed only slightly less during the Final Fee Period than did Munsch Hardt, who carried the laboring oar in formulating and drafting the Joint Plan.[29] According to the Objecting Parties, LLS's duties, as counsel for the Committee, should have been limited to review of the Joint Plan.

The Court agrees with the Objecting Parties' macro-level of analysis regarding LLS's fees for its work on the Joint Plan. While LLS was clearly unhappy with the provisions of the Joint Plan and sought through objections to contest and alter the Joint Plan, it was unreasonable and

---

[28]The $125,159.00 includes $12,520.50 of interim fees incurred by September 25, 2005. Bean Exh. 1 at 21. Thus, the total fees attributable to Munsch Hardt's work on the Joint Plan for what would approximate the Final Fee Period were $112,638.50.

[29]The difference in fees cited in the Post-Hearing Brief is $16,763.00; this number is inaccurate because it compares all the fees charged by Munsch Hardt for work on the Joint Plan against only those fees charged by LLS for its work on the Joint Plan during the Final Fee Period. PHB at 35. When comparing LLS's fees for work on the Joint Plan to those of Munsch Hardt for comparable time periods—*i.e.*, the Final Fee Period—the difference in fees is actually only $4,241.60 in favor of Munsch Hardt. *Compare* Bean Exh. 1 at 21 *with* LLS Exh. 1 at 19.

unnecessary for LLS to incur fees at an approximate one-to-one ratio with Munsch Hardt. In the Court's view, LLS's fees are exceedingly high for the work it did on the Joint Plan.

## 2. The Competing Plan

Because of their dissatisfaction with the Joint Plan, the Competing Proponents filed a motion seeking termination of the Debtors' period of plan exclusivity in order to propose the Competing Plan. The Committee supported the Competing Proponents in their efforts. After a hearing on the exclusivity termination motion, the Court terminated the Debtors' exclusivity, conditioned on the Competing Proponents depositing the sum of $250,000.00 into the registry of the Court to cover certain potential costs to the Debtors' estates caused by the delay in the plan process. After complying with the Court's condition, the Competing Plan was filed.

The Objecting Parties object to the amount of LLS's fees in connection with the Competing Plan. The Objecting Parties again state that LLS's role was limited to one of review of the Competing Plan, while Keiffer, as attorney for the Competing Proponents, took the laboring oar with regard to formulating and drafting the Competing Plan. To support its argument, the Objecting Parties point to LLS's Final Fee Application, wherein LLS stated the following:

E.  <u>Matters Related to the Competing Proponents</u>

. . . .

60.  LLS, on behalf of the Committee, analyzed and negotiated the terms of the Competing Proponents' Disclosure Statement and Plan in an effort to obtain a greater return for unsecured creditors. LLS also thoroughly reviewed and analyzed the treatment afforded the unsecured creditors in the Competing Proponents' Amended Plan and advised the Committee regarding such treatment.

LLS Exh. 1 at 19. Based on this statement, the Objecting Parties argue that LLS's role was, by its

own admission, limited to one of review of the Competing Plan. The Objecting Parties point to the approximate $76,000.00 that LLS billed for its work on the Competing Plan, *see* LLS Exh. 1 at 41-66,[30] as being excessive when compared to Munsch Hardt's $38,663.50 in fees billed for its review of the Competing Plan. Bean Exh. 1 at 23. The Objecting Parties also argue that LLS's fees were clearly excessive when compared to Keiffer's fees of approximately $111,000.00 for the entirety of his work in the Case, including the drafting of the Competing Plan.

While LLS's $76,000.00 in fees billed in connection with the Competing Plan appears excessive, the Court disagrees, in part, with the Objecting Parties' characterization of LLS's role in working on the Competing Plan. Notwithstanding LLS's statement of its role in the Final Fee Application, Skierski testified at the Final Fee Application Hearing to a greater, behind-the-scenes role played by LLS in this process. In fact, Skierski testified that LLS worked to organize the Competing Proponents so that they could compete with the Bean Group and the Debtors in order to give the Committee some leverage in its plan negotiations. Based on this testimony, it is clear to the Court that LLS did more than simply review and monitor the Competing Plan. However, regardless of LLS's level of involvement, the Court is hard-pressed to find that $76,000.00 in fees for LLS's work on the Competing Plan was reasonable and necessary, especially in light of Keiffer's lead role in drafting the Competing Plan and his total billing of $111,000.00 in fees for the entirety

_____

[30]LLS listed $120,137.40 in fees incurred in the Final Fee Period for its work on the Competing Plan. LLS Exh. 1 at 20. This figure includes some of LLS's work on the Wyatt Litigation. Because these two tasks are being treated separately in this Memorandum Opinion and Order, the Court will divide the fees between the two tasks.

As to the Competing Plan, the Court agrees with the Objecting Parties' characterization of time entries listed in the Final Fee Application under the heading "(E) Matters Related to Wyatt Group and Competing Plan" through February 6, 2006 as relating to the Competing Plan. PHB at 37. When Wyatt tried to withdraw his support for the Competing Plan on February 7, 2006, *see* LLS Exh. 1 at 11-12, the matter changed to one of litigation; therefore, all entries from and after February 7, 2006, and all entries under the heading "(K) Matters related to Mediation" in the Final Fee Application, will be allocated to the Wyatt Litigation.

of his involvement in the Case.

### 3. The Wyatt Litigation

The Wyatt Litigation arose out of Competing Proponent O. S. Wyatt's ("Wyatt") attempt to withdraw from the Competing Plan. Wyatt had posted an irrevocable $3,000,000.00 letter of credit guaranteeing the funding of the Competing Plan as a condition to the Court postponing the Joint Plan confirmation process. At the hearing on the disclosure statement for the Competing Plan, Wyatt attempted to withdraw his support for the Competing Plan. The Committee and the Competing Proponents objected to this attempted withdrawal, and the matter devolved into heated litigation. Eventually, after Court-ordered mediation supervised by former bankruptcy judge William Schultz, the parties reached an agreement resolving the matter. Wyatt was given an interest in what was known among the parties as the "Vista Litigation"[31] and a release from his letter of credit in exchange for his agreement to help fund the Joint Plan and a waiver of his claim against the Debtors.

The Objecting Parties object to the amount of LLS's fees charged for its work on the Wyatt Litigation as being excessive. The Objecting Parties again point to Munsch Hardt's billed fees of $16,909.00 for its work on the Wyatt Litigation[32] as the benchmark by which LLS's fees should be judged. Bean Exh. 1 at 24. In comparison, LLS billed approximately $79,000.00 for its efforts on the Wyatt Litigation matter. LLS Exh. 1 at 48-63.

While the Court agrees that LLS's fees are excessive, the Objecting Parties mischaracterize LLS's role in the Wyatt Litigation by limiting it to one of review only. The legal issues presented by

---

[31]The Vista Litigation arose out of a technology licensing and marketing agreement, a technology transfer and support agreement, and a distribution agreement DNA entered into with VISTA Controls, Inc. LLS Exh. 10 at 33.

[32]Munsch Hardt listed its work on the Wyatt Litigation under the subdivision "Mediation" in its final fee application. Bean Exh. 1 at 24.

the Wyatt Litigation were unique, to say the least. And, because it supported the Competing Plan to attempt to secure a higher and better return for unsecured creditors, the Committee (and LLS) could not afford to just monitor the Wyatt Litigation, as the Objecting Parties suggest, and watch the key proponent to the Competing Plan walk away. To do so would have been disastrous to the Committee's efforts to extract more (and better) value for its constituency. Therefore, the type of involvement LLS had in the Wyatt Litigation was warranted, even if the scope and amount of fees was not.[33]

### 4. The H&B Litigation

The H&B Litigation arose out of H&B's initiation of an adversary proceeding on the eve of the Plan confirmation hearing contesting ownership of the Reliance Claim. H&B, who was a member of the Committee, resigned from the Committee and then alleged that it had a direct ownership interest in the proceeds of the Reliance Claim because of its prior representation of the Debtors and certain directors and officers of the Debtors in D&O litigation giving rise to the claim. The likelihood of confirming the Plan was thrown into doubt because the H&B Litigation sought to limit the amount of the Reliance Claim available for distribution under the Plan. As a result, the H&B Litigation gave rise to the Bean Group's threat to withdraw its support for the Plan unless the H&B litigation was resolved, favorably, prior to confirmation of the Plan. Ultimately, the H&B Litigation was resolved prior to confirmation of the Plan when various parties in the Case offered to pay the collective sum of $80,000.00 to H&B over and above its distribution under the Plan as an unsecured creditor.

---

[33]As pointed out in its Post-Hearing Response, LLS correctly notes that the Debtors' stake in the Wyatt Litigation was far less than that of the Committee; thus, it is entirely reasonable to expect LLS to have billed more than Munsch Hardt for work on this matter.

The Objecting Parties object to the scope of LLS's work on the H&B Litigation. Again, the Objecting Parties assert that LLS's role should have been limited to one of review and monitoring Munsch Hardt's and Rothberg's significant work on the matter. The Objecting Parties further argue that LLS overstepped its bounds by getting directly involved in the H&B Litigation.

LLS incurred fees in the amount of $27,499.50 for its work on the H&B Litigation, LLS Exh. 1 at 22, while Munsch Hardt incurred fees in the amount of $28,366.00 for its work on the H&B Litigation. Bean Exh. 1 at 26. The Objecting Parties assert that LLS should take nothing for its efforts on the H&B Litigation because its fees were unnecessary in light of Munsch Hardt's obligation, as Debtors' counsel and Joint Plan proponent, to contest the H&B Litigation.

The Court disagrees. Due to the H&B Litigation arising at the eleventh hour and its threat of derailing the entire Plan confirmation process, which would have undoubtedly hurt unsecured creditors, the Court finds that, on a macro-level, LLS's work on the H&B Litigation was necessary and reasonable. The testimony produced at the Fee Application Hearing made clear that Munsch Hardt and LLS agreed to share responsibility for the H&B Litigation. The evidence is clear that Munsch Hardt and LLS coordinated their efforts to avoid unnecessary duplication. The results obtained benefitted all parties involved, and a substantial portion of the work put into the H&B Litigation by LLS was both reasonable and necessary.

### b.     No Material Benefit

As an additional ground for their objections, the Objecting Parties contend that LLS's efforts outlined in the Final Fee Application resulted in no material benefit to unsecured creditors, thus warranting a reduction in LLS's fees. The Objecting Parties cite to *Andrews & Kurth, LLP v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998) for the proposition

that, in order for services to be compensable by the estate, those services must have resulted in an "identifiable, tangible, and material benefit to the bankruptcy estate." 157 F.3d at 426. A good portion of the Final Fee Application Hearing was devoted by both the Objecting Parties and LLS to discussing what benefit (or the lack thereof) that LLS provided to unsecured creditors during the Final Fee Period.

Notwithstanding the Objecting Parties' vehement objection, the Court is convinced that LLS's efforts ultimately resulted in a material benefit to unsecured creditors. While the percentage recovery to unsecured creditors did not change (approximately 14 percent), their payout went from being contingent, based on the collection of contingent assets under the original plan, to a guaranteed cash payment to be made within 30 days of the effective date under the confirmed Plan. LLS Exh. 10 at 97.

### c. Conclusion

Based on the Court's macro-level analysis of the work done by LLS during the Final Fee Period, especially when compared to the work done by Debtors' counsel Munsch Hardt, and to a lesser degree, that of Keiffer and Rothberg, the Court finds that while LLS did perform reasonable and necessary services that resulted in a material benefit to its constituency, LLS's fees are ultimately excessive for the Final Fee Period and warrant reduction. Based on the Court's review of the record and its extensive experience in dealing with committee fee applications in Chapter 11 cases, the Court would have expected to see fees of no more than $235,000.00 to $240,000.00 for the Committee's counsel during the Final Fee Period in a case such as this. To justify its macro-level analysis, the Court will undertake a micro-level analysis of the individual time entries contained within the Final Fee Application in determining what the reasonable number of hours would have

been for work on the Case by LLS.

### ii. The Micro-Level of Analysis

The Objecting Parties substantiate their macro-level analysis questioning the reasonableness of LLS's fees by making particularized objections to the Final Fee Application entries of LLS. The Post-Hearing Brief summarizes these objections as follows: (i) the Final Fee Application contains clumped time entries in violation of section II.D of General Order 2000-7, Guidelines for Compensation and Expense Reimbursement of Professionals (the "Fee Guidelines"); (ii) the Final Fee Application contains time billed for multiple attorneys attending hearings in violation of Fee Guidelines sections II.E and F; (iii) the Final Fee Application contains vague time entries in violation of Fee Guidelines section II.C; (iv) the Final Fee Application contains an entry where Franklin billed his full hourly rate for travel time in violation of Fee Guidelines section II.G; (v) LLS's increase in its hourly rates in 2006 violates Fee Guidelines section II.D; (vi) the Final Fee Application contains duplicate time entries in violation of Fee Guidelines sections II.E and F; (vii) LLS overstaffed the Case in violation of Fee Guidelines sections II.E and F; (viii) LLS attorneys billed for excessive research that was ultimately unnecessary and unreasonable; and (ix) the Final Fee Application contains time entries for listening and sending voice mails that are unreasonable and unnecessary. PHB at 10.

The Fee Guidelines apply to all fee applications filed in connection with bankruptcy cases pending in this district. *See In re Anderson Grain Corp.*, 222 B.R. 528, 534 (Bankr. N.D. Tex. 1998). The Fee Guidelines assist fee applicants in preparing their fee applications in such a way that the Court can easily make a determination as to the reasonableness and necessity of fees charged for services provided to the estate. The Court will address each of the Objecting Parties' objections with

this in mind.

### a. Objections

### 1. Clumped Time Entries

The Objecting Parties first object to multiple time entries in the Final Fee Application as being "clumped"—*i.e.*, the time for individual tasks is combined and presented in one bulk number. The Objecting Parties summarized their objections related to clumping by providing a demonstrative exhibit attached to their Post-Hearing Brief. PHB at Exh. C.[34] In all, 80.3 hours of time entries constituting $20,503.86 of fees in the Final Fee Application were objected to as being improperly clumped time entries.[35] Based upon the Court's cross-referencing of Exhibit C with the other exhibits to the Post-Hearing Brief and the Final Fee Application itself, the Court finds that the fee figure should be adjusted to $20,503.80.[36]

Section II.D of the Fee Guidelines states:

> If a number of separate tasks are performed on a single day, the fee application should disclose the time spent for each such task, i.e., no "grouping" or "clumping." Minor administrative matters may be lumped together where the aggregate time attributed thereto is relatively minor. A rule of reason applies as to how specific and detailed the breakdown needs to be. For grouped entries, the applicant must accept the Court inferences therefrom.

---

[34]The Court notes that the Post-Hearing Brief and exhibits attached thereto were not introduced into evidence at the Final Fee Application Hearing. However, the Final Fee Application was introduced into evidence, and it contains all the time entries objected to and highlighted in the exhibits to the Post-Hearing Brief. The Court makes reference to the Post-Hearing Brief exhibits only for demonstrative purposes. Many of the objected to time entries appearing in the demonstrative exhibits attached to the Post-Hearing Brief could rightfully be classified in multiple categories, and thus are objectionable on multiple grounds. However, it appears that the Objecting Parties have endeavored to avoid "double-counting" their objections based on the Court's review of the Post-Hearing Brief and exhibits.

[35]Bezdicek's time entries that were objected to are for December 3, 5, 6, 12, and 29, 2005; January 16, 17, 19, 20, 27, 30 (x2), and 31, 2006; February 1, 3, and 7, 2006. LLS Exh. 3.

[36]This 6 cent adjustment represents the correct addition of the numbers included in Exhibit C.

The majority of the complained of clumped time entries (16 of 18) were submitted by Linda Bezdicek ("Bezdicek"), an associate with LLS.[37] Bezdicek's fees for these entries totaled $14,585.40.[38] Skierski acknowledged the clumped time entries at the Final Fee Application Hearing, stating that their inclusion was an oversight on his part and that Bezdicek had since been advised of her mistake.[39]

Based upon the Court's review of LLS's time entries in the Final Fee Application and highlighted in Exhibit C to the Post-Hearing Brief, the Court finds that approximately one half of Bezdicek's time included in the highlighted clumped time entries was reasonable and necessary, warranting fees in the amount of $7,292.70. Bezdicek spent an excessive amount of time on matters that did not warrant her time.[40] For instance, Bezdicek's time entries reference a significant amount of work on the various plans and disclosure statements in the Case. Why Bezdicek was spending so much time on the various plans and disclosure statements is not clear, particularly in light of the fact that both Franklin and Skierski were also doing that work. While Bezdicek undoubtedly performed some services that were reasonable and necessary, the Court cannot discern what portion of each time entry was spent on what the Court views as reasonable tasks, and what portion was unnecessary. LLS did not meet their burden of producing sufficient evidence to prove the necessity of all the time in the clumped time entries. Accordingly, the Court will reduce the time.

---

[37]The remaining two clumped time entries included one by Franklin for fees of $3,283.20 on February 14, 2006 and one by a non-bankruptcy practitioner, Nan Braley ("Braley"), for fees in the amount of $2,635.20 on January 30, 2006.

[38]As adjusted. *See* n. 36, *supra*.

[39]In fact, LLS noted in its Post-Hearing Response that it "failed to catch the clumped entries . . . ." PHR at 5.

[40]Bezdicek joined LLS in 2005 after clerking for two judges over four years.

For essentially the same reasons, Braley's time will be reduced by one half, with the Court awarding $1,317.60 in fees for Braley's work on January 30, 2006. LLS did not adequately explain the necessity of Braley's work. Again, while some portion of the time was undoubtedly reasonable and necessary, the Court cannot award more than half the requested fees without more evidence substantiating the whole of the time entry. Conversely, Franklin's time entry for February 14, 2006 contained work that the Court concludes was both reasonable and necessary. Accordingly, the Court will not reduce Franklin's time entry for this date.

The Court will sustain the Objecting Parties' objection to the clumped time entries contained in Exhibit C to the Post-Hearing Brief in the amount of $8,610.30. The remaining requested fees contained therein will be allowed as being both reasonable and necessary.

## 2. **Multiple Attorneys Appearing at Hearings**

The Objecting Parties next object to multiple time entries in the Final Fee Application where multiple LLS attorneys attended the same hearing or conference. The Objecting Parties summarized the time entries to which they object in Exhibit D to the Post-Hearing Brief. In all, 48.8 hours of time entries constituting $17,573.10 of fees in the Final Fee Application were objected to.[41] Based upon the Court's cross-referencing of Exhibit D with the other exhibits to the Post-Hearing Brief and the Final Fee Application itself, the Court finds that these figures should be adjusted to 42.4 hours and $15,579.00 in fees.[42]

---

[41]The complained of time entries appear on December 20, 2005; January 2, 3, and 30, 2006; February 8, 2006; and March 7, 8, 29, and 31, 2006.

[42]The adjusted time and fee figures represent the correct addition of the time and fee entries included in Exhibit D. Based upon the Court's review, the time entry for Skierski for January 2, 2006, where Skierski prepared for a hearing, was erroneously included in this list. Likewise, the time entries for March 7 and 8, 2006, where Franklin, Skierski, and Melissa Hayward ("Hayward") prepared for a hearing in conjunction with the Final Retention

Section II.E of the Fee Guidelines states:

Professionals should be prepared to explain time spent in conferences with other professionals or paraprofessionals in the same firm. Relevant explanation would include complexity of issues involved and the necessity of more individuals' involvement. Failure to justify this time may result in disallowance of all, or a portion of, fees related to such conferences.

Section II.F of the Fee Guidelines states:

Professionals should be prepared to explain the need for more than one professional or paraprofessional from the same firm at the same court hearing, deposition, or meeting. Failure to justify this time may result in compensation for only the person with the lowest billing rate. The Court acknowledges, however, that in complex chapter 11 cases the need for multiple professionals' involvement will be more common and that in hearings involving multiple or complex issues, a law firm may justifiably be required to utilize multiple attorneys as the circumstances of the case require.

Almost all of the complained of entries involve both Franklin and Skierski preparing for and attending the same hearings. The Objecting Parties ask that LLS only be allowed fees for the attorney with the lowest hourly billing rate attending the hearing. Obviously, either Skierski or Franklin needed to be present at the hearings. However, the Court agrees that both attorneys did not need to be present at the hearings outlined in Exhibit D to the Post-Hearing Brief, based on each attorney's level of skill and experience. The Court is not persuaded by LLS's arguments that Franklin and Skierski prepared for and addressed different aspects of these hearings and therefore both needed to be involved in the hearings. That may have been what happened, but the Court finds such excessive senior-level attorney involvement at hearings neither reasonable nor necessary without greater explanation than that proffered by LLS at the Final Fee Application Hearing.

---

Application, are also erroneously included in this list of objections because only Franklin attended the hearing. Subtracting the time and fees for these erroneous entries, the correct number of hours objected to is 42.4 hours and the correct amount of fees objected to is $15,579.00.

Notwithstanding this determination, the Court cannot agree with the Objecting Parties that only the time for the attorney with the lowest hourly rate should be billed, which in this case is Skierski, because Franklin's expertise may have been more suitable for handling some of the hearings. Accordingly, the Court finds that the reasonable amount of fees necessary to perform the tasks outlined in Exhibit D to the Post-Hearing Brief is one half of that billed. This award addresses the specter of dual and excessive representation complained of by the Objecting Parties, but it also does not completely discount Franklin's involvement. The Court will therefore sustain the Objecting Parties objection in the amount of $7,789.50. The remainder of the fees outlined in Exhibit D will be allowed in their full amount as being both reasonable and necessary.

### 3. Vague Time Entries

The Objecting Parties next object to multiple time entries in the Final Fee Application on the grounds that the entries are vague. The Objecting Parties summarized the time entries to which they object in Exhibit E to the Post-Hearing Brief. In all, 45.2 hours of time entries constituting $14,888.70 of fees in the Final Fee Application were objected to.[43] Based upon the Court's cross-referencing of Exhibit E with the other exhibits to the Post-Hearing Brief and the Final Fee Application itself, the Court finds that these figures should be adjusted to 40.5 hours and $12,485.70.[44]

Section II.C of the Fee Guidelines states:

---

[43]The hearing entries that the Objecting Parties object to for vagueness appear on October 4, 6, 19, and 28, 2005; November 11, 14, 16, 17, 18, 23, and 28, 2005; December 1, 4, 6, 8, 9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 27, 28, and 30, 2005; January 1, 3, 5, 6, 9, 10, 13, 25, and 30, 2006; February 2, 3, 7, 13, and 16, 2006; March 8, 10, 20, and 24, 2006; and April 3, 14, and 17, 2006.

[44]The corrected figures represent the subtraction of duplicate time entries for December 8 and 9, 2005 which were already included in Exhibit A to the Post-Hearing Brief. PHB Exh. E at 3. The remaining .2 subtraction represents a typographical error appearing in the time entry for November 16, 2005. *Id*. at 1.

> At a minimum, time entries should identify the person performing the service, the date(s) performed, what was done, and the subject involved. Mere notations of telephone calls, conferences, research, drafting, etc., without identifying the matter involved, may result in disallowance of the time covered by the entries.

Many of the time entries highlighted in Exhibit E to the Post-Hearing Brief involve the making of or review of communications between LLS and other parties. Others use the cryptic description that "attention" was paid to certain tasks.[45]

The Court agrees that the entries are vague and provide little detail, if any, as to the "who, what, and when" of services performed. While the Objecting Parties seek full denial of these fees, the Court does not agree that all the fees outlined in Exhibit E of the Post-Hearing Brief were unreasonable and unnecessary. However, based upon the Court's review of the complained of time entries, the Court will sustain the Objecting Parties' objection as to the vague time entries in the amount of $9,364.28. LLS simply failed to adequately explain the reasonableness and necessity of the suspect time entries. The whole purpose behind providing detailed time entries is to apprise the Court of what was done so that the Court can make a meaningful assessment of the reasonableness and necessity of services provided. The remainder of the objected to fees will be allowed in their full amount as being reasonable and necessary.

### 4. Travel Time

The Objecting Parties next object to a single time entry in the Final Fee Application on the grounds that Franklin billed his normal hourly rate for travel instead of one half of his hourly rate as required by the Fee Guidelines. Post-Hearing Brief Exh. G. On February 20, 2006, Franklin billed

---

[45]For example, Franklin's entry of December 8, 2005 lists "Attention to objection to disclosure statement (3.0)." LLS Exh. 3 at 6. This entry provides no meaningful description of the actual services performed by Franklin. When questioned at the Final Fee Application about what "attention" meant, Skierski was unable to provide a meaningful answer.

4.5 hours (a fee of $1,944.00) for travel time to and from Houston, Texas.[46] Section II.G of the Fee

Guidelines states that "[t]ravel time is compensable at one-half rates, but work actually done during

travel is fully compensable." The Objecting Parties object to $972.00 of the requested fees for this

travel time. At the Final Fee Application Hearing, LLS agreed that it had billed the full $1,944.00 in

error. Accordingly, the Court will sustain the objection to the fees for travel time in the amount of

$972.00. The remaining amount of fees for travel time will be allowed as reasonable and necessary.

### 5.    Fee Adjustments

The Objecting Parties next object to LLS's billable rate increases that occurred in 2006.

According to the Objecting Parties, LLS failed to adequately explain its rate increases from 2005 to

2006 and failed to demonstrate the reasonableness and necessity of such rate increases. The

Objecting Parties argue that only LLS's 2005 rates should apply to work done on the Case, even

during 2006. Accordingly, the Objecting Parties seek to reduce LLS's fees in the Final Fee

Application by $45,207.80.

Section I.D of the Fee Guidelines states:

Hours and total compensation requested in each application should be aggregated
and itemized as to each professional and paraprofessional who provided
compensable services. Dates of changes in rates should be itemized as well as
reasons for said changes.

This objection goes to the reasonableness of LLS's rates, rather than of LLS's hours billed;

thus, a comparison with the local market is in order. The Final Fee Application does not explain the

reason for the increase in billable rates, but it does note the different rates charged by each

professional. LLS Exh. 3 at 66-69. However, as LLS explained at the Final Fee Application Hearing,

---

[46]Based upon the Court's review, this time entry is accurately listed in the objection.

and as is common knowledge in this district, it is the customary practice of local law firms to review and adjust their billable rates on an annual basis. While Skierski could not provide specifics about the review process LLS undertook in adjusting its hourly rates, the Court is satisfied by the explanation offered. Moreover, the rate increases objected to were not so large as to overly concern the Court.[47] The plain language of the Interim Retention Application and the Final Retention Application left LLS some room in adjusting its rates on a periodic basis. *See* n. 2, *supra*. The Court will overrule the Objecting Parties' objection as to the rate increase and allow LLS its fees at the increased hourly rates, except where otherwise disallowed in this Memorandum Opinion and Order.

### 6. Duplicate Time Entries

The Objecting Parties next object to multiple time entries in the Final Fee Application on the grounds that the entries represent the unnecessary duplication of, or excessive work by, LLS attorneys. The Objecting Parties summarized the time entries to which they object in Exhibit A to the Post-Hearing Brief. In all, 234.1 hours of time entries constituting $77,285.85 of fees in the Final Fee Application were objected to.[48] Based upon the Court's cross-referencing of Exhibit A with the other exhibits to the Post-Hearing Brief and the Final Fee Application itself, the Court finds that these

---

[47]Much was made of the increase in Bezdicek's hourly rate, which increased from $135.00 per hour in 2005 to $261.00 per hour in 2006. *See* LLS Exh. 3 at 66-69. Skierski explained the reason for the increase as being because Bezdicek was mistakenly billed out as a first-year associate in 2005, instead of as a fifth-year associate, as her experience warranted.

[48]The Objecting Parties broke down the objected to time entries by project classification and date as follows: (i) Administrative Matters—February 13, 2006; April 17 and 21, 2006; (ii) Bean Group (Joint Plan)—November 16, 23, 24, 25, 28, and 30, 2005; December 1, 6, 7, 8, 9, 13, 14, 15, 16, 17, 19, and 20, 2005; January 4, 2006; February 23, 24, and 27, 2006; March 1 and 2, 2006; April 3, 2006; (iii) Matters Related to Haynes and Boone Dispute—March 22, 29, 30, 31, 2006; April 3 and 4, 2006; (iv) Matter Relating to Mediation—February 9, 10, 13, 14, 15, 19, 2006; (v) Matters Related to Competing Proponents—December 20, 2006; January 10, 17, 18, 20, and 31, 2006; February 1, 2, 3, and 6, 2006; (vi) Wyatt Motion to Withdraw—February 7, 8, 15, 16, and 17, 2006; (vii) Cash Collateral—January 20, 24, 25, and 26, 2006; (viii) Fee Application—April 5, 6, and 10, 2006; (ix) Vista Litigation—February 15, 2006; March 10, 2006.

**Memorandum Opinion and Order** **Page 31**

figures should be adjusted to 226.2 hours and $74,958.85.[49]

The Objecting Parties support their objection by citing to sections II.E and F of the Fee Guidelines for the proposition that, unless otherwise explained, only one attorney should bill time for each task. The Court agrees with this logic fundamentally, though not with the numbers posed by the Objecting Parties. Based upon the Court's review of the time entries in Exhibit A to the Post-Hearing Brief, the Court will sustain the Objecting Parties' objection as to half of the requested amount, or $37,479.43.

The Case was clearly overstaffed by LLS, and a large portion of the billed time that appears in Exhibit A to the Post-Hearing Brief appears unnecessary. For instance, Bezdicek billed at least 29.9 hours for work on the Joint Plan, even though both Skierski and Franklin billed extensive time on the matter. Why a newly practicing associate needed to bill so much time for such work, in light of the senior-level attorneys already handling the matter, is unexplained on this record. Similarly, both Franklin and Skierski simultaneously billed heavily on other portions of the Case, including on the Wyatt mediation, the Wyatt Litigation, and the Competing Plan. Again, the Court remains unpersuaded that two such senior-level attorneys were needed to handle these matters. While Skierski, as a senior associate and later, a junior partner, may have needed some guidance from Franklin, and while it is reasonable to expect Franklin to bill some time for his supervision of Skierski, it is unreasonable to have *both* billing so heavily for these tasks.

Notwithstanding the obvious excessive billing apparent in these examples and throughout

---

[49]The adjusted hour figure represents the correct addition of the time entries listed in Exhibit A, as well as the subtraction of duplicate time entries appearing for November 28 (listed as November 24 in one location) and December 19, 2005, and February 15 and March 30, 2006. PHB Exh. A at 2, 4, 5. Additionally, the Court could find no time entries in the Final Fee Application corresponding to the objection to Skierski's February 24, 2006 work on the disclosure statement or his April 3, 2006 work on the confirmation order. *Id*. at 3. The adjusted fee figure, by and large, represents the subtraction of the fees associated with these duplicate or missing entries.

the Final Fee Application, a portion of the objected to fees was reasonable and necessary. Therefore, based on the Court's review of the time entries in the Final Fee Application and highlighted in Exhibit A to the Post-Hearing Brief, the Court finds that the remaining fees objected to in Exhibit A should be allowed in their full amount as being both reasonable and necessary.

### 7. Overstaffing

The Objecting Parties next objection deals with LLS's staffing of the Case. In a nutshell, the Objecting Parties seek to have Franklin's fees denied in full or reduced to the hourly rate of Skierski, who swore in the affidavits attached to both the Interim Retention Application and the Final Retention Application that he was the attorney primarily responsible for representing the Committee. The Objecting Parties again point to sections II.E and F of the Fee Guidelines to support their objection. The Objecting Parties also point to Munsch Hardt's, Keiffer's, and Rothberg's staffing of the Case as benchmarks by which to measure LLS's staffing decisions. For instance, Munsch Hardt primarily utilized one partner, Joe Wielebinski ("Wielebinski"), one associate, Davor Rukavina ("Rukavina"), and one paralegal, Audrey Monlezun ("Monlezun"), to handle over 93 percent of the time Munsch Hardt billed on the Case. Bean Exh. 1 at 38.[50] In comparison, LLS extensively utilized two partners, Franklin and Skierski,[51] two associates, Bezdicek and Hayward, and no paralegal for its work on the Case. LLS Exh. 3 at 66-69. These four individual attorneys billed approximately 98 percent of LLS's time spent on the Case. *Id*.

---

[50]Because Keiffer and Rothberg were not employed by the estate, they have no fee applications on file with which to compare LLS's fees. Rather, comparison was made to Keiffer's and Rothberg's testimony as to the fees they billed to their respective clients.

[51]In all fairness, Skierski was a senior-level associate at the commencement of the Case, and he was later promoted to partner during its pendency. Once Skierski was promoted, though, there were no other mid- to high-level associates in LLS's bankruptcy practice group available to work on the Case. Skierski testified, in fact, that there were no other bankruptcy associates in LLS's bankruptcy practice group until Bezdicek and Hayward were hired in 2005, both of whom were new to private practice.

As a more telling example of the overstaffing of the Case, the Objecting Parties compare the total hours billed by the primary attorneys involved for both Munsch Hardt and LLS. For Munsch Hardt, Wielebinski billed 289.1 hours, Rukavina billed 509.5 hours, and Monlezun (a paralegal) billed 110.8 hours. Bean Exh. 1 at 38. In comparison, for LLS, Franklin billed 419.7 hours, Skierski billed 229.9 hours, Bezdicek billed 354.7 hours, and Hayward billed 120.9 hours, with no paralegal involvement. LLS Exh. 3 at 66-69.

Just looking at these numbers and ignoring the minor additional fees billed by other attorneys and paraprofessionals at each firm, it is clear to the Court that LLS was "top-heavy" in partner hours spent on the Case, as well as "bottom-heavy" in associate hours. LLS's ratio of partner-to-associate hours is not what the Court would expect to see in a reasonably staffed case of this size and complexity.

While the Court agrees with the Objecting Parties' conclusion that LLS overstaffed the Case, it will overrule their objection as to a straight denial of Franklin's hours or a reduction in Franklin's rate to that of Skierski's. The Court instead uses the analysis contained in this particular objection as a factor in considering the overall reasonableness and necessity of hours billed by LLS.

### 8. Excessive Research

The Objecting Parties next object to multiple time entries in the Final Fee Application on the grounds that the entries are for excessive research time billed by attorneys at LLS. The Objecting Parties summarized the time entries to which they object in Exhibit B to the Post-Hearing Brief. In all, 222.5 hours of time entries constituting $45,381.00 of fees in the Final Fee Application were objected to. Based upon the Court's cross-referencing of Exhibit B with the other exhibits to the Post-Hearing Brief and the Final Fee Application itself, the Court finds that these figures should be

adjusted to 222.3 hours and $42,381.90 in fees.[52]  The Objecting Parties subdivided their objection according to research done on (i) Joint Plan matters and (ii) Competing Plan matters.

Regarding Joint Plan Matters, 127.4 hours of time entries constituting $18,702.00[53] were objected to.  All of this research was completed by Bezdicek, and it included research on (i) the absolute priority rule, (ii) "fair and equitable" treatment, (iii) good faith/bad faith, (iv) treatment of administrative claims, (v) negative solicitation, and (vi) review of ALI/ABA materials.[54]  Based upon the Court's review of the time entries objected to in Exhibit B of the Post-Hearing Brief, the Court finds that LLS's time billed for research was clearly excessive and beyond that reasonable and necessary for the handling of the Case.  The enumerated research issues are not novel, and considering the fact that two partners, including LLS's most senior bankruptcy partner, worked on the Case, it was neither reasonable nor necessary to bill for this research here.[55]  While LLS argued that this research was necessary due to the unique facts of the Case, the Court disagrees in large part.  LLS did not meet its burden of proving that research on typical Chapter 11 issues such as these was either reasonable or necessary.  Accordingly, the Court will sustain the Objecting Parties' objection to the fees charged in conjunction with the research done on the Joint Plan in the amount of

---

[52]The 222.3 hour figure represents the correct addition of the time entries objected to.  The corrected fee figure represents an addition of 90 cents for an incorrect time entry appearing for January 13, 2006 and the correction of an addition error of $3,000.00 for the time entries relating to research done under the heading "Matters Related to Competing Proponents Plan."  PHB Exh. B at 2-3.

[53]These are the correct hour and fee figures.  *See* n. 52, *supra*.

[54]The time entries in question appear on November 17, 18, 22, 25, 28, 29, and 30, 2005; December 7, 8, 9, 14, 15, 21, 22, 27, 28, and 30, 2005; January 2, 10, 11, 12, and 13, 2006.

[55]Part of the rationale of paying for high-priced partner work in a bankruptcy case is that you get more for your money—*i.e.*, straightforward and typical issues such as the absolute priority rule and good faith do not need to be researched because it is expected that partners know this material.  While some research might have been necessary here for unusual quirks that can appear in Chapter 11 cases, LLS simply failed to carry its burden of proving the necessity and reasonableness of the research conducted here.

$16,831.80.

Regarding Competing Plan matters, 94.9 hours of time entries constituting $23,679.90[56] was objected to. Again, most of this research was completed by Bezdicek, this time at her 2006 rates.[57] Again, the Court finds this time clearly excessive, although the Court does agree with LLS that there were some unique issues presented by Wyatt's attempt to withdraw from the Competing Plan. Based upon the Court's review of the time entries contained in Exhibit B to the Post-Hearing Brief, the Court finds that approximately one half of the time objected to and billed by LLS in conjunction with the research completed on the Competing Plan matters was reasonable and necessary. Again, LLS did not meet its burden of proving that the entirety of the fees sought were both reasonable and necessary. Accordingly, the Court will sustain the Objecting Parties' objection in the amount of $11,839.95. The remaining fees requested will be allowed in full.

### 9. Reasonableness of Fees Related to Voice Mail Entries

The Objecting Parties next object to multiple time entries in the Final Fee Application on the grounds that the entries are for unreasonable charges billed by LLS attorneys relating to sending and receiving voice mail messages. The Objecting Parties summarized the time entries to which they object in Exhibit F to the Post-Hearing Brief. In all, 2.7 hours of time entries constituting $883.80 of fees in the Final Fee Application were objected to.[58]

In support of their objection, the Objecting Parties again cite to section II.C of the Fee

---

[56]This is the correct fee figure. *See* n. 52, *supra*.

[57]As noted earlier, Bezdicek was mistakenly billed at a first-year associate rate in 2005. In 2006, her rate was increased to that of a fifth-year associate.

[58]The time entries at issue appear on the Final Fee Application on October 5, 12, and 18, 2005; November 11, 13, and 29, 2005; December 8 and 13, 2005; January 4, 2006; February 2, 14, and 16, 2006; and March 21 and 24, 2006. Based upon the Court's review, these time entries are accurately listed in the objection.

**Memorandum Opinion and Order** **Page 36**

Guidelines, noting that "[m]ere notations of telephone calls . . . without identifying matter involved, may result in disallowance of the time covered by the entries." Most of these time entries are for one-tenth of an hour. The Objecting Parties argue that it does not take six minutes to leave or review a voice mail message. The Objecting Parties further argue that billing for such time is unreasonable, unnecessary, and not customary.

The Court disagrees with this analysis in part. It is quite common for attorneys to bill for time spent sending and receiving voice mail messages. The Court reviews and approves fee applications containing such time entries on a daily basis. However, the Court does take issue with the vagueness of many of the time entries wherein nothing more than the leaving of a voice mail is indicated. Without further description as to the "who, what, and when" behind leaving the voice mail, the Court cannot adequately determine the reasonableness and necessity of such time entries. Based upon the Court's review of the time entries contained in Exhibit F to the Post-Hearing Brief, and based on the lack of evidence substantiating the reasonableness and necessity of such voice mail messages, the Court will sustain the Objecting Parties' objection in the amount of $441.90. Because some of the time billed was reasonable and necessary, the Court will allow the remaining fees objected to in their full amount.

### b.    Conclusion

Based upon the Court's review of the Objecting Parties' objections on a micro-level of analysis, the Court concludes that $93,329.16 in fees billed by LLS for the Final Fee Period in the Final Fee Application were unreasonable or unnecessary. While LLS did provide material benefit to the unsecured creditors in the Case and ultimately supported confirmation of the Plan, LLS simply overstaffed the Case. In the Court's view, and generally speaking, one partner, one associate, and

one paralegal would have been sufficient to handle substantially all of the matters raised in the Case, much like Munsch Hardt staffed the Case.[59]

While admitting mistakes in the Final Fee Application, LLS pointed to its voluntary fee reductions in the Case as a good faith effort on its part to account for any excesses. First, LLS pointed to the 10 percent discount of its normal hourly rates in obtaining the job as counsel for the Committee; next, LLS pointed to its additional voluntary 5 percent reduction of the Final Fees; finally, LLS noted that, even though there were problems with Bezdicek's entries in the Final Fee Application, she was billed mistakenly at a first-year associate rate for some time, resulting in a substantial reduction in the fees that would normally have been charged for Bezdicek's work.[60] While the Court appreciates the self-policing measures taken by LLS to try and make up for any problems with the Final Fee Application, the simple truth is that these measures did not sufficiently address the extent of unreasonable and unnecessary time billed by LLS in the Case.[61]

The Court will allow LLS's fees in the amount of $240,307.66 and expenses in the amount of $8,287.27 for the Final Fee Period.[62] The fees allowed represent the Court's determination of the

---

[59]LLS billed for no paralegal time, though it did bill a minimal number of hours for the firm librarian. *See* LLS exh 1 at 3. When questioned about the lack of paralegal time, Skierski testified that the firm sometimes uses associates to perform tasks a paralegal normally would, or the firm uses its secretarial staff to perform the work. Skierski testified that LLS does not bill for secretarial time. Skierski did not give an accounting as to how much "paralegal" work was done by secretaries and how much was handled by associates of the firm.

[60]Skierski noted that LLS did not try to recover the fees lost by this billing error. In all, LLS claimed to have voluntarily reduced its fees by approximately $85,000.00, based on a demonstrative exhibit handed to the Court during the Final Fee Application Hearing.

[61]The Court notes that, with any fee application of this magnitude, there are likely to be mistakes and areas of excess. Often, the doggedness of the objector determines to what extent these issues are addressed. It is not the presence of mistakes or even minor excess in a fee application that concerns the Court; rather, it is the extent of the excesses and mistakes, such as those present in the Final Fee Application, which trouble the Court.

[62]The Court arrived at this figure by taking the total fees requested for the Final Fee Period ($333,636.82) and subtracting for LLS's clumped time entries ($8,610.30), the appearance of multiple attorneys at hearing and conferences ($7,789.50), vague time entries ($9,364.28), excessive travel fees ($972.00), duplicate time entries ($37,479.43), excessive research ($28,671.75), and vague voice mails ($441.90). Expenses incurred during the

**Memorandum Opinion and Order** **Page 38**

lodestar—*i.e.*, the number of hours LLS should reasonably have spent, multiplied by the going market rate.[63] Because the Court's focus was on determining the number of reasonable hours billed for necessary services by LLS, the Court sees no reason to disturb its calculated lodestar. Therefore, further adjustment of the lodestar using the *Johnson* factors is unnecessary.

### C. Post-Final Fee Period Fees

In the Final Fee Application, LLS requested approval of $4,410.00 in anticipated fees in connection with its representation of the Committee during the Post-Final Fee Period. LLS Exh. 1 at 28-29. LLS did not provide documentation in the Final Fee Application as to the breakdown of these anticipated fees. In the course of defending the Final Fee Application, LLS amended its request for Post-Final Fee Period fees and expenses, requesting compensation in the amount of $37,046.70 in fees and $4,150.89 in expenses. LLS Revised Exh. 11. The Objecting Parties filed multiple supplemental objections to the allowance of the Post-Final Period Fees. *See* n. 9, *supra*. Whether LLS is entitled to a recovery of fees for defending the Final Fee Application constitutes the sole contested legal issue in this matter.

Section 330(a)(6) of the Code states that "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. § 330(a)(6). LLS argues that it is entitled to fees not only incurred in preparing the Final Fee Application, but also for its defense of the Final Fee Application against the

---

Final Fee Period were allowed in full.

[63]While the Objecting Parties made much of what they considered to be unauthorized and unreasonable rate increases on the part of LLS between 2005 and 2006, there was no evidence offered by the Objecting Parties to suggest that LLS's adjusted rates were out of line with other firms of its size in the local bankruptcy market. To the contrary, LLS's rates outlined in the Final Fee Application are consistent with the hourly rates this Court sees in fee applications from firms of LLS's stature.

objections of the Objecting Parties. The Objecting Parties disagree, instead asserting that because compensation is only available for services that were reasonable and necessary to the administration of the estate pursuant to the mandates of section 330, and because the estate did not benefit in any way from the fees generated by LLS in defending the Final Fee Application, no fees should be allowed for the Post-Final Fee Period.

There is authority for both positions. As pointed out by LLS in its Response to Supplemental Objection to Fee Application of Locke Liddell & Sapp LLP Regarding Post-Application Fees (the "Post-Final Fee Period Response"), some courts have allowed for the recovery of fees incurred in defense of an attorney's fee application. *See e.g., Smith v. Edwards & Hale, Ltd. (In re Smith)*, 317 F.3d 918, 928 (9th Cir. 2002) (allowing recovery of fees incurred in defending fee application where fee applicant made showing that services satisfied requirements of section 330(a)(4)(A) and that circumstances of case exemplified situation where costs incurred defending fee application were necessary pursuant to section 330(a)(1)). In contrast, the Objecting Parties point to cases such as *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 882-83 (11th Cir. 1990) (denying attorney's request for fees incurred in defending against debtor's appeal of original fee award on grounds that fees were not reasonable nor necessary to administration of the bankruptcy estate) and *Boldt v. Crake (In re Riverside-Linden Investment Co.)*, 945 F.2d 320, 323 (9th Cir. 1991) (denying fees incurred in defense of fee application when most of objections to fee application were sustained).

Based upon the Court's research, it appears that neither the Fifth Circuit nor the Northern District of Texas has addressed this issue. The Court is disinclined to choose between a per se rule granting or denying recovery in all situations. A better disposition was announced in *In re St. Rita's*

*Assocs. Private Placement, L.P.*, 260 B.R. 650 (Bankr. W.D.N.Y. 2001). In that case, it was held that

while debtor's counsel was entitled to be compensated for the preparation of its fee application

pursuant to section 330(a)(6), it was not entitled to compensation for defending its fee application

against objections thereto, especially since the objections were filed in good faith and ultimately

resulted in a partial disallowance of the requested fees. 260 B.R. at 652. The *St. Rita's* court

reasoned that such a rule comported with the "American rule" of recovery,[64] applicable to fee

disputes occurring outside the realm of bankruptcy. *Id*. The court did not go so far as to preclude

any recovery of attorney fees incurred in defending a fee application—in fact, it left open the door

to recovery of such fees where sanctions are appropriate for the filing of inappropriate objections.

*Id*. A careful reading of the *Riverside-Linden* and *Smith* cases, cited above for differing

propositions, supports the *St. Rita's* compromising analysis.

The Court is further convinced that *St. Rita's* analysis is proper when read in conjunction

with the specific provisions of section 330(a)(3)(E), which requires the Court to consider "whether

the compensation [sought] is reasonable based on the customary compensation charged by

comparably skilled practitioners in cases *other than cases under this title*." (Emphasis added); *see*

*also Anderson Grain*, 222 B.R. at 532 (noting that "bankruptcy courts need to be mindful that

financial rewards to attorneys in bankruptcy court should be comparable to what they could achieve

in other areas of commercial practice"). Because the American Rule applies absent explicit statutory

or contractual authority, and because the Code contains no statutory provision for the recovery of

---

[64]Cases brought under federal law are subject to the "American Rule," and the prevailing party cannot recover attorney's fees absent specific statutory authority, a contractual right, or certain special circumstances. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255-60 (1975); *see also Galveston County Navigation Dist. No. 1 v. Hopson Towing Co., Inc.*, 92 F.3d 353, 356 (5th Cir. 1996) (noting that "[g]enerally, absent statute or enforceable contract, litigants must pay their own attorneys' fees"). The American Rule applies to litigation in the bankruptcy courts. *In re S.S.*, 271 B.R. 240, 245 (Bankr. D.N.J. 2002).

**Memorandum Opinion and Order** **Page 41**

attorney fees for *defending* a fee application, counsel should not normally be able to recover fees for defending a fee application in the bankruptcy court.

Because the Court finds that the Objecting Parties' objections were filed in good faith and were meritorious in significant part, the Court will deny the recovery of the Post-Final Fee Period fees sought by LLS to the extent that such fees were incurred in its defending the Final Fee Application.

Notwithstanding the denial of LLS's fees incurred in defending the Final Fee Application, LLS is entitled to recovery of its fees for preparing the Final Fee Application. 11 U.S.C. § 330(a)(6); *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir. 1980) (noting that it would be "unduly penurious" to require preparation of a fee application without granting reasonable compensation therefor). LLS introduced into evidence documentation of $3,778.20 in fees incurred in preparation of the Final Fee Application (the "Preparation Fees") beyond those fees and expenses included in the Final Fee Application.[65] LLS Revised Exh. 11 at 8. After careful review, the Court is satisfied that LLS has met its burden as to the reasonableness and necessity of the Preparation Fees. The Court will award no expenses for the preparation of the Final Fee Application beyond those expenses contained in the Final Fee Application itself, because the documentation provided to the Court in LLS's Revised Exhibit 11 does not spell out what portion of the $4,150.89 in submitted expenses is attributable to preparation, versus defense, of the Final Fee Application, nor did LLS carry its burden of proving the reasonableness and necessity of these Post-Final Fee Period

---

[65]LLS's Revised Exhibit 11, introduced at the July 26, 2006 hearing, lists $4,197.60 in fees incurred by LLS under the heading "Matters Related to Fee Application." From this number, the Court subtracted fees of $419.40 for time entries appearing after April 28, 2006, the date the Final Fee Application was filed. *See* LLS Revised Exh. 11 at 8. Note that these fees are in addition to the fees already included in the Final Fee Application that relate to the preparation of the Final Fee Application. LLS Exh. 1 at 3, 32-33.

expenses. *See id*. at 8.

### III.    Conclusion

Based upon the Court's review of the Final Fee Application and the objections thereto, it is hereby:

**ORDERED** that LLS is awarded $271,617.31 in fees and $9,119.67 in expenses on a final basis pursuant to the Final Fee Application, for a total payment of $280,736.98; and it is further

**ORDERED** that LLS's recovery of these fees and expenses on a final basis be reduced by any amount previously recovered from the estate by LLS.

###End of Order###